**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IN RE PETITION OF PINEWOOD TECHNOLOGIES ASIA PACIFIC LIMITED FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 | Case No. 24-mc-60119 |

**MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR**
**JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

Pinewood Technologies Asia Pacific Limited ("PWAP") hereby petitions for an order of judicial assistance, pursuant to 28 U.S.C. § 1782, appointing Tara J. Plochocki, Esq. as a Commissioner of the Court to facilitate subpoenas for the gathering of documentary and testamentary evidence from William Berman, the Chief Executive Officer of Pendragon PLC, who "resides in" or is "found in" the Southern District of Florida. Petitioner aims to obtain limited, but critical, discovery for use in connection with a fraud claim which Petitioner intends to file in an ongoing legal proceeding against Pinewood Technologies PLC ("PWUK") in the High Court of Justice Business and Property Court of England and Wales, Technology and Construction Court.

**FACTUAL BACKGROUND**

**A. Parties and Relevant Agreements**

Petitioner is a corporate entity of recent vintage. It was formed in 2017 by David Neilsen and Josephine Lee, each of whom has deep experience in technology/software and the Asia Pacific market, for the sole purpose of promoting and selling PWUK's Dealer Management System ("DMS") to auto dealers and manufacturers in the Asia Pacific region. Declaration of Abigail Healey ("Healey Decl."), ¶¶ 4-5, Ex. 1 ¶ 6, Exs. 2-3. Most Asian auto dealerships used

1

local DMS software, which was tailored to their legal and commercial specifications. *Id.* ¶ 6, Ex. 4. PWAP proposed to break into the Asian Pacific market for PWUK using Neilsen and Lee's expansive connections in the region to persuade customers to switch over to a UK-based software program. *Id.* Ex. 1 ¶ 7. The Reseller Agreement, entered June 2017 between PWAP and PWUK, reflected the terms of this arrangement. *Id.* ¶ 7, Ex. 5. In short, PWUK licensed PWAP as the exclusive reseller of the DMS in certain "Territories" of the Asia Pacific, among them, Hong Kong, Vietnam, Thailand, and the Philippines. In return, the Reseller Agreement required PWAP to pay monthly fees to PWUK calculated based on the number of user accounts its customers created.

      To say that PWAP succeeded would be an understatement. Within the first two years, PWAP entered nine contracts with dealerships and sold 631 user accounts; the Reseller Agreement's target number had been 250 user accounts. *Id.* ¶ 8, Ex. 6 at ¶ 22; *id.* ¶ 7, Ex. 5 § 5. PWAP doubled down and sought to expand sales to new Territories. Based on its cultivation of contacts in Japan, in January 2019, PWUK offered PWAP a Second Reseller Agreement, identical to the first. *Id.* ¶ 9, Ex. 7. In Japan, PWAP entered into framework agreements with three Original Equipment Manufacturers, 30 dealerships, and generated 764 user accounts, nearly double the target set in the Second Reseller Agreement. *Id.* ¶ 8, Ex. 6 at ¶ 24.

      While the Reseller Agreements were in effect, PWUK was not permitted to directly contact customers in PWAP's Territories. Only if the Agreement were to expire or terminate could it communicate directly with signed customers. Exs. 5, 7 § 4.1. Otherwise, if PWUK wanted to take over Asia Pacific for itself and capture the fees generated by all PWAP's work, then it could buy it out. *Id.* § 2.2. The Reseller Agreement specifically authorized a buyout upon three years' notice and set the price at 4x the amount PWUK had invoiced PWAP in the previous

12 months, as relevant.  Given PWAP's success in the region, this would have been a significant number in any year of the contract.

PWUK wanted PWAP's customers, operations, and territories, but did not want to pay for them.  PWUK thus resorted to the cheapest way of doing business:  it stole what it wanted.  Under the guise of pitching further work with PWAP to new management, PWUK tricked PWAP into sharing its contacts, immediate and long-term expansion strategies, projections, and labor, only to terminate both Reseller Agreements and walk away, leaving PWAP with nothing but sunk costs incurred in its good faith attempts to expand PWUK's reach in the Asia Pacific region.  Under English law, this constitutes fraud.  Healey Decl. ¶¶ 11.  PWAP seeks evidence to support that claim, which will be filed as an additional claim in an existing lawsuit for breach of contract pending in the English courts.

**B.  PWUK's Failure to Perform**

PWUK effected its fraud by procuring proprietary information on an accelerated basis and under false pretenses while decelerating the software fixes required by PWAP's customers, impairing its ability to collect fees.

The DMS software was not plug-and-play in the Asia Pacific; software adjustments (termed Development Items) were essential to enabling the Asia Pacific customers to use the DMS to run their dealerships.  These refinements were contractually required of PWUK; sales of DMS would not be particularly effective if the customers could not use the software being sold.  Thus, the Reseller Agreements expressly required adjustments based on the legal requirements of the territory, the franchise's own idiosyncratic requirements, and updates to the software.  Sometimes, a customer would require tweaking because of need particular to the locality.  For example, Japanese customers needed the software to perform currency rounding, because the Japanese yen cannot be invoiced in decimal points.  *See* Healey Decl. ¶ 8, Ex. 6 ¶ 17.3 n.2.

3

PWAP itself could not make any changes to the DMS.  Thus, for the DMS to be functional in particular markets, PWUK had to make localization adjustments or forego that customer/locality, regardless of whether that adjustment was characterized as a legal or franchise or other requirement.  Given that the parties had an entire agreement devoted to selling the DMS in Japan, PWUK had an obligation to make the DMS usable.

Unless and until PWUK properly developed software for the localization requirements and met the other express contractual requirements, the system could not be rolled out to its users and no revenue could be generated from the customers.  PWAP continued to sink time and money into the large-scale implementation projects in Japan, into building out an organization able to provide necessary customer support in its clients' countries and into signing up customers but was stymied by the inability to deliver functional software.  *Id.* ¶ 11.  For customers in South-East Asia who had gone live with the DMS, significant gaps in the implementation remained.  In consequence, PWAP was unable to collect the full user fees from some customers, and tried to implement a separate system as a work-around solutions for some Development Items where this was possible.  For this reason, a course of dealing evolved whereby PWAP refrained from claiming breach for PWUK's failure to make adjustments to the software, and PWUK did not demand immediate payment of its invoices to PWAP, since PWAP's liquidity was affected by PWUK's own non-performance.  This left PWAP in a vulnerable position, but it trusted the good faith of its counterpart and proceeded to fulfill its mandate to expand DMS users in the Asia Pacific territories.  *Id*.

### C.  PWUK Defrauds PWAP of Its Entire Business

During the performance of the agreements, there were no disputes between PWUK and PWAP about whether PWUK was, in fact, required to make the DMS usable to the customers PWAP secured.  The relationship had been productive and cooperative but took a turn when the

4

CEO of Pendragon—PWUK's parent corporation—retired after 30 years in April 2019. *Id.* ¶ 4, Ex. 1 ¶ 18. From this point forward, the Development Items piled up. PWAP initially became suspicious when it received a flurry of questions from PWUK about the market potential for the territories covered by the Asia Pacific Reseller Agreements (*id.* Ex. 1 ¶ 19), but it received assurances from PWUK that it would not terminate the Reseller Agreements with PWAP because the buyout clauses in the Reseller Agreements were cost-prohibitive. *Id.* ¶ 12.

Thus, PWAP obliged when, in September 2019, PWUK asked PWAP to put together an accelerated growth plan for the Asia Pacific markets, and to include current leads, how to scale the team, and what would be needed from both sides to achieve that plan. *Id.* ¶ 4, 13; Exs. 1 ¶ 19.2 and 9. PWUK then inquired about investing directly in PWAP. *Id.* ¶ 4. Ex. 1 ¶ 19.4.

Bill Berman replaced the interim CEO of Pendragon in February 2020, at which point, Pendragon/PWUK showed increased interest in PWAP's success. *Id.* ¶ 4, Ex. 1 ¶ 19. On February 25, 2020, David Neilsen was asked to speak to PWUK's CFO about a direct investment to finance expansion of DMS sales. *Id.* ¶ 4, Ex. 1 ¶ 19.5. At the same time, PWAP was informed that it was to upload information concerning the sales pipeline to a new app so that the Pendragon board could stay informed. *Id.* ¶ 14, Ex. 10. A few days later, on March 2, 2020, PWUK's CFO reached out to Neilsen's colleague to ask for more information about what contracts were in the pipeline and what PWAP's expansion plans were, including target customers. *Id.* ¶ 15, Ex. 11. That same day, Neilsen had a meeting with PWUK executives to discuss the potential of the Asia Pacific market and PWAP intended to staff and fund the growth. PWAP was cooperative, as PWUK led PWAP to believe that it was soliciting this information to evaluate investing in PWAP. *Id.* ¶ 15.

5

While the potential investment remained under evaluation, PWUK's CFO requested PWAP to start forecasting DMS users by month. PWAP complied with the request in the spirit of partnership, unaware that there was never any real consideration of the investment proposal at all. At an April 9, 2020 meeting, PWUK informed PWAP that due to the pandemic, there was no longer an appetite for making an investment in PWAP, which was unusual considering PWUK's unquenchable thirst for data about the Asia Pacific region and PWAP's business plans. PWAP accepted its business partner's answer at face value and asked for a firm commitment on financial accommodations and completion of the development items for the continued delays in the DMS for Thailand, Vietnam and Japan. PWUK agreed and asked PWAP to send a proposal with dates. *Id.* ¶ 16.

In June 2020, PWUK's International Implementation Leader conveyed that he had been instructed to "have a consistent visibility of proposals and the pipeline position." *Id.* ¶ 17, Ex. 12. He demanded all client proposals, which were provided, as were international user growth forecasts. These requests died down in early 2021, and the work of expansion continued, but unsteadily, as the Development Items still had not been completed. *Id.* ¶ 4, Ex. 1 ¶ 19.13.

When Neilsen raised the issue directly with PWUK in November 2021, its end game was clear. In response to Neilsen's invocation of his fiduciary duty to his investors, and the more basic proposition that PWAP cannot sell something that does not work, PWUK responded that it could not commit to a delivery date for the development items, but it could simply take over the business from PWAP. *Id.* ¶ 4, Ex. 1 ¶ 21. It made no offer to buy PWAP out: the choice was to be stuck selling something that does not—and will not—work, or hand over its business, which represented the sole means PWAP had of repaying the investors it had secured to expand PWUK's business after it had declined to invest itself.

By deceiving PWAP into believing that PWUK would continue to perform and support PWAP's plans to expand, it had left PWAP saddled with debt and unable to move forward in sales.  At the same time, PWUK asked when it could expect payments to resume per the Reseller Agreement, despite its own nonperformance on rendering the DMS usable for PWAP's customers.  *Id.* ¶ 18, Ex. 13.  In May 2022, PWUK terminated the first Reseller Agreement for non-payment of the invoices, and in July 2022, PWAP terminated the Second Reseller Agreement on the basis that PWUK had not committed to a date to deliver the adapted DMS for Japanese customers, despite attempts by PWAP to work out a way to deliver these contracts. *Id.* ¶ 8, Ex. 6 ¶¶ 7, 34.

### D.  PWAP Files a Lawsuit for Breach of Contract, Unaware of the Fraud

PWAP retained counsel and ultimately sued PWUK for breach of contract in late July 2022.  Incredibly, PWUK claims that it had no obligation to adjust the DMS software so that the customers could use it. That is, they disavow the so-called localization requirement.  *Id.* ¶ 19, Ex. 14.  By reverse inference then, in PWUK's view, the Reseller Agreements contained an implied clause restricting PWAP's potential customers to those who would not have any need to localize the DMS software.  For the most part, PWUK has admitted that it was on notice of Development Items but denies that the customer *really* needed them and/or avers, for the first time, that PWUK did not understand multiple requests made *years* prior.  *See id.* ¶ 19, Ex. 14.  This, of course, is not a reasonable way to construe the contract, nor does PWUK offer a reasonable defense to its failure to conform the software.  PWUK's behavior post-termination shows that it agreed:  after it terminated the Reseller Agreements, it promptly contacted PWAP's customers and made the localization changes PWAP had requested months and years prior. *Id.* ¶ 4, Ex. 1 ¶¶ 24-26.

### E. PWUK Defrauded PWAP in order to Sell PWUK to Respondent Lithia

As it turns out, Pendragon was not positioning PWUK to just takeover the DMS Asia Pacific business, it was positioning itself for a sale. On August 13, 2022, reports revealed that Lithia Motors Inc. ("Lithia") had made a board-approved cash offer for Pendragon of £460 million, a value that was no doubt enhanced by Pendragon/PWUK's fraud-propelled coup of the Asia Pacific market. *Id.* ¶ 20, Ex. 15. By stringing PWAP along with promises to cure defects in the software and potentially invest, PWUK procured customer contacts and a full-fledged expansion plan. Lulling PWAP into a false sense of security, with full knowledge that it took on investors to support the expansion of the DMS sales, PWUK stalled on Development Items and excused payments on invoices until management was prepared to sell the business altogether. PWUK then did an about-face, claimed breach, thereby relieving themselves from having to buy out PWAP's contracts. Under the terms of the eventual deal, which is set to close at the end of January 2024, PWUK will be spun out and remain listed as a standalone corporation on the London stock exchange. *Id.* ¶ 21, Ex. 16. Lithia will invest GBP30m into Pinewood for a 16.7% equity stake in the new PWUK. Additionally, Lithia will enter into a joint venture with PWUK in North America to rollout the DMS platform here. Lithia will have control over the entity in the US and has the right to take over the software IP under certain circumstances. *Id.*

### F. Legal Claim for Which Evidence is Sought.

PWAP intends to add a fraud claim against PWUK to its lawsuit for breach of contract. Under English law, a claimant may bring a claim for fraudulent misrepresentation or deceit where it has justifiably relied on false statements which were made knowingly or with reckless disregard for the truth. *Id.* ¶ 11. English courts require evidentiary support of a claim for fraud; claims with insufficient cogent evidence of fraud when pleading the claim are susceptible to dismissal on summary judgment or on the Court's own order. *Id.* ¶ 22.

Mr. Berman's installation as CEO of Pendragon PLC in February 2020 coincided with PWAP's presentation of information in connection with a potential investment from PWUK. Declaration of Tara J. Plochocki ¶ 2, Ex. 1; Healey Decl. ¶ 16. At the same time, PWUK's demands for information and data from PWAP escalated. Healey Decl. ¶ 15, 17, Exs. 11, 12. This was all under Mr. Berman's ultimate control. As discussed above, Pendragon PLC positioned itself and PWUK for sale within two years of Mr. Berman becoming CEO. He is undoubtedly in possession of documents relating to the design and execution of his strategy for PWUK and the DMS system, how it was valued, what its liabilities were, and what his plan was for the resellers.

Mr. Berman is also the person most capable of testifying as to his vision for Pendragon and its subsidiary PWUK, decisions made about the reseller agreements, and how PWUK was valued in the original and revised Lithia bids. Mr. Berman can be expected to have knowledge concerning how, if at all, PWUK's potential liability for breach of contract and/or fraud was presented in the due diligence phase of the Lithia deal. This is relevant to the English proceeding because the timing of the estimate would show whether PWUK intended to terminate the Reseller Agreements while telling PWAP that their relationship would continue, leading PWAP to continue its efforts to expand the customer base and increase sales at its expense.

Petitioner therefore seeks an order authorizing the issuance of a subpoena for deposition testimony from Mr. Berman.

## LEGAL ARGUMENT

Section 1782 Petitions must meet four statutory requirements. *Sergeeva v. Tripleton Int'l Ltd.,* 834 F.3d 1194, 1198-99 (11th Cir. 2016). When a Petition meets the statutory requirements, courts consider four discretionary factors, bearing in mind Section 1782's twin

9

aims of "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *In re Pimenta*, 942 F.Supp.2d 1282, 1288 (S.D. Fla. 2013) (quoting *Euromepa, S.A. v. R. Esmerian, Inc.,* 154 F.3d 24, 28 (2d Cir. 1998)).

### A. The Petition Meets All Four Statutory Requirements of 28 U.S.C. § 1782.

The Petition meets the four statutory requirements of Section 1782. The statute requires that: (1) the person from whom discovery is sought "reside[s] or [is] found in the district of the district court" to which the petition is made, (2) the discovery is "for use in a proceeding before a foreign [or international] tribunal", (3) the application is made "by a foreign or international tribunal" or "any interested person", and (4) the request must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing". *Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1198 (11th Cir. 2016)(quoting *Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1269 (11th Cir. 2014)). The Petitioner's Petition handily meets these requirements.

#### 1. Respondent Berman is Found in this District.

Respondent Bill Berman is based in Fort Lauderdale, Florida. Mr. Berman is registered to vote in Florida and indicates in his LinkedIn profile that he is based in Fort Lauderdale. Plochocki Decl. ¶¶ 3-4, Exs. 2-3. Respondent therefore resides or is found in the Southern District of Florida, and the petition meets Section 1782's first statutory requirement.

#### 2. Petitioner's requested discovery is for use in a pending proceeding in supported of a claim to be filed therein.

Petitioner has already filed a lawsuit in which it has brought a claim against PWUK and has presented herein the basis for a second claim of fraudulent misrepresentation, which will be

10

filed upon the provision of evidence sought by this Petition. This satisfies the "for use" requirement of § 1782.

The lawsuit in which PWAP will file an additional claim was filed on July 19, 2022. It is still in its early stages, and petitioner may still file another claim. The statute's requirement of obtaining evidence "for use" in a foreign proceeding "does not limit the provision of judicial assistance to 'pending' adjudicative proceedings." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258 (2004). In *Application of Furstenberg Fin. SAS v. Litai Assets LLC*, the Eleventh Circuit Court of Appeals ruled that the district court did not err by concluding discovery sought was "for use in a proceeding in a foreign…tribunal" because Petitioners intended to file complaint in Luxembourg within forty-five days of receiving Section 1782 discovery. 877 F.3d 1031, 1034-35 (11th Cir. 2017). Here, the Declaration of Abigail Healey confirms that Petitioner will file a fraud and/or fraudulent misrepresentation claim in England if it receives the evidence sought by this Petition. Healey Decl. ¶ 11. Proclaiming the intent to file a claim and articulating a legal theory for that claim satisfies this requirement. *In re: Application of Bracha Found.*, 663 F. App'x 755, 764 (11th Cir. 2016) (affirming grant of § 1782 petition where petitioner explained legal theory and intent to file if successful in obtaining the evidence sought by the petition). Here, Petitioner has adduced the basis for its contemplated fraudulent misrepresentation claim to be filed in the lawsuit already pending in the High Court of Justice of England and Wales.

### 3. Petitioner is an "interested person," since Petitioner is the Claimant.

Petitioner is an "interested person" for purposes of Section 1782. The statutory term "interested person" encompasses both parties and contemplated parties to foreign litigation. *See* 28 U.S.C. § 1782; *Intel*, 542 U.S. at 256 ("the text of § 1782(a), 'upon the application of any

11

interested person,' plainly reaches beyond the universe of persons designated 'litigant'");

*Application of Furstenberg Fin. SAS*, 877 F.3d at 1035 (holding that Petitioners intending to file a criminal complaint in Luxembourg were "interested persons"). Here, Petitioner is the Claimant, and thus meets the third statutory requirement of Section 1782. Petitioner thus meets the third statutory requirement of Section 1782.

### 4. The Petitioners seek testamentary and documentary evidence from the Respondent.

The Petition seeks testimony and documents from Mr. Berman, which is a proper use of the statute. A § 1782 petition can seek documentary evidence, particularly electronically stored information, located in foreign countries. *Sergeeva*, 834 F.3d at 1199-1200 (holding that electronic documents, even in the possession of an American parent company's Bahamian subsidiaries, are subject to 1782 disclosure in accordance with the Federal Rules of Civil Procedure if in the parent company's "possession, custody, or control"). As the Chief Executive Officer of Pendragon PLC working from Fort Lauderdale, Mr. Berman has the practical ability to provide the documents and communications requested in the draft subpoenas. All available evidence suggests that Mr. Berman conducts Pendragon business, which would mean he has access to his emails and relevant documents in Fort Lauderdale. Indeed, he has given interviews about Pendragon's merger talks from his Florida home. Plochocki Decl. ¶ 5, Ex. 4. The Petitioners therefore meet the fourth and final statutory requirement of Section 1782, and thus the Court should turn to the discretionary factors outlined by the Supreme Court in *Intel*.

### B. The Court Should Grant this Petition in Its Discretion.

Granting this Petition is an appropriate exercise of this Court's discretion. The Supreme Court articulated four factors to consider in exercising discretion under Section 1782. *See Intel,* 542 U.S. at 264-65; *Sergeeva*, 834 F.3d at 1199.

### 1. The discovery sought is beyond the reach of the English Court.

First, courts consider whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case the need for Section 1782(a) aid generally is not as apparent. *In re Rendon,* Case No. 1:20-mc-21152-KMM, 2020 WL 8771274, at *5 (S.D. Fla. Nov. 5, 2020) (citing *In re Jagodzinski,* No. 18-20606-MC, 2019 WL 1112389, at *5 (S.D. Fla. Jan. 15, 2019) (citing *Intel*, 542 U.S. at 264), *report and recommendation adopted*, No. 18-20606-CIV-WILLIAMS, 2019 WL 2255564 (S.D. Fla. Apr. 8, 2019)) (first factor favored petitioner where respondent was not a party). Whereas a foreign tribunal has jurisdiction over those appearing before it and can itself order them to produce evidence, non-parties "may be outside the foreign tribunal's jurisdictional reach" and "their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264; *see also In re Gonzalez*, Case No. 20-24628-MC-UNGARO, 2021 WL 3835180, at *9 (S.D. Fla. Apr. 14, 2021).

Mr. Berman is not a party to the pending lawsuit in which the contemplated fraudulent misrepresentation claim will be filed, and it is not expected that he will be. As a Florida resident, he is not subject to the jurisdiction of the English court. Although he is the Chief Executive Officer of a UK company, that entity will not be a party to the litigation either. Even if Mr. Berman were in England, English courts do not have the power to compel third parties to make pre-action disclosures in support of contemplated claims, and testamentary depositions are not part of regular disclosure procedures. Healey Decl. ¶ 24.

Therefore, the discovery sought is beyond the power of the English Court.

### 2. There is no evidence that the English Court in the pending lawsuit would reject discovery obtained through Petitioner's application.

Second, the Court may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. The proceedings do not have to be "pending or imminent." *In re Clerici*, 481 F.3d 1324, 1333 (11th Cir. 2007). The parties will adjudicate the merits of the dispute described above in these proceedings.

The English lawsuit is an appropriate subject of judicial assistance; its common law undergirds American jurisprudence, and courts in England and Wales are affirmatively receptive to U.S. judicial assistance. *In Re: Ex Parte Application of Godfrey*, 2018 WL 1863749, at *10 (S.D. Fla. 2018) (collecting cases); *In re Novoship (UK) Ltd.,* No. 20-MC-60876, 2020 WL 3286308, at *3 (S.D. Fla. June 18, 2020) (noting that § 1782 is routinely used to obtain evidence for proceedings in the United Kingdom); *In re Fed. Republic of Nigeria*, No. 121MC00007 JGKVF, 2022 WL 4234556, at *5 (S.D.N.Y. Sept. 14, 2022) (granting petition for discovery for use in English courts on the basis that the courts would admit the evidence and the House of Lords had endorsed the use of Section 1782 discovery).

Further, Petitioner's English solicitor has declared that she expects the evidence obtained from Mr. Berman in this proceeding to be admissible in the English Court. Healey Decl. ¶ 26.

The second discretionary factor weighs in favor of granting the Petition.

### 3. The application does not circumvent England's laws of evidence.

Third, the *Intel* Court has stated that a district court may consider whether the § 1782 request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." 542 U.S. at 264-65. This petition does not circumvent any prohibitions on proof-gathering. This Petition seeks records of non-privileged

14

communications between counterparties to a corporate acquisition.  There is no specific policy in English law that would prohibit use of this type of record; to the contrary, the evidence sought is of the type ordinarily used to support and defend against commercial claims.  Healey Decl. ¶ 27.

### 4. The requests are discrete in temporal and substantive scope.

Fourth, courts consider whether the discovery is unduly intrusive or burdensome. *Intel*, 542 U.S. at 264-65. Courts look to the familiar proportionate standard under the Federal Rules of Civil Procedure. *See e.g.*, *In re England/Bahamas*, 2021 WL 3270074, at *7 n. 16.  Under those standards, the discovery sought is neither burdensome nor unreasonable.  The subpoena for testimony and documents, a copy of which are attached to the Plochocki Declaration as Exhibit 5, seek documents and communications relating to PWUK and the DMS in the Asian Pacific region, both historically and forward-looking, as well as communications relating to PWAP and/or reseller agreements.  The documents obtained and testimony elicited from Mr. Berman are expected to establish that Pendragon intended to dispense with resellers while it represented to PWAP that they would continue to work together or that it otherwise concealed or misrepresented the liability represented by the Reseller Agreements with PWAP.  These are narrow issues given the scope of the Pendragon acquisition and Mr. Berman's stewardship of Pendragon.  The documentary evidence is likely entirely electronic and maintained in a deal database and in the inboxes of several Lithia employees.  It will be easily searchable.  As Mr. Berman only became the CEO in February 2020, it highly unlikely that responsive documents span a period of more than four years.

Nor is the requested deposition burdensome.  Petitioner seeks to depose Mr. Berman about a discrete component of Pendragon's operations and its strategy for a single geographic

aspect of the business of its subsidiary. This will not be a lengthy examination, and Petitioner is willing to make accommodations in consideration of Mr. Berman's schedule.

Thus, the discretionary factors articulated by the Supreme Court all weigh in favor of granting the Petition.

## CONCLUSION

For the foregoing reasons, the Petition for Judicial Assistance should be granted.

Respectfully submitted,

**Dated:** January 19, 2024

**LEWIS BAACH KAUFMANN MIDDLEMISS PLLC**

/s/ Elizabeth M. Velez
Elizabeth M. Velez
Florida Bar No. 73614
10 Grand Central
155 East 44th Street
25th Floor
New York, NY 10017
elizabeth.velez@lbkmlaw.com

Tara J. Plochocki (*pro hac vice* application to be filed)
1050 K Street NW
Suite 400
Washington D.C.  20001
Tel. 202-659-7217
tara.plochocki@lbkmlaw.com

*Counsel for Petitioner Pinewood Technologies Asia Pacific Limited*