# EXHIBIT 1

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

HT-2022-000244

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**TECHNOLOGY AND CONSTRUCTION COURT (KBD)**

ON AN APPLICATION

BETWEEN:

**PINEWOOD TECHNOLOGIES ASIA PACIFIC LIMITED**
**Claimant/Respondent**

- and -

**PINEWOOD TECHNOLOGIES PLC**
**Defendant/Applicant**

---

**WITNESS STATEMENT OF DAVID DONALD NEILSEN**

---

I, **DAVID DONALD NEILSEN**, of Pinewood Technologies Asia Pacific Limited, with registered office at 14/F, Manning House, 38-48 Queen's Road Central, Central, Special Administrative Region of Hong Kong, China, **WILL SAY** as follows:

1. I am the Managing Director of Pinewood Technologies Asia Pacific Limited ("**Pinewood AP**"). I am duly authorised to make this witness statement on behalf of Pinewood AP.

2. This witness statement has been prepared following discussions with Pinewood AP's solicitors King & Spalding International LLP, including over videoconference.

3. This witness statement is made on behalf of Pinewood AP, in response to the Defendant's ("**Pinewood UK**") application dated 26 January 2023 for summary judgment (the "**Application**"). I have read the witness statement of Stephen Charles Dunseath dated 26 January 2023 ("**Dunseath 1**") and have adopted its defined terms, unless otherwise indicated.

1

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

| | |
|---|---|
| I. | **EXHIBITS AND REFERENCES** |

4. Save where otherwise expressly indicated, I make this statement from facts within my knowledge. Where I refer to facts and matters outside my own knowledge, based on information and belief, I identify the sources of those facts and matters, and I confirm that such facts and matters are true to the best of my knowledge and belief.

5. There is now produced and shown to me a paginated bundle of copy documents which is annexed and marked "DDN-1" to which I will refer below. I refer to the documents by page numbers e.g. [DDN-1/page no.].

| | |
|---|---|
| II. | **SIGNING OF THE RESELLER AGREEMENTS** |
| A. | **The First Reseller Agreement** |

6. In July 2017, Pinewood AP was a small start-up business. I had founded the company with Josephine Lee, a longstanding personal friend and business partner. There were no other employees, and I was funding the business myself at the time.

7. At the time, I had been in discussions with Pinewood UK regarding becoming their exclusive reseller in certain territories in the Asia Pacific region, and ultimately, they agreed to appoint Pinewood AP. Paul Hopkinson, the Managing Director at Pinewood UK (at the time and I understand that he remains in this role at the date of this witness statement), emailed me, attaching a copy of a draft reseller agreement. I do not have a copy of this email as, prior to the dispute with Pinewood UK, Pinewood AP only retained email archives for three years.

8. I discussed the draft agreement with Mr Hopkinson. I recall that he told me that the draft represented Pinewood UK's standard terms and that, except for the sales targets and territories covered by the appointment, Pinewood UK would not accept any changes to the terms. I certainly do not remember any discussion of or negotiation in relation to clause 16 of the agreement (titled "Liability of Pinewood"), or any of its sub-clauses.

9. After some negotiation in relation to the sales targets and territories only, I signed the agreement and sent it back to Mr Hopkinson. I do not remember the precise date on

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

which I signed the agreement, but I can see that the fully executed copy is dated 28 July 2017, so it must have been on or around that date.

### B. The Second Reseller Agreement

10. By the time Pinewood AP entered into the Second Reseller Agreement with Pinewood UK in January 2019, Pinewood AP had already successfully obtained contracts with customers in Hong Kong, the Philippines and Thailand. However, we had also been working hard to market the Pinewood DMS in Japan and South Korea (each of which was an "Additional Territory" under the First Reseller Agreement) and needed to enter into the Second Reseller Agreement before we could enter into any contracts with Japanese customers. Mr Hopkinson's position all along was that, as soon as we had customers ready to sign in an Additional Territory, Pinewood UK would agree to convert it to a Territory.

11. I was not sent a draft of the Second Reseller Agreement. Rather, Mr Hopkinson emailed me a copy that he had already signed. I recall thinking that this was very strange as in the normal course, you would expect a reseller to be asked to sign first and then return it to the product owner for countersignature. I asked Mr Hopkinson why he had sent me a signed copy and I recall clearly that he told me that new management was coming into Pinewood UK's parent company, Pendragon PLC ("**Pendragon**"), and he was under pressure. He said that he did not want to bring the agreement up with Pendragon as he thought that they would reject any new reseller agreements.

12. Conscious of Mr Hopkinson's warning, the time and money that we had already invested in entering the Japanese market, and the consequent need to secure Pinewood AP's appointment as the reseller in Japan, I countersigned the Second Reseller Agreement immediately. There was no time to seek legal advice, and, in any event, there was no negotiation or discussion at all of the terms of the agreement, which were materially identical to the terms of the First Reseller Agreement.

### III. PINEWOOD UK'S RESELLER AGREEMENTS WITH OTHER RESELLERS

13. Pinewood AP was not Pinewood UK's only independent reseller. As far as I am aware, Pinewood UK continues to sell the Pinewood DMS through independent resellers in

the Netherlands and South Africa. I believe that Pinewood UK may also, or at least it did in the past, resell the Pinewood DMS through an independent reseller in the Middle East.

14. I do not have any personal knowledge of the terms of Pinewood AP's reseller agreements with other independent resellers, or the terms that it proposes to prospective resellers. However, I have spoken to Joshua Bunyan, who was previously the International Business Development Executive at Pinewood UK in charge of all overseas sales and reseller engagements outside of the UK market. Mr Bunyan was employed at Pinewood UK from June 2015 until June 2016, and then again from June 2017 until May 2018. Mr Bunyan worked closely both with Mr Hopkinson and Steve Meadows, a Technical Director at Pinewood UK. Following his employment at Pinewood UK, I recruited Mr Bunyan to work at Pinewood AP.

15. Mr Bunyan has now told me that Mr Hopkinson had prepared the draft First Reseller Agreement alongside David Bell (an in-house lawyer at Pendragon). Mr Hopkinson had indicated to Mr Bunyan that the First Reseller Agreement represented Pinewood UK's standard terms of business with resellers and that Pinewood UK would not permit any changes to such reseller agreements, with the exception of sales targets and territories.

16. Mr Bunyan has also told me that he has seen a copy of Pinewood UK's reseller agreement with its reseller in the Netherlands, Grayhams. As far as he recalls, it is identical to the Reseller Agreements. Finally, Mr Bunyan told me that he was in contact with a potential reseller in Barbados while in his role at Pinewood UK, and Mr Hopkinson had indicated that the same form of reseller agreement would be used.

IV. **PINEWOOD UK'S REQUESTS FOR PINEWOOD AP'S STRATEGIC INFORMATION**

17. Up until the first half of 2019, the relationship between Pinewood UK and Pinewood AP was, generally speaking, a collaborative one and my discussions with Mr Hopkinson reflected a shared desire to work to grow Pinewood AP's customer base for the mutual benefit of both Pinewood AP and Pinewood UK.

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

18. However, from March 2019 to June 2019, there were significant leadership changes at Pendragon. Trevor Finn, who had previously been CEO of Pendragon for 30 years, left in March 2019 and was replaced in April 2019 by Mark Herbert. At the same time, Bill Berman was appointed as a Non-Executive Director, and he went on to be appointed CEO of Pendragon on 19 February 2020.

19. I do not know whether it is a coincidence, but the change in leadership at Pendragon coincided with a noticeable change in the tone of my conversations with Mr Hopkinson and other Pinewood UK representatives. In particular, from September 2019 to January 2021, Ms Lee and I received a flurry of requests from Pinewood UK for our growth strategies and client proposals. There were also indications from Mr Hopkinson and others that Pinewood UK had a growing interest in selling the Pinewood DMS directly in each market. I describe these conversations and requests below.

   19.1   On 7 March 2019, I had a call with Mr Hopkinson, during which he told me he was frustrated because the "punters" at head office were telling him how to run his business at Pinewood UK. He said that the calls for Pinewood UK to go direct to market were getting stronger. I exhibit the note I made of the call on Microsoft OneNote.[1]

   19.2   In early September 2019, I had another call with Mr Hopkinson, during which he asked me to put together an accelerated growth plan for the Asia Pacific markets. He asked me to provide current leads, how we would scale the team and what would be needed from both Pinewood AP and Pinewood UK to achieve the plan. On 16 September 2019, I delivered the first version of the plan[2] and, following Mr Hopkinson's feedback, I delivered a revised version on 2 October 2019.[3]

---

[1]   D. Neilsen OneNote Record, 7 March 2019 **[DDN-1/1]**.

[2]   Email from D. Neilsen to P. Hopkinson, attaching Pinewood AP Accelerated Growth Plan, 16 September 2019 **[DDN-1/2-11]**.

[3]   Email from D. Neilsen to P. Hopkinson, attaching Pinewood AP Accelerated Growth Plan, 2 October 2019 **[DDN-1/12-22]**.

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

19.3 On 8 October 2019, Mr Hopkinson messaged me on Whatsapp, asking if I agreed that DMS systems were cheaper in China.[4] I confirmed that that was the case and explained that we would focus on more profitable markets. Mr Hopkinson mentioned that PwC had presented to the Pendragon Board "*about what we should be doing*" but that he had "[m]*anaged to fault most of their stuff*".[5]

19.4 On 25 October 2019, I had a call with Mr Hopkinson, during which we discussed our growth plans. He asked me about the potential of Pinewood UK investing directly in Pinewood AP. I indicated to him that I was in talks with potential external investors to provide capital to allow Pinewood AP to expand, as by now we were beginning to secure some high value contracts.

19.5 On 25 February 2020, Mr Hopkinson emailed me, asking if I would speak directly to Tom Hartley, the CFO of Pinewood UK. He said in that email that an investment by Pinewood UK, rather than by external investors, "*would mean our interests are completely aligned*".[6] I held the call with Mr Hartley, and we discussed the considerable growth potential in the Asia Pacific region. Mr Hartley seemed very interested and told me that he would need to discuss matters internally with Pendragon management before coming back to me.

19.6 Also on 25 February 2020, Peter Thomas, our account manager at Pinewood UK, emailed Ms Lee saying that he needed a "*clearer position*" on "*the order pipeline expectations for AP.*"[7] In a follow up email, he mentioned an "*app that's been created for keeping pipeline detail up to date*" and said that he needed "*to make sure that the 'board' are clearly informed of what's cooking.*"[8]

---

[4] WhatsApp Messages between P. Hopkinson and D. Neilsen, 8 October 2019 **[DDN-1/23-25]**.

[5] WhatsApp Messages between P. Hopkinson and D. Neilsen, 8 October 2019 **[DDN-1/23-25]**.

[6] Email from P. Hopkinson to D. Neilsen, 25 February 2020 **[DDN-1/26-31]**.

[7] Email from P. Thomas to J. Lee, 25 February 2020 (00.59) **[DDN-1/32-33]**.

[8] Email from P. Thomas to J. Lee, 25 February 2020 (09.55) **[DDN-1/32-33]**.

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

19.7 On 2 March 2020, Mr Hartley approached Ms Lee directly and requested Pinewood AP's sales and rollout forecast, which Ms Lee duly provided.[9] I recall thinking that it was strange that Pinewood UK's CFO approached us directly for this information, rather than Mr Thomas. I also expected follow meetings to discuss how to plan and execute these pipelines but nothing came to pass.

19.8 Also on 2 March 2020, I attended a Microsoft Teams meeting with Mr Hopkinson, Mr Hartley, Mr Meadows and Mr Thomas. The subject of the meeting was "AP Market Development."[10] At the meeting, Mr Hartley and Mr Hopkinson asked me a number of questions about the potential of the Asia Pacific markets, our staffing plan and how we would fund the growth required to take advantage of the opportunities. I was, by this point, concerned that Pinewood UK was seeking to evaluate the value of the business for their own benefit. By this point, the pace of Pinewood UK's development work had also markedly slowed.

19.9 On 6 March 2020, Mr Thomas held a meeting with Ms Lee, Mr Hartley and Mr Thomas with the subject "PWAP Prospect & Pipeline Review".[11] The purpose of the meeting was said to be to discuss the current status of all prospects and how Pinewood UK would like Pinewood AP to report to them in the future.

19.10 Also on 6 March 2020, I emailed Mr Hartley, following up on his request for a draft copy of our term sheet for a convertible bond investment, as well as an "investment teaser".[12] He replied to me on 12 March 2020, saying that he had a meeting with the Pendragon CFO and asked for the Pinewood AP financial model. He also asked what was "*driving the timetable*" and whether "*there* [are]

---

[9] Email from J. Lee to T. Hartley, attaching Pinewood AP Sales & Rollout Forecast 2020-2021, 2 March 2020 **[DDN-1/35-36]**.

[10] Microsoft Teams Meeting Invitation ("AP Market Development"), 2 March 2020 **[DDN-1/34]**.

[11] Microsoft Teams Meeting Invitation ("PWAP Prospect & Pipeline Review"), 6 March 2020 **[DDN-1/55]**.

[12] Email from D. Neilsen to P. Hopkinson, attaching Pinewood AP Convertible Bond Notes Term Sheet and Investment Opportunity Teaser, 6 March 2020 **[DDN-1/37-54]**.

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

*any cashflow issues we should be aware of.*"[13] I did not provide the financial model as I was concerned that Pinewood UK could use it against us somehow.

19.11 On 17 June 2020, Mr Thomas contacted Ms Lee, asking that Pinewood AP share all client proposals with him.[14] This was the first time that we had received such a request, but we agreed to comply with it. Again, there were no follow up requests for meetings to jointly plan how to execute these proposals.

19.12 On 8 September 2020, Mr Thomas emailed Ms Lee and I, setting out a suggested growth forecast up until 2025 and asking for our feedback.[15] He said that he needed it to provide to Mr Hartley so that he could "*update his international user growth forecast for the board.*" Ms Lee provided our sales and rollout forecast on 23 September 2020.[16]

19.13 On 24 January 2021, Ms Lee provided a sales forecast update to Mr Thomas. After this date, Pinewood did not request and sales or pipeline forecasts.

20. I do not know the underlying reasons for these requests. There may be a legitimate explanation and I accept that Pinewood UK had a legitimate financial interest in our successful growth of the Pinewood DMS in the Asia Pacific market. However, that does not explain why the information requests were condensed over a relatively short period of time, coinciding with (i) the change of leadership at Pendragon; and (ii) a substantial slowdown in the delivery of development updates required to launch the Pinewood DMS with existing and prospective customers. I also note that, in September 2020, Pendragon released a new corporate strategy which, for the first time, placed the Pinewood DMS at the centre of the Pendragon Group's strategy.[17]

21. In November 2021, I held a call with Mr Hopkinson to explain that I was unable to invest and secure investment into Pinewood AP without firm commitments from

---

[13] Email from T. Hartley to D. Neilsen, 12 March 2020 **[DDN-1/56-57]**.

[14] Email from P. Thomas to J. Lee, 17 June 2020 **[DDN-1/58]**.

[15] Email from P. Thomas to D. Neilsen and J. Lee, 8 September 2020 **[DDN-1/95-96]**.

[16] Email from J. Lee to P. Thomas, attaching Pinewood AP Sales & Rollout Forecast 2020-2021, 23 September 2020 **[DDN-1/93-98]**.

[17] Pendragon Group Strategy Investor Presentation, September 2020 **[DDN-1/59-93]**.

8

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

       Pinewood UK on the timing of outstanding development work. Mr Hopkinson told me that if I wanted to "exit" Pinewood AP, Pinewood UK could just take over the business.

22.    I now suspect that Pinewood UK and Pendragon discovered, through the information they requested and that we provided to them, the value that Pinewood AP was sitting on as the exclusive appointed reseller in the Asia Pacific region and Pinewood UK formulated a strategy to take Pinewood AP out of the picture and take on our customers and markets directly for themselves. Pinewood AP had little or no insight into the progress of the development work that Pinewood UK was undertaking (or ought to have been undertaking), nor the underlying reasons for the delays in delivery. That factual position can only be established by insight into the internal communications from both Pinewood UK and Pendragon at the time.

**V.**    **PINEWOOD UK'S ACTIONS POST TERMINATION OF THE RESELLER AGREEMENTS**

23.    The Reseller Agreements were terminated on 27 May 2022 (in the case of the First Reseller Agreement) and 19 July 2022 (in the case of the Second Reseller Agreement). Pinewood AP's Claim was served on 26 July 2022. For present purposes, I do not address the underlying reasons for the termination of the Reseller Agreements.

24.    However, I am aware that, almost immediately following the termination of the Reseller Agreements, Pinewood UK approached each of Pinewood AP's former customers, seeking to require them to enter into direct contracts for the provision of the Pinewood DMS. I have, for example, seen a copy of an email dated 16 June 2022 from Mr Thomas to Pinewood AP's former customer in Hong Kong, Kingsway Cars Limited, stating that "*You* [sic] *contract with Pinewood Asia Pacific for provision of Pinewood DMS is no longer valid as explained in the email from Mr Hopkinson. As such you need to enter into contractual terms with Pinewood UK directly for continued provision of the system.*"[18]

25.    I have also confirmed verbally with various of Pinewood AP's other former customers under the First Reseller Agreements that they have now signed direct contracts with

---

[18]    Email from P. Thomas to A. Wong and J. Lee, 16 June 2022 **[DDN-1/99]**.

9

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

Pinewood UK. With respect to the three Original Equipment Manufacturers that Pinewood AP contracted with in Japan, I understand that Pinewood UK has now contracted, or is in the process of contracting with, Porsche Japan K.K. ("**Porsche Japan**") and Volkswagen Group Japan K.K. and Audi Japan K.K. ("**VW / Audi Japan**"):

25.1 We received an automatic system update on 9 May 2023 indicating that user acceptance testing ("**UAT**") of the Pinewood DMS with Porsche Japan dealers has now commenced.[19] I do not believe that Porsche Japan would have commenced UAT without a direct contract in place with Pinewood UK.

25.2 On 18 April 2023, a representative from VW / Audi Japan informed us that they had taken a decision to continue developing the Pinewood DMS, including in coordination with Porsche Japan, and that they were now negotiating final conditions with Pinewood UK.[20] The representative apologised for not informing us earlier, so the decision may have been made much earlier.

26. I have also recently become aware that Pinewood UK appears to have, since contracting directly with our former customers, delivered a number of long outstanding development items. In particular:

26.1 I have spoken to Anuwat Inthraphuvasak and Thanawat Thanyakiriluck, who are representatives of Pinewood AP's former customer in Thailand, AAS Auto Service Co., Ltd ("**AAS**"). They confirmed to me that AAS contracted directly with Pinewood UK and that Pinewood UK has delivered a number of outstanding development items. One of these was "seed numbering", a development that Pinewood UK had failed for many years to be implement whilst Pinewood AP was the appointed reseller in Thailand.

26.2 I have spoken to Kazuhiro Shingyochi, a former employee of Pinewood AP's wholly owned subsidiary in Japan, who has a close relationship with the DMS Project Owners at Porsche Japan and VW / Audi Japan. He told me that

---

[19] Porsche Japan UAT System Update, 9 May 2023 **[DDN-1/102]**.

[20] Email from K. Ebara to R. Zimmermann, 18 April 2023 **[DDN-1/100-101]**.

10

*On behalf of the Claimant*
*David Donald Neilsen*
*1st Witness Statement*
*Dated 16 June 2023*

Pinewood UK has (i) delivered the outstanding developments required to launch the Pinewood DMS in Japan and; (ii) committed to launching the Pinewood DMS with a pilot dealership in Japan in July 2023. This seems to me to be consistent with Porsche Japan commencing UAT testing.

27. I do not know why Pinewood UK appears to have substantially accelerated the pace of its development work with respect to the Asia Pacific market immediately upon having obtained direct contracts with Pinewood AP's former customers. However, when combined with Pinewood UK and Pendragon's prior requests for our growth strategies and client proposals, I am concerned that Pinewood UK and/or Pendragon may have made a conscious decision either not to carry out, or at least not to deliver, development work while Pinewood AP was the contracted reseller, with the ultimate aim of driving Pinewood AP out of business and taking on our contracts directly. It is also entirely possible in my view that Pinewood UK was in contact with underlying customers to prepare for that eventuality. This is information which Pinewood UK will hold. Without waiving legal privilege, I am advised by Pinewood AP's lawyers that they will seek relevant disclosure from Pinewood UK in this regard.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

………………………………………………………………
**DAVID DONALD NEILSEN**

Dated: 16 June 2023

11