# EXHIBIT 5

**DATED**      **2017**

**(1)  PINEWOOD TECHNOLOGIES PLC**

**(2) Pinewood Technologies Asia Pacific Limited**
**(Reseller)**

**RESELLER AGREEMENT**

**relating to the provision of the Pinnacle Dealership Management System**
**as a remote application service to motor vehicle dealerships**

# TABLE OF CONTENTS

RESELLER AGREEMENT                                                      3

1.    INTERPRETATION                                                    3

2.    DURATION                                                          7

3.    APPOINTMENT                                                       7

4.    COMPETITION RESTRICTIONS                                          8

5.    TARGETS                                                           9

6.    PINNACLE DMS AND LICENCE                                          10

7.    METHOD OF RESALE                                                  12

8.    PINNACLE USER ACCOUNT MONTHLY FEES                                13

9.    GENERAL OBLIGATIONS OF THE RESELLER                               16

10.   GENERAL OBLIGATIONS OF PINEWOOD                                   18

11.   TRADE MARKS                                                       19

12.   IPR                                                               20

13.   CONFIDENTIALITY                                                   20

14.   TERMINATION FOR CAUSE                                             22

15.   CONSEQUENCES OF EXPIRY OR TERMINATION                             25

16.   LIABILITY OF PINEWOOD                                             26

17.   FORCE MAJEURE                                                     26

18.   ASSIGNMENT                                                        27

19.   LEGAL NOTICES                                                     27

20.   GENERAL                                                           28

21.   COUNTERPARTS                                                      29

SCHEDULE 1 – CONTRACT DETAILS                                          30

1.    RESELLER CONTROLLER(S)                                            30

2.    ADDRESSES FOR LEGAL NOTICES                                       30

SCHEDULE 2 – FORM OF ESCROW AGREEMENT                                   31

SIGNATURE PAGE                                                          32

# RESELLER AGREEMENT

**AGREEMENT DATE:** 28th July 2017

## BETWEEN:

(1) **PINEWOOD TECHNOLOGIES PLC**, a company registered in England and Wales with registered number 03542925, whose registered office address is at Loxley House, 2 Oakwood Court, Little Oak Drive Annesley, Nottingham, Nottinghamshire NG15 0DR (**"Pinewood"**); and

(2) **Pinewood Technologies Asia Pacific Limited,** a limited company registered in Hong Kong with registered number **63493973** whose registered office address is at Suite 603,, Admiralty Centre, Tower 1, 18 Harcourt Road, Admiralty,Hong Kong (the **"Reseller"**).

## WHEREAS:

(A) Pinewood produces a software product known as the Pinnacle Dealer Management System (DMS) which is a management system for Motor Vehicle Dealerships.

(B) Pinewood provides the Pinnacle DMS as a remote application service to its customers, running on Pinewood's own computer systems.

(C) The Reseller wishes to have a licence to operate and provide Pinnacle DMS as a remote application service to Motor Vehicle Dealerships in the Territory specified in this Agreement.

(D) Pinewood has accordingly agreed to appoint the Reseller as its reseller of the Pinnacle DMS in the Territory, and the Reseller has agreed to accept such appointment, on the basis of and subject to the terms of this Agreement.

## NOW IT IS AGREED AS FOLLOWS:-

1. ## INTERPRETATION

1.1 **Definitions**

In this Agreement, the following terms shall have the following meanings unless otherwise stated:-

**"Additional Territory"** means any of**: Japan, , Singapore or the Republic of Singapore, China or the Peoples Republic of China, Republic of Korea**

"**Affiliate**" means in relation to any party, any subsidiary or holding company of that party, and any subsidiary of any holding company of that party; and for the purposes of this definition:-

(a) a company is a "subsidiary" of another company, its "holding company", if that other company:-

  (i) holds a majority of the voting rights in it; or

  (ii) is a member of it and has the right to appoint or remove a majority of its board of directors; or

  (iii) is a member of it and controls alone, or pursuant to an agreement with other persons, a majority of the voting rights in it;

  (iv) is able or has the right to secure that its affairs are conducted in accordance with the wishes of that other company, including by virtue of any powers

conferred by any constitutional document regulating that or any other company, or by virtue of any agreement in relation to that company or any other company; or

(v)     it is a subsidiary of a company which is itself a subsidiary of that other company; and

(b)     references to the voting rights in a company are to the rights conferred on members, shareholders or other interest holders to vote at general meetings of the company on all, or substantially all, matters, including on the composition of the members of the board of directors; and

(c)     rights shall be treated as held by a holding company if they are held by any of its subsidiary companies;

**"Agreement Year"** means the 12 month period commencing on the Commencement Date, and each subsequent consecutive period of 12 months;

**"Commencement Date"** means the date of this Agreement;

"**Confidential Information**" means in relation to a party, all materials which have at any time been disclosed or otherwise made available by that party to the other party under or in connection with this Agreement, whether before, on or after the date of this Agreement, including any materials specifically marked as or stated to be confidential, any materials supplied pursuant to any obligations under this Agreement, any materials obtained or received by the other party as a result of the discussions leading up to this Agreement, any materials of or relating to that party and its representatives which are obtained, received, processed or accessed by the other party in performance of this Agreement, and any materials relating to that party or its Affiliates, their businesses, products, finances, customers, suppliers or operations; and for the avoidance of doubt, the Pinnacle DMS and all materials supplied by Pinewood in relation to it is Confidential Information of the Pinewood;

"**Customer**" means each person whom the Reseller contracts with to provide Pinnacle DMS Services;

"**Customer Initial Activation Date**" means under any Customer Contract the date on which that Customer originally commences receiving the Pinnacle DMS Services, being the date on which the Pinnacle DMS and all initial Pinnacle User Accounts first become active and available for live production use under the first Customer Contract entered into by the Customer, before any variations, extensions and renewals;

"**Customer Contract**" means each contract which the Reseller enters into to provide Pinnacle DMS Services, and all subsequent variations, extensions and renewals of it;

"**Customer Data**" means all data, configurations, information and other materials specific to a Customer, held or processed by the Reseller, including on the Pinnacle DMS or as part of any Pinnacle DMS Services, and any back-ups;

"**Customer Quarter**" means, for any Customer, the 3 calendar-monthly period commencing with the next calendar month after the calendar month in which the Customer Initial Activation Date fell, and each subsequent 3 calendar-monthly period;

**"Intellectual Property Rights"** means all or any registered or unregistered intellectual property rights in any part of the world, including patents, design rights and registered designs, copyrights, database rights, topography rights, trade marks and service marks, domain names, know-how, rights in inventions, designs and ideas, rights to confidence, and any similar or analogous rights, together with any right to apply for any such intellectual property rights and the benefit of any applications for any such intellectual property rights, in each case for the full period of such rights and all extensions and renewals of such rights;

**"Legal Notice"** means a notice which shall comply with the requirements of Clause 19;

**"Motor Vehicle Dealership"** means any business that deals in motor vehicles (including passenger cars, motor cycles, coaches, buses, vans, trucks, lorries or other types of motor vehicles), motor vehicle repair and service centres, motor vehicle parts retail and distributors, tyre retail and distributors;

**"Pinnacle App"** means an application written by Pinewood as listed in Schedule 3, which is designed to be downloaded and installed on a Mobile Device and used to access Pinnacle;

**"Pinnacle DMS"** means a dealer management system called "Pinnacle" produced by Pinewood, which provides management functionality for Motor Vehicle Dealerships, and is provided as a remote application service to Motor Vehicle Dealerships, together with all future Updates, and including all materials and software supplied by Pinewood as part of the same, but not including the source code for any materials or software supplied in obfuscated, compressed, compiled, object code, byte code or similar form;

**"Pinnacle DMS Licence"** means the software licence in respect of the Pinnacle DMS and Pinnacle App granted by Pinewood to the Reseller in accordance with Clause 6;

**"Pinnacle DMS Services"** means the provision of the Pinnacle DMS and Pinnacle App to a Motor Vehicle Dealership as a remote application service and the system is accessed remotely from the Motor Vehicle Dealership's computers (usually through a web browser);

**"Pinnacle Mobile User Account"** means:-

(a)     generally, a single concurrent user account log-in enabling access to the Pinnacle Tech+ App, as provided for in the design of the Pinnacle DMS, and on the basis that no individual may access and use the Pinnacle DMS except through such a user account log-in); and

(b)     in relation to each Customer Contract, the number of Pinnacle Mobile User Accounts agreed to be provided under that Customer Contract from time to time;

**"Pinnacle User Account"** means:-

(a)     generally, a single concurrent user account log-in enabling access to the Pinnacle DMS and Pinnacle App (or any part or module thereof), as provided for in the design of the Pinnacle DMS, and on the basis that no individual may access and use the Pinnacle DMS except through such a user account log-in); and

(b)     in relation to each Customer Contract, the number of Pinnacle User Accounts agreed to be provided under that Customer Contract from time to time;

**"Pinnacle User Account Activation Date"** means,

(a)     for the initial Pinnacle User Accounts under a Customer Contract, the Customer Initial Activation Date; and

(b)     for each additional Pinnacle User Account under a Customer Contract, the date on which that Pinnacle User Account first becomes active and available for live production use;

**"Pinnacle User Account Monthly Fee"** means, for each Pinnacle User Account and each Pinnacle Mobile User Account the amount per calendar month calculated in accordance with Clause 8;

**"Term"** means the period of this Agreement commencing on the Commencement Date and ending on expiry or termination of this Agreement;

**"Territory"** means Hong Kong Special Administrative Region, Guam, The Kingdom of Thailand and Macau Special Administrative Region

**"Trade Marks"** means the names "Pinewood" and "Pinnacle";

**"Updates"** means any fixes, patches, updates, service packs, upgrades for, and any new releases and new versions of the Pinnacle DMS, as supplied by Pinewood to the Reseller from time to time.

1.2     **Interpretation**

In this Agreement:

(a)     **Clause**

a reference to a **"Clause"** is a reference to a clause of this Agreement, and a reference to a **"Schedule"** is to a schedule of this Agreement;

(b)     **Company**

a reference to a "**company**" includes any company formed under the Companies Acts 1985 or 2006 of England and Wales, or the Companies Ordinance of Hong Kong and any analogous company, corporation, body corporate or other form of legal organisation in any part of the world, including any legal entity which has shareholders, stockholders, members, capital holders or otherwise has a separate legal personality or in which multiple persons can hold shares or other interests;

(c)     **Gender**

a reference to any gender includes all genders;

(d)     **Headings**

headings are included for ease of reference only and are not part of, nor shall they affect the construction or interpretation of, this Agreement;

(e)     **Including Words**

the word **"including"** shall be deemed to be followed by **"(without limitation)"**;

(f)     **Legislation**

any reference to an act, statute, regulation, order, directive or other legislation, shall include any amendment, replacement or re-enactment of all or part of it for the time being in force, and all instruments, orders, notices, regulations, directions, and other subordinate legislation for the time being made, issued or given under it, or deriving validity from it;

(g)     **Materials**

a reference to any "**materials**" includes any property, information, data  or materials of any kind in whatever form including software, specifications, plans, graphics, images, video, film, text, scripts, ideas, inventions, concepts, methods, designs, processes, procedures, drawings, flow-charts, diagrams, reports, advice, and opinions;

(h)     **Person**

a reference to a **"person"** includes an individual, firm, company, government authority, and any other entity with separate legal personality in any jurisdiction in the world;

(i)     **Singular and Plural**

the singular includes the plural and vice versa;

(j)     **Software**

a reference to any "**software**" includes any computer programs, instructions or algorithms, firmware, source code, object code, scripts, applets, mark-up languages, layout, formatting, databases, spreadsheets, and includes any materials comprised in any software provided and /or developed by Pinewood;

(k)   **Writing**

a reference to "**writing**" includes any recorded form, which can be read by a computer or by eye, including physical and digital form, facsimile and electronic mail.

1.3   **Schedules**

The Schedules form part of this Agreement.

## 2.   DURATION

2.1   **Commencement and Initial Fixed Period**

This Agreement shall come into force on the Commencement Date and shall (subject as provided herein) continue in force until terminated by either party in accordance with the terms of this Agreement.  Either party shall be entitled to terminate this Agreement at any time by giving to the other no less than 3 years' prior Legal Notice.

2.2   If Pinewood wishes to take over the reseller business then all reseller customer contracts will be assigned to Pinewood, Pinewood will pay the reseller a compensation payment equivalent to 4 times the total value of the invoices raised by Pinewood to the Reseller in the 12 months prior to Pinewood exercising its right under this clause, payable in the reseller currency, at the time of the completion of the purchase. No other business assets are included in this as they would be freely negotiated at the time.

## 3.   APPOINTMENT

3.1   **Appointment as Reseller**

Pinewood hereby appoints the Reseller as its exclusive reseller of the Pinnacle DMS in the Territory for the Term, and the Reseller accepts such appointment, on the basis of and subject to the terms of this Agreement.

3.2   **Reseller's Rights in relation to the Pinnacle DMS**

The appointment as Reseller under Clause 3.1 is an exclusive appointment to use the Pinnacle DMS to provide on the Reseller's own account Pinnacle DMS Services in the Territory in accordance with the Pinnacle DMS Licence granted in Clause 6. Such appointment does not transfer any right, title or interest in or to the Pinnacle DMS to the Reseller, or grant any other licence to the Reseller in relation to the Pinnacle DMS, or include the right to supply copies of the Pinnacle DMS to third parties, or to grant licences or sub-licences of the Pinnacle DMS to third parties other than in the circumstances set out in Clause 6.

3.3   **Customers to whom the Pinnacle DMS Services may be provided**

Unless otherwise expressly agreed in writing by Pinewood, the Reseller may only sell Pinnacle DMS Services to and only for use by Motor Vehicle Dealerships, and only for use with respect to Motor Vehicle Dealership outlets physically located within the Territory.

3.4   **No Sub-Resellers**

The Reseller shall only provide the Pinnacle DMS Services direct to Motor Vehicle Dealerships under a contract between the Reseller and the Motor Vehicle Dealership entered into in accordance with Clause 7. Save in the circumstances set out in Clause 6, the Reseller shall not be entitled to sub-licence the Pinnacle DMS to any other person, or appoint any person to otherwise resell or distribute the Pinnacle DMS or any Pinnacle DMS Services, including on the basis that such reseller or distributor has a contract with another person and is sub-contracting to the Reseller for the provision of Pinnacle DMS Services.  This provision shall not prevent the

Reseller appointing marketing agents to solicit customers for the Reseller.

3.5   **Devote Reasonable Resources**

The Reseller shall devote reasonable resources to the promotion, sale and provision of the Pinnacle DMS Services in the Territory, and the Reseller shall not during the Term carry on any other business in competition with the Pinnacle DMS or Pinnacle DMS Services. If the Reseller wishes to conduct the sale of any other goods, services, or software or any other business, then it shall do so under a trade mark and trading name which does not involve the use of the names "Pinewood" or "Pinnacle" or any associated logos, or anything confusingly similar thereto.

**3.6**   For a period of 36 months commencing on the Commencement Date, should Pinewood wish to appoint a reseller in any Additional Territory, it shall first, by written notice offer the appointment to the Reseller ("the Offer") who shall have four months from the date of the Offer to accept or reject the appointment and enter into an agreement on materially the same terms, but subject to any additional restrictions Pinewood may reasonably require, as this Agreement as a reseller in the Additional Territory. If within four months from the date of the Offer the Reseller shall not have entered into an agreement for its appointment, the Offer shall be deemed to have lapsed and Pinewood shall be free to appoint any other person. The provisions of this Clause 3.6 shall only apply where the Reseller has met the last applicable targets as set out in Clause 5.1.. Where the Reseller has not met, or is not meeting the applicable target, Pinewood shall not be obliged to make an Offer to the Reseller, and notwithstanding any provisions of exclusivity, shall be entitled to appoint any other reseller as it sees fit.

4.   **COMPETITION RESTRICTIONS**

4.1   **Pinewood**

(a)   **Restriction**

Except as provided in Clause 4.1(c), Pinewood agrees that it will not solicit for itself customers for Pinnacle DMS Services or similar, or otherwise provide Pinnacle DMS Services or similar to any customer, in each case where such customers are Motor Vehicle Dealerships physically located in the Territory and are to be provided during the Term or any renewed Term, and Pinewood agrees that it will not appoint another reseller in the Territory.

(b)   **Enquiries**

Except as provided in Clause 4.1(c), Pinewood agrees to promptly refer to the Reseller all enquiries it receives relating to the Pinnacle DMS and the supply of the Pinnacle DMS Services to Motor Vehicle Dealerships physically located inside the Territory.

(c)   **Exceptions**

Nothing in this Agreement shall prevent Pinewood operating any web site, and it is agreed that Pinewood shall be entitled to provide Pinnacle DMS Services direct to any person, or reseller outside of the Territory and its Affiliates, in the Territory, if:-

(i)   the Reseller is unable to provide the Pinnacle DMS Services to that person or its Affiliate(s) for any reason; or

(ii)   Pinewood has passed that person on to the Reseller as an enquiry and the Reseller has failed to conclude a Customer Contract with that person within 180 days of the referral of the enquiry to the Reseller; or

(iii)   Pinewood provides Pinnacle DMS Services to a Vehicle Manufacturer for use in the Territory with no more than 50 Pinnacle User Accounts.

(iv)   A reseller outside of the Territory has customers with Motor Vehicle Dealerships inside the Territory.

PROVIDED THAT Pinewood does not offer more favourable terms than those provided to the Reseller under this Agreement.

4.2   **Restrictions on Reseller**

(a)   **Sales outside the Territory**

The Reseller shall not without the express written consent of Pinewood supply the Pinnacle DMS Services for use by any person outside the Territory, including with respect to any motor vehicle business, dealership or outlet of any kind located outside the Territory.

(b)   **Enquiries**

The Reseller shall promptly refer to Pinewood all enquiries it receives relating to the Pinnacle DMS and the supply of Pinnacle DMS Services for any motor vehicle business, dealership or outlet of any kind located outside the Territory.

(c)   **Non-Competition By Reseller during the Term**

The Reseller shall not, for the Term, promote, market, sell, licence, resell, supply or otherwise provide or deal in any software, licence or services to or in relation to Motor Vehicle Dealerships, which is or are similar to or may compete with the Pinnacle DMS and/or Pinnacle DMS Services, and the Reseller shall not have any interest in any business that does any of the same or provide any support or assistance to any business that does any of the same.

## 5.   TARGETS

5.1   **Targets**

The Reseller shall achieve sales of the Pinnacle DMS Services in each Agreement Year such that the total number of new Pinnacle User Accounts provided under all Customer Contracts by the end of each Agreement Year shall be increased by the numbers set out in the table below (the "**Target**"):-

| Agreement Year | Target |
|---|---|
| Agreement Year 1 | **100** Pinnacle User Accounts |
| Agreement Year 2 | **150** Pinnacle User Accounts |
| Agreement Year 3 | **200**Pinnacle User Accounts |
| Agreement Year 4 | **300** Pinnacle User Accounts |
| Agreement Years 5+ | To be agreed between Pinewood and the Reseller[PP1] |

5.2   **Remedies**

If in any Agreement Year the Reseller does not achieve the Target, then Pinewood shall be entitled at its option by Legal Notice to the Reseller given within 3 months after the end of the Agreement Year, to do the following (which shall be cumulative remedies):-

(a)   If the Reseller achieves less than 50% of the Target in any one [PP2]Agreement Year, the restriction under Clause 4.1 (a) shall no longer have effect;

(b)   If the Reseller achieves less than 50% of the Target in two consecutive Agreement Years the Reseller shall immediately be prohibited from entering into any new Customer Contracts or renewing any existing Customer Contracts

(c)     If the Reseller achieves less than 50% of the Target in three consecutive Agreement Years Pinewood shall be entitled to immediately terminate this Agreement without any compensation payment to the Reseller; and

The remedies in this Clause shall be without prejudice to any other rights or remedies of Pinewood.

6.     **PINNACLE DMS AND LICENCE**

6.1     **Supply**

Pinewood agrees to supply to the Reseller such files making-up the Pinnacle DMS, including such documentation for installing and operating the Pinnacle DMS, as Pinewood may determine are reasonably required to enable the Reseller to set-up and run the Pinnacle DMS and provide the Pinnacle DMS Services, within 10 days of signature of this Agreement.

6.2     **Licence**

In order to carry out its appointment as reseller of the Pinnacle DMS, Pinewood grants to the Reseller the following non-exclusive licence in relation to the Pinnacle DMS (the "**Pinnacle DMS Licence**"), which forms part of this Agreement, and is granted on the following conditions, each of which is of the essence of this Agreement:-

(a)     **Duration**

The Pinnacle DMS Licence shall commence on the Commencement Date of this Agreement and shall terminate on expiry or termination of this Agreement, however caused.

(b)     **Permitted Use**

The Reseller is licensed to run and use the Pinnacle DMS to provide Pinnacle DMS Services to Motor Vehicle Dealerships under contracts directly between the Reseller and such persons in accordance with the terms of this Agreement, PROVIDED THAT such persons must be using the Pinnacle DMS Services in relation to their own Motor Vehicle Dealership business and must not be reselling the Pinnacle DMS Services to any other person or using the Pinnacle DMS Services to provide services to any other person.

(c)     **Location**

Pinnacle DMS will be provided by Pinewood hosted using the Microsoft Azure service.

(d)     **Pinnacle User Accounts**

The Reseller shall only permit the Pinnacle DMS (including all instances of it) to be used and accessed through the number of Pinnacle User Accounts the Reseller has created and granted from time to time under Customer Contracts.

(e)     **Sub-Licensing**

The Reseller shall not be entitled to grant any sub-licence in respect of the Pinnacle DMS except in the following circumstances:-

(i)     **Remote Access by Customers**

The Reseller shall be entitled to authorise and permit Customers who have signed Customer Contracts to access the Pinnacle DMS remotely through web browsers as part of the Pinnacle DMS Services, provided that they shall only be entitled to log-in and access the Pinnacle DMS through Pinnacle User Accounts.

(f)     **Security**

The Reseller must take all reasonable steps to keep the Pinnacle DMS safe and secure and to prevent any unauthorised access, taking, use or copying of the Pinnacle DMS. The Reseller shall comply with all security standards, procedures and requirements specified by Pinewood, which Pinewood applies to itself.

(g) **Modifications**

The Reseller must not modify, edit, reverse engineer, decompile, disassemble, create derivative works based on or copy the Pinnacle DMS (except for the copies permitted by this Pinnacle DMS Licence).

(h) **No Assignment**

The Reseller shall not be entitled to assign or transfer the Pinnacle DMS or the benefit of this Pinnacle DMS Licence, or charge, declare a trust over or otherwise transfer to or create any third party interest in the Pinnacle DMS or Pinnacle DMS Licence.

(i) **Updates**

The Pinnacle DMS Licence shall extend to include Updates for the Pinnacle DMS supplied by Pinewood from time to time.

(j) **Inspection**

The Reseller shall permit Pinewood to inspect at all locations where the Pinnacle DMS is stored, installed or used, the Pinnacle DMS, the servers and systems on which it is running, and the numbers of Pinnacle User Accounts in existence, for the purpose of verifying compliance with the terms of this Agreement.  The Reseller shall procure that Pinewood may exercise such right against any Hosting Company.

(k) **Moral Rights**

Pinewood retains all moral rights in relation to the Pinnacle DMS and shall be entitled to hold itself out as the creator of the Pinnacle DMS. The Reseller shall not do anything or permit anything to be done which conflicts with such rights.

(l) **Notices**

The Reseller must not remove, add to, change or tamper with and must reproduce in any copy of the Pinnacle DMS, all copyright notices, logos and trademarks appearing in or on the Pinnacle DMS.

(m) **Source Code**

Subject to Clause 6.5 below, and except for any materials supplied by Pinewood in source code form, the Pinnacle DMS Licence shall not extend to any source code for any software supplied as part of the DMS.

(n) **No other License**

Except for the rights granted this Clause 6.2, Pinewood grants no other licences or rights in relation to the Pinnacle DMS, and any licences or rights implied by law are hereby excluded.

6.3 **Updates**

Pinewood will supply to the Reseller all Updates for the Pinnacle DMS which Pinewood releases from time to time and applies into live production use with Pinewood's own customers. Indemnity

6.4 **SaaS Assured and Source Code Escrow**

Pinewood agrees to enter into a SaaS Assured agreement and place the source code for the Pinnacle DMS (other than any third party components) into escrow with NCC ESCROW INTERNATIONAL LIMITED (Registered in the UK, with company number 03081952, and

registered office at MANCHESTER TECHNOLOGY CENTRE, OXFORD ROAD, MANCHESTER, M1 7EF) (the "**Escrow Agent**") on the terms of the form of agreement set out in Schedule 2. For these purposes, Pinewood and the Reseller shall on request from the other enter into the Saas Assured and escrow agreement in the form set out in Schedule 2 with NCC Escrow International Limited (the "**Escrow Agreement**"). The Reseller shall pay directly, or if Pinewood agrees to pay any of the same, shall reimburse Pinewood on demand, all fees and charges of the Escrow Agent in respect of such escrow and Escrow Agreement. The parties agree that escrow and Escrow Agreement shall terminate in the event that this Agreement or the Pinnacle DMS Licence expires or terminates for any reason other. No release of any source code or other materials to the Reseller under the Escrow Agreement shall operate so as to terminate or otherwise prejudice this Agreement or relieve the Reseller of its continuing obligations to pay any amounts under this Agreement.

## 7.   METHOD OF RESALE

7.1   **Requirement for Customer Contract**

   (a)   **Contract with Customer**

      The resale of the Pinnacle DMS by the Reseller shall be by way of the Reseller contracting on its own account with Motor Vehicle Dealerships to provide Pinnacle DMS Services using the Pinnacle DMS.

   (b)   **Requirement for Customer Contract**

      The Reseller shall only provide Pinnacle DMS Services under Customer Contracts complying with Clause 7.2.

   (c)   **Principal, not Agent**

      The Reseller shall at all times act as principal, and not as agent of Pinewood, in relation to all Customer Contracts

7.2   **Contents of Customer Contracts**

The Reseller shall ensure that all Customer Contracts shall comply with the following requirements:-

   (a)   **Writing and Legally Binding**

Customer Contracts shall be in writing, duly signed by all parties, and legally binding under the laws of the Territory.

   (b)   **Form**

      All Customer Contracts may be in such form as the Reseller may reasonably use, having taking appropriate legal advice in the Territory, but Pinewood reserves the right to specify the form of all Customer Contracts.

   (c)   **Duration**

      No Customer Contract shall have a duration which is or is capable of lasting more than 3 years from the original Customer Initial Activation Date.

   (d)   **Pinnacle User Accounts**

      All Customer Contracts shall specify clearly the number of Pinnacle User Accounts which the Customer is provided with and all charges which the Reseller is making under the Customer Contract or otherwise, including for the Pinnacle User Accounts and Pinnacle DMS Services.

   (e)   **No Conflicts with this Agreement**

      No Customer Contract shall contain any provision, right or licence the grant,

performance or observance of which by the Reseller or Customer would conflict with any term of this Agreement, or put the Reseller in breach of any term of this Agreement, or put at risk the security of the Pinnacle DMS and Pinewood's Intellectual Property Rights in the same, or grant or purport to grant rights to any Customer which are in excess of those permitted to be granted by the Reseller under this Agreement or otherwise granted to the Reseller under this Agreement.

(f)     **Arms' Length**

All Customer Contracts which the Reseller enters into shall be on arm's length commercial terms, but the Reseller is otherwise free to set the price at which it provides the Pinnacle DMS Services, as long as such services are not provided as a loss-leader.

(g)     **Intellectual Property Rights and Confidentiality**

All Customer Contracts shall contain a term in which the Customer acknowledges and agrees for the benefit of Pinewood that all Intellectual Property Rights in the Pinnacle DMS are and shall remain those of Pinewood, that the Customer has no rights in the Pinnacle DMS other than to access it as a remote application service through a Pinnacle User Account, and that the Customer will maintain the Pinnacle DMS strictly confidential and take all reasonable steps, including technical and organisational, to prevent unauthorised access to and use of the Pinnacle DMS.

7.3     **Post-Contract Information**

The Reseller shall promptly provide to Pinewood on request a copy of each executed Customer Contract, including each extension, variation or renewal thereof, and such other information relating to the Customer, its Affiliates, and Motor Vehicle Dealerships as Pinewood may require.

7.4     **Liability to Customer**

The Reseller shall indemnify Pinewood from and against any liability which any law may impose on Pinewood with respect to any Customer arising out of or in connection with any Pinnacle DMS Services provided or to be provided by the Reseller, or any acts or omissions of the Reseller.

## 8.     PINNACLE USER ACCOUNT MONTHLY FEES

8.1     **Obligation to Pay**

In consideration of the appointment of the Reseller under this Agreement and the grant of the Pinnacle DMS Licence, the Reseller agrees to pay to Pinewood the Pinnacle User Account Monthly Fees under this Clause 8 for each Pinnacle User Account provided from time to time by the Reseller under a Customer Contract.

8.2     **Amount**

(a)     **Initial Amount**

From the Commencement date:

1.  In the Territory excluding the Kingdom of Thailand:

    (i)     the Pinnacle User Account Monthly Fee will be **US$50.00** per Pinnacle User Account; and

    (ii)    the Pinnacle Mobile User Account Monthly Fee will be **US$13.00** per Pinnacle Mobile User Account.

2.  In the Kingdom of Thailand:

    (i)     the Pinnacle User Account Monthly Fee will be **THB1700** per Pinnacle User Account; and

(ii)      the Pinnacle Mobile User Account Monthly Fee will be **THB450** per Pinnacle Mobile User Account.

unless and until varied in accordance with the following provisions.

(b)   **General Right to Vary**

Pinewood shall be entitled to increase the monthly rate for the Pinnacle User Account Monthly Fees from time to time, such increases to take effect on or at any time after the end of the 3rd Agreement Year, by Legal Notice given at least 90 days prior to the effective date of the increase (the "**Effective Date**"), by such amount as Pinewood may in its absolute discretion determine provided it does not exceed the Annual Consumer Price Index (CPI) rate for the Territory for the 12 month period prior to the notification of the increase. Such increased Pinnacle User Account Monthly Fee shall apply on the earliest of the following:-

(i)      to all Pinnacle User Accounts under any Customer Contract, where that Customer Contract was entered into on or after the Effective Date;

(ii)      to any new Pinnacle User Accounts supplied, sold or otherwise created or granted on or after the Effective Date of the increase, under any Customer Contract that was in force at the Effective Date;

(iii)      to all Pinnacle User Accounts for a Customer, with effect from the calendar month first falling on or after the end of the 3rd year from the Customer Initial Activation Date for that Customer, or if later the calendar month first falling on or after the Effective Date.

(c)   **Pro-Rata Calculations**

Where a Pinnacle User Account Activation Date falls part way through a calendar month, then the Pinnacle User Account Monthly Fee for that calendar month will be a percentage of the full monthly fee applicable for that calendar month, being the percentage which the number of days from and including the Pinnacle User Account Activation Date to the end of that calendar month, is of the total number of days in that calendar month.

(d)   **Reductions**

If a Pinnacle User Account ceases (such as due to termination of a Customer Contract or reduction in the number of Pinnacle User Accounts agreed with the Customer) the Pinnacle User Account Monthly Fees will still be payable under this Agreement up to the end of the Customer Quarter in which the Pinnacle User Account ceased, and there will be no refund of any such Pinnacle User Account Monthly Fees.

8.3   **Sales Taxes**

The Pinnacle User Account Monthly Fees are exclusive of value added tax or other sales or consumption tax which shall (where applicable) be payable in addition at the rate prevailing at the due date for payment, and shall be payable at the same time as the Pinnacle User Account Monthly Fees on which it is chargeable.

8.4   **Statement**

Within 30 days after the end of end of each calendar month from the Commencement Date, the Reseller shall send to Pinewood a written statement setting out details of:-

(a)      the total number of Pinnacle User Accounts in effect at the start of that calendar month, and associated Customers;

(b)      each new Pinnacle User Account whose Pinnacle User Account Activation Date fell within that calendar month, including details of the Pinnacle User Account Activation

Date and associated company;

(c) each Pinnacle User Account that ceased in that calendar month, including details of the date the Pinnacle User Account ceased, the Customer, and the reason,

together with a certificate from a director of the Reseller confirming that such figures are true and accurate. If the Reseller fails to issue such statement on time, then Pinewood may (without prejudice it rights) make such estimates as Pinewood make determine in its sole discretion for the purposes of invoicing below.  This statement may be combined with the report under Clause 9.11.

8.5 **Invoicing and Payment**

(a) **Monthly Billing**

For all Pinnacle User Accounts (including as identified in the statement for the purposes of Clause 8.4(a) above) for a Customer in effect at the start of a calendar month for that Customer, Pinewood may issue its invoice to the Reseller for the Pinnacle User Account Monthly Fees for such Pinnacle User Accounts for such calendar month at any time in advance of or at any time after the start of that calendar month, and such invoice shall be paid by no later than the end of the following calendar month.

(b) **New Pinnacle User Accounts**

For each new Pinnacle User Account (including as identified in the statement for the purposes of Clause 8.4 above) for a Customer which comes into effect during a calendar month, Pinewood may invoice the Reseller for the Pinnacle User Account Monthly Fee for the calendar month in which the Pinnacle User Account Activation Date fell, pro-rated in accordance with Clause 8.2(c), at any time after such Pinnacle User Account came into effect, and such invoice shall be paid by the end of the subsequent calendar month.

8.6 **Currency**

The Pinnacle User Account Monthly Fees and all sales and other taxes thereon shall be calculated and payable in the currency stated in 8.2.

8.7 **Method of Payment**

Payment of all amounts due under this Agreement shall be made by electronic funds transfer to a bank account designated in writing by Pinewood, and each party shall be responsible for its own bank charges.

8.8 **Interest**

If any payments to be made by the Reseller under this Agreement become overdue, Pinewood shall be entitled to charge daily interest on such overdue payment from the due date until and including date of payment (before as well as after judgement) at the per annum rate of 4% above base rate of Barclays Bank PLC, and such interest shall be payable on demand.

8.9 **Credit Risk**

The Reseller shall assume the credit risk of Customers, so that the Pinnacle User Account Monthly Fees shall continue to be payable even if a Customer defaults in payment of or delays paying the Reseller under any Customer Contract.

8.10 **Deductions and Withholding Taxes**

The Pinnacle User Account Monthly Fees (and all value added taxes and sales taxes thereon) shall be the net amount payable by the Reseller, and shall be made in full without withholding, deduction or set-off, including in respect of any taxes, charges, and other duties that may be imposed by any law or country on the same or on either party (with the exception of any corporation tax charged by the UK government on Pinewood's net income), and the Reseller

shall be responsible for paying any such taxes, charges and other duties, except in so far as any such taxes, charges and other duties may be credited in full by Pinewood against its own tax liabilities.  The parties agree to co-operate in all respects necessary to take advantage of such double taxation treaties as may be available, and each party agrees to assist the other party to mitigate or obtain a credit or reduction of such taxes, charges and other duties, including providing any information, certificates and documentation reasonably required. .

8.11    **Exchange Controls**

The Reseller is responsible for complying with all exchange control and similar laws applicable to the payment of monies to foreign persons out of the Territory, and if the Reseller is unable to make full payment of any amounts under this Clause 8 due to any such laws, then this shall be treated as a breach and failure to make payment under this Agreement.  Pinewood will co-operate with the Reseller and provide any information reasonably required by government agencies to comply with such exchange control laws.

9.    **GENERAL OBLIGATIONS OF THE RESELLER**

9.1    **Promotion**

The Reseller shall actively and regularly promote the Pinnacle DMS and Pinnacle DMS Services to all car Motor Vehicle Dealerships in the Territory, and shall solicit the custom of such Motor Vehicle Dealerships for the Pinnacle DMS Services in the Territory. The Reseller shall use all reasonable endeavours to secure as many customers for the Pinnacle DMS Services and sales of Pinnacle User Accounts as possible in the Territory and to extend and meet all demand for the Pinnacle DMS Services in the Territory from Motor Vehicle Dealerships.

9.2    **Promotional Materials**

The Reseller shall not publish, issue or display or authorise the publication of, issuance or display of any advertisement or promotional materials relating to the Pinnacle DMS without Pinewood's prior approval, such approval not to be unreasonably withheld or delayed. Pinewood may provide its own promotional and advertising material for the Pinnacle DMS relating to other countries to the Reseller for inclusion in the Reseller's own promotional and advertising materials for the Pinnacle DMS.

9.3    **Promotional Statements**

Further, the Reseller shall not without Pinewood's prior written consent make any representations, warranties, guarantees or other commitments with respect to the specifications, features or capabilities of the Pinnacle DMS which are inconsistent with those contained in the promotional material supplied by Pinewood.

9.4    **Promotion Instructions**

The Reseller shall comply with all instructions, methods, policies and procedures which Pinewood may from time to time specify concerning the resale of the Pinnacle DMS.

9.5    **Staffing**

The Reseller shall employ a sufficient number of suitably qualified personnel to ensure the proper fulfilment of the Reseller's obligations under this Agreement.

9.6    **Representations**

The Reseller shall in all correspondence and dealings indicate that it is acting as principal, and not as agent for Pinewood. The Reseller shall not represent itself as an agent of Pinewood for any purpose, or pledge Pinewood's credit, or give any condition or warranty or make any representation on Pinewood's behalf, or otherwise incur any liability on behalf of Pinewood.

9.7    **Reputation**

The Reseller shall co-operate fully with Pinewood to establish and maintain the standards and reputation of Pinewood and not do or omit to do anything to prejudice or otherwise adversely affect the goodwill or reputation of Pinewood, the Pinnacle DMS and the Trade Marks.

9.8 **Information**

The Reseller shall keep Pinewood fully informed with regard to the sales of Pinnacle DMS Services in the Territory and the activities of the Reseller and shall in particular bring to the Reseller's attention any serious problems or useful information of which it becomes aware.

9.9 **Complaints**

The Reseller shall promptly bring to the notice of Pinewood any complaints or claims received by it relating to the Pinnacle DMS or Pinnacle DMS Services and shall deal with such complaints and claims in such manner as Pinewood shall direct. A full analysis of any customer complaints will be covered during the quarterly review.

9.10 **Legal Compliance and Local Laws**

The Reseller must comply with all applicable laws relating to the conduct of the Reseller's business and the provision of the Pinnacle DMS Services in the Territory. The Reseller shall monitor and keep Pinewood promptly informed of all laws in the Territory affecting the provision of the Pinnacle DMS Services in the Territory and all changes thereto.

9.11 **Reporting**

The Reseller shall send to Pinewood a written report by no later than 10 days after the end of each quarter during the Term detailing:-

(a)     new Customers obtained in that quarter;

(b)     the Reseller's marketing and promotion activities and expenditure during that quarter;

(c)     the Reseller's proposed future marketing activities and expenditure;

(d)     details of identified potential customers for the Pinnacle DMS Services and their known or anticipated requirements for the Pinnacle DMS Services;

(e)     sales forecasts;

(f)     market conditions, competitors and methods of business in the Territory relating to products and services of the same or a similar type to the Pinnacle DMS,

and including any other information Pinewood may request.

9.12 **Records and Accounts**

The Reseller shall keep true and accurate accounts and records relating to its business of the provision of Pinnacle DMS Services, and its performance of this Agreement, including records of all Customer Contracts and all contracts with Hosting Companies, and such other records and accounts as Pinewood may specify from time to time. The Reseller shall supply copies of its accounts and records to Pinewood on request in paper or electronic form as required by Pinewood, and shall permit and procure for Pinewood the right upon request to inspect and take copies of such accounts and records from any location where they are situated.

9.13 **Meetings**

The Reseller shall make available senior management staff to attend meetings with Pinewood from time to time on request for the purpose of enabling Pinewood to manage and review the Reseller's performance of this Agreement and the overall market conditions and prospects in the Territory.  Pinewood will act reasonably in requesting such meetings, and the parties will normally expect to use telephone or video conference.  Pinewood may also request face to face meetings in the UK or the Territory.

9.14 **Audit**

The Reseller shall permit Pinewood to audit the Resellers performance of and compliance with this Agreement, and its procedures and arrangements for doing so, and shall supply to Pinewood such information and provide Pinewood with such assistance and co-operation from its staff as Pinewood shall require to enable Pinewood to conduct such audit. Such audits may include representatives of Pinewood visiting all premises of the Reseller and third parties where it carries out business or where the Pinnacle DMS or any Customer Data is stored or hosted, and may include representatives of Pinewood visiting and interviewing Customers.  Pinewood shall meet any costs which it incurs to carry out such audit.  Pinewood shall establish a reasonable remit for such audits, and shall not put the Reseller to unreasonable expense in complying with such audits.

10. **GENERAL OBLIGATIONS OF PINEWOOD**

10.1 **Promotional Materials**

Pinewood shall supply the Reseller with electronic copies of all its relevant current promotional literature available relating to the Pinnacle DMS.

10.2 **Supply of Information**

Pinewood will supply the Reseller with all information that is reasonably necessary to enable the Reseller to install and operate the Pinnacle DMS.  The information may be made available online via a password-protected web site, in which case the Reseller is responsible for keeping up to date with it.

10.3 **Training**

Pinewood will provide reasonable training to the Reseller's staff in relation to the Pinnacle DMS, to enable it to effectively install and operate the Pinnacle DMS and provide and sell the Pinnacle DMS Services, as follows:-

(a) **On Site**

Within the first Agreement Year of this Agreement Pinewood agrees to provide the services of a single trainer for 30 days of training at the premises of the Reseller in the Territory, free of labour charge.  Pinewood agrees to provide a further 15 days of training at the premises of the Reseller in the Territory if necessary, at Pinewood's standard rates for training. All such training shall be called-off or ordered in a minimum of 5-day contiguous blocks. Any further on-site training required after this will be at Pinewood's discretion.  In all cases, the Reseller is responsible to paying for all plane flights, hotel accommodation costs, subsistence expenses, local travel arrangements and other expenses.

(b) **At Pinewood UK Premises**

Pinewood will provide unlimited training for officers and employees of the Reseller at Pinewood's premises in the United Kingdom, at no cost to the Reseller, but the Reseller agrees that it will pay for all costs and expenses, including travel, accommodation and subsistence for its staff attending such training.

(c) **Arrangements**

Where the Reseller requires any such training, the Reseller shall inform Pinewood and the parties shall agree a reasonable date or dates on which such training shall take place, such agreement not to be unreasonably withheld or delayed.

(d) **Training Obligations of Reseller**

The Reseller shall undertake such training and "train the trainer" courses as Pinewood may reasonably require the Reseller to undertake to enable it to install, operate,

maintain the Pinnacle DMS and provide and support the Pinnacle DMS Services to the standard reasonably required by Pinewood.

(e) **Reasonable Usage**

The Reseller shall make reasonable usage of Pinewood's training obligations stated above, but shall also seek to minimise such usage by carry out its own training where it has staff who are experienced and capable of providing such training to other staff of the Reseller.

10.4 **Support**

(a) **First Line Support**

The Reseller is responsible for providing first-line support to its Customers, and for putting in place trained staff capable of handling a range of support questions agreed with Pinewood.

(b) **Pinewood Remote Support**

Pinewood will provide the Reseller with reasonable technical support and information regarding the Pinnacle DMS, including the installation and setup of the Pinewood DMS, and second-line support where the Reseller is unable to resolve any difficulties that it or a Customer is having, provided always that Pinewood will not be obliged to deal directly with a Customer. This support will be provided remotely by telephone, video conferencing and e-mail.  The Reseller shall also procure remote internet VPN-based access to the Pinnacle DMS operated by the Reseller.

10.5 **Future Developments**

Pinewood will keep the Reseller advised about all releases and further developments of the Pinnacle DMS which may assist the Reseller in the successful operation and promotion and sale of Pinnacle DMS Services.  Pinewood will make any necessary changes to ensure that the Pinnacle DMS meets the legal requirements of the Territory, provided that the Reseller provides Pinewood reasonable notice and detail of the changes required.  Pinewood will use its best endeavours to make any necessary changes to ensure that the Pinnacle DMS meets the vehicle manufacturer franchise standards of the franchises held by Contracting Customers.

10.6 Pinewood will provide hosting for the Pinnacle DMS Services in accordance with the Service Levels set out in Schedule 4.

11. **TRADE MARKS**

11.1 **Licence**

The Reseller is licensed for the Term to:-

(a) use the Trade Marks in its corporate name and corporate correspondence, web site and e-mails;

(b) to register a single domain name containing all or any of the Trade Marks;

(c) use and reproduce the Trade Marks in relation to marketing  and sale of the Pinnacle DMS Services, including in any brochures, adverts, and business literature relating to the Pinnacle DMS and Pinnacle DMS Services.

11.2 **Identification of status**

The Reseller shall in its letters, business forms, advertisements, and promotional literature describe

itself as authorised reseller of the Pinnacle DMS in the Territory. Whenever the Trade Mark is used by the Reseller it shall be accompanied by wording to show that it is a trade mark used by the Reseller under licence: the terms of such wording and its placing shall be as reasonably requested by Pinewood and shall include the use of the ® symbol where the Trade Mark is registered or ™ where not.

11.3    **No other Marks**

The Reseller shall not use any other trade mark or name in relation to the Pinnacle DMS or Pinnacle DMS Services other than the Trade Marks.

11.4    **Form**

The Reseller shall reproduce the Trade Marks in the form authorised from time to time by Pinewood.

11.5    **Not Claim Ownership**

The Reseller acknowledges that all Intellectual Property Rights in the Trade Mark are the property of Pinewood, and the Reseller will not make any representation or do any act which may be taken to indicate that it has any right title or interest in or to any Trade Mark other than as licensee, and acknowledges that nothing contained in this Agreement shall give the Reseller any right, title or interest in or to the Trade Mark.

11.6    **Not Register**

Without prejudice to the registration of the Reseller's company name in the companies register for the Territory, the Reseller shall not seek to register the Trade Marks as trade marks, or any name or logo containing any of the names or initials thereof, or any name, mark or logo which might create confusion with the Trade Marks.

11.7    **Goodwill**

All use of the Trade Marks by the Reseller shall be for the benefit of Pinewood and the goodwill that accrues to the Trade Marks as a result of the sale of Pinnacle DMS Services in the Territory shall vest in and accrue to Pinewood.

11.8    **Not Prejudice Ownership**

The Reseller undertakes not to do or permit to be done any act which would or might prejudice the right or title of Pinewood to the Trade Marks.

12.    **IPR**

12.1    **Acknowledgement**

The Reseller acknowledges that all Intellectual Property Rights in and to the Pinnacle DMS and the Trade Marks shall be and remain Pinewood's sole and absolute property, and no rights or licences are granted to the Reseller except as expressly stated in writing in this Agreement. The Reseller shall, at the expense of Pinewood, take all such steps as Pinewood may reasonably require to assist Pinewood in maintaining the validity and enforceability of such Intellectual Property Rights during the Term.

12.2    **Notice of Infringements**

The Reseller shall inform Pinewood promptly if it becomes aware of any action by a third party which amounts or might amount to infringement of the Trade Marks, or passing-off in relation to the business of the sale of the Pinnacle DMS Services, or infringement of any Intellectual Property Rights in the Pinnacle DMS.

13.    **CONFIDENTIALITY**

13.1 **Keep Confidential**

Each party undertakes to hold and maintain in strict confidence at all times the Confidential Information of the other party, in accordance with the terms of this Clause 13.

13.2 **Permitted Uses**

The Reseller may use the Confidential Information of Pinewood for the purposes of the management, administration, performance and enforcement of this Agreement, the provision of the Pinnacle DMS Services, and the exercise of any rights, licences and permissions under this Agreement. Pinewood and its Affiliates may use the Confidential Information of the Reseller for the purposes of the management, administration, performance and enforcement of this Agreement, and exercising any rights, licences and permissions under this Agreement.

13.3 **Security**

Each party shall take all reasonable steps to keep all Confidential Information of the other safe and secure and to prevent any unauthorised access, taking, use or copying of any such Confidential Information.

13.4 **Disclosure**

Each party agrees not to disclose any Confidential Information of the other to any person, except that a party may disclose such Confidential Information:-

(a) **Staff**

to any officer or employee that party, and in the case of the Reseller, to any Hosting Company under Clause 10.6 for the purposes of their carrying out any duty assigned to them in connection with the carrying out of the purposes permitted under Clause 13.2;

(b) **For internal business purposes**

to that party's Affiliates, shareholders, to any professional advisers of that party, to any insurer of that party, and to any lender, security trustee, bank or other financial institution from whom that party is seeking or obtaining or has obtained finance, in each case to the extent that such persons need to see the same for the purposes of funding, administration, and management of that party's business, or the purposes permitted under Clause 13.2;

(c) **Where required by law**

to any person to whom disclosure is required by any applicable law, or the rules of any recognised stock exchange or regulatory body, or any written request of any taxation authority;

(d) **Government Authorities**

to any government authority, including any local authority;

(e) **Disputes**

where required by any order of any court or tribunal of competent jurisdiction, or any person or body to whom any dispute, matter or question under this Agreement may have been referred for resolution, or to enable that party to institute, defend or carry on any legal proceedings; and

(f) **Assignment**

to any person where this is reasonably required in connection with any permitted assignment of this Agreement.

13.5 **Conditions of Disclosure**

A party disclosing any Confidential Information of the other party pursuant to Clause 13.4 or otherwise shall, unless and to the extent such disclosure is required by law, make such disclosure in good faith and in confidence, shall only disclose as much of the Confidential Information as is strictly necessary, and shall ensure that the person to whom any Confidential Information is disclosed shall be under a legally binding duty to hold confidential that Confidential Information and not to use or disclose it except in accordance with this Clause 13. The acts and omissions of any person to whom the Pinnacle DMS is disclosed by the Reseller shall be considered to be the acts and omissions of the Reseller.

13.6   **Excluded Information**

This Clause 13 shall not apply to any information which is or falls into the public domain except as a result of a breach of this Agreement, or as a consequence of any unauthorised disclosure, act or omission of any party or any person to whom it may have disclosed Confidential Information.

14.   **TERMINATION FOR CAUSE**

14.1   **Repudiatory Breach**

A party may, by Legal Notice to the other party, terminate this Agreement immediately, or on such date as the party terminating may specify in its Legal Notice of termination, if the other party is in repudiatory breach of this Agreement.

14.2   **Remedial Breach**

A party may, by Legal Notice to the other party, terminate this Agreement immediately, or on such date as the party terminating may specify in its Legal Notice of termination, if the other party commits any breach (other than a trivial breach) of this Agreement, which is remediable, and fails to remedy such breach within 30 days of Legal Notice from the other party specifying the breach and the remedy required. Pinewood may specify a shorter remedy period reasonably achievable by the Reseller, if any such breach does or may be in breach of the Pinnacle DMS Licence or does or may affect the security or confidentiality of the Pinnacle DMS or any Intellectual Property Rights of Pinewood in the Pinnacle DMS.

14.3   **Repeated Breach**

If a party commits any repeated breaches of this Agreement (other than trivial breaches), whether or not remediable, the other party may by Legal Notice to the breaching party specifying the breach institute the following procedure:-

(a)   on receipt of the Legal Notice, the other party shall within 14 days provide a reasonable written plan of actions, measures and procedures which the breaching party will take and put in place to prevent such breaches from recurring, for approval by the other party;

(b)   on approval of the plan, the breaching party shall subsequently take such actions, measures and procedures within 30 days of approval of the plan, and provide evidence to the other party that it has done so in that time period;

(c)   if any such repeated breach recurs within 60 days of any previous such breach, then the other party shall be entitled by Legal Notice to the breaching party, either re-run the procedure in Clauses 14.3(a) and 14.3(b) above, or terminate this Agreement immediately, or on such date as the party terminating may specify in its Legal Notice of termination.

Pinewood may by Legal Notice specify shorter periods than those under the above provisions, if any such breach does or may be in breach of the Pinnacle DMS Licence or does or may affect the

security or confidentiality of the Pinnacle DMS or any Intellectual Property Rights of Pinewood in the Pinnacle DMS.

14.4   **Insolvency**

A party may, by Legal Notice to the other party, terminate this Agreement immediately, or on such date as the party terminating may specify in its Legal Notice of termination, if any of the following events occurs in relation to the other party (an "**Insolvency Event**"):-

(a)   **Winding Up**

it shall be liquidated or wound up, or have a petition for winding-up presented against it which is not withdrawn in 30 days, or it shall pass a resolution for voluntary winding-up except for the purposes of a bona-fide amalgamation or restructuring; or

(b)   **Administration**

it shall have an administrator, receiver or administrative receiver appointed to the whole or any part of its undertaking or assets, or it shall have a petition for the appointment of an administrator presented against it which is not withdrawn in 30 days, or documents are filed with a court for the appointment of an administrator in relation to it, or a notice of intention to appoint an administrator is given by it or its directors or by a qualifying floating charge holder (as defined in paragraph 14 of Schedule B1 to the Insolvency Act 1986), and is not withdrawn in 30 days;

(c)   **Compromise with Creditors**

it shall convene any meeting of its creditors or make an arrangement or otherwise compound or compromise with its creditors;

(d)   **Cease Business**

it shall cease or threaten to cease to carry on business or a substantial part thereof or shall dispose or threaten to dispose of the whole or a substantial part of its property, undertaking or assets;

(e)   **Distress**

any step is taken to levy distress or execution upon any of its assets or any assets in its possession; or

(f)   **Other Jurisdiction**

if any jurisdiction or under any law outside England and Wales in or under which it is formed, domiciled, carries on business or has any assets, any event equivalent to or analogous to, or having a similar effect or purpose to those set out in paragraphs (a) to (e) above shall happen in relation to it.

14.5   **Non-Payment by Reseller**

If any sum payable by the Reseller under this Agreement becomes overdue, then:-

(a)   **Removal of Restrictions**

if such sum is not paid within 14 days of Legal Notice from Pinewood demanding its payment, then Pinewood shall be entitled by Legal Notice to the Reseller to terminate the restriction in Clause 4.1 immediately; and

(b)   **Termination**

if such sum is not paid within 30 days of Legal Notice from Pinewood demanding its payment, this shall be deemed to be a repudiatory breach of this Agreement, and Pinewood shall be entitled by further Legal Notice to the other party, to terminate this Agreement immediately, or on such date as Pinewood may specify in its Legal Notice of termination.

14.6    **Change of Control of Reseller**

(a)    **Control**

For the purposes of this Clause 14.6 a person has or persons have "**Control**" of the Reseller if that person has individually or those persons have collectively have:-

(i)    absolute or beneficial ownership or effective control (including directly or indirectly through any chain of Affiliates, nominees and/or trustees) of more than 50 percent of the voting rights in the Reseller, where voting rights are the right to vote at general meetings of the company on all, or substantially all, matters, including on the composition of the members of the board of directors, and include rights conferred on shareholders, stockholders and members of the company; or

(ii)    the power to otherwise secure that the affairs of the Reseller are conducted in accordance with the wishes of that person or those persons, including by means of the holding of shares or the possession of voting rights in or in relation to that or any other company, or by virtue of any powers conferred by the articles of association or other document or agreement regulating that or any other company, or by virtue of any agreement between any of the Reseller's and/or any other company's shareholders or members.

(b)    **Reseller Controllers**

For the purposes of this Clause 14.6 the "**Reseller Controller(s)**" shall mean the person who individually has Control, or the persons who collective have Control of the Reseller as at the date of this Agreement, as stated in Paragraph 1 of Schedule 1, and where there is any permitted change of Control in the following provisions, the person or persons who individually or collectively have such Control after the change.

(c)    **Notice of change of Control**

The Reseller shall give Pinewood reasonable advance Legal Notice of any proposed change in the identity of, composition of, or rights of the person or persons who Control the Reseller, detailing the proposed new Reseller Controller(s) who individually or collectively are proposed to assume Control.

(d)    **Termination Right**

Except as provided in Clause 14.6(e), Pinewood shall be entitled by Legal Notice to the Reseller to terminate this Agreement immediately, or on such date as Pinewood may specify in its Legal Notice of termination, if Control of the Reseller passes out of the hands of the Reseller Controller(s). Such right of termination may be exercised at any time up to 30 days after the Reseller has given to Pinewood Legal Notice of such change of Control under Clause 14.6(c). Pinewood may alternatively, by Legal Notice to the Reseller, at its sole discretion, agree to such change of Control on such conditions as Pinewood may specify, in which case the new person or person(s) identified by the Reseller as Controller(s) shall be treated as the Resellers Controller(s) for the purposes of this Clause, if and when such person or persons do acquire Control of the Reseller.

(e)    **Permitted Changes**

Where Control is held by persons collectively, then the right of termination under the above Clause will not apply if Control is transferred to a sub-set of the same persons, or if the relative shareholdings or interest holdings of those persons changes provided that such persons continue to collectively Control the Reseller.

15. **CONSEQUENCES OF EXPIRY OR TERMINATION**

On expiry or termination of this Agreement for any reason, the following terms shall apply:-

15.1 **Customer Contracts**

(a) **Contacting Customers**

The Reseller permits Pinewood to contact each Customer at any time after, and at any time up to 3 months before expiry or termination of this Agreement, to inform them that the Reseller will be ceasing to provide the Pinnacle DMS Services and offering a transfer of the Customer Contract to Pinewood or a new contract in replacement for the Customer Contract.

(b) **Facilitate Transfer**

The Reseller shall procure that Pinewood is able to take over each Customer on expiry or termination of this Agreement, including, at Pinewood's request, agreeing to a transfer of any Customer Contract to Pinewood or its nominee, or agreeing to a termination of any Customer Contract to enable Pinewood or its nominee to offer that Customer a new contract. For the purposes of further assurance of the above obligation, the Reseller hereby perpetually and irrevocably authorises Pinewood as its agent to exercise any rights, including termination rights, of the Reseller under Customer Contracts, to agree to a mutual termination of Customer Contracts by consent with the Customer, and to execute on behalf of the Reseller, with the Customer, an agreement transferring the Customer Contract to Pinewood.

(c) **Customer Information and Data**

The Reseller shall provide to Pinewood promptly on request all Customer Data and all Customer records which it has, and access to its Pinnacle DMS systems to enable a smooth transition of Customers to any replacement systems or services Pinewood is putting in place.

15.2 **Consequences**

If this Agreement expires or is terminated, then the Pinnacle DMS Licence shall immediately terminate.

15.3 **Termination of Pinnacle DMS Licence**

The Pinnacle DMS Licence shall terminate, and the Reseller shall return or permanently and securely erase at the request of Pinewood the Pinnacle DMS, and shall certify to Pinewood that it has done so within 7 days of the termination of this Agreement.

15.4 **Termination of Trade Mark Licence**

The licence in relation to the Trade Marks under Clause 11 shall terminate and the Reseller shall cease to use the Trade Marks.

15.5 **Change of Corporate Name**

The Reseller shall as soon as possible change its corporate name so that it does not include any of the words "Pinewood" or "Pinnacle". The Reseller hereby unconditionally and irrevocably appoints Pinewood as its agent to do any act and sign any document on its behalf necessary to change such corporate name.

15.6 **Return of Confidential Information**

Except to the extent otherwise stated in this Agreement, each party shall return all Confidential Information of the other, except that each party shall be entitled to retain such of those materials where and to the extent reasonably necessary to perform this Agreement and any continuing parts of this Agreement, and to exercise any rights or permissions arising out of expiry or

termination of this Agreement, and to maintain a proper record of this Agreement for all reasonable evidential, liability, insurance, tax and other lawful purposes for which it would be reasonable to retain the same, and in such case that party shall confirm on request which materials it is proposing to retain and for what purposes and for how long.  A party shall comply with this Clause within 7 days of request, and certify in writing that it has complied with this Clause.  There shall be no right to retain any copy of the Pinnacle DMS.

15.7   **Preserved Terms**

Expiry or termination of this Agreement for any reason shall not bring to an end the obligations of confidentiality of the parties under this Agreement, or any claims or liabilities of a party arising out of or in respect of any breach of this Agreement, and for the avoidance of doubt, the following Clauses shall continue in force after expiry or termination of this Agreement: 1, 8, 9.7, 9.8, 9.12, 11.5, 11.6, 11.7, 11.8, 12, 13, 15, 16, 18, 19 and 20.

## 16.   LIABILITY OF PINEWOOD

16.1   **Liability not limited**

Pinewood does not exclude its liability for death or personal injury resulting from its negligence, for fraud or fraudulent misrepresentation, or for breach of Clause 13 (Confidentiality).

16.2   **Excluded Types of Loss**

Subject to Clause 16.1, Pinewood excludes, in relation to any liability it may have for breach of this Agreement, negligence under, in the course of or in connection with this Agreement, misrepresentation in connection with this Agreement, or otherwise howsoever arising in connection with this Agreement, any such liability for: (1) special, indirect or consequential loss; (2) loss of profit, bargain, use, expectation, anticipated savings, data, production, business, revenue, contract or goodwill; (3) any costs or expenses, liability, commitment, contract or expenditure incurred in reliance on this Agreement or representations made in connection with this Agreement; or (4) losses suffered by third parties or the Reseller's liability to any third party.

16.3   **General Liability Limit**

Subject to Clause 16.1, Pinewood limits its liability for breach of this Agreement, negligence under, in the course of or in connection with this Agreement, misrepresentation in connection with this Agreement, or otherwise howsoever arising in connection with this Agreement, in aggregate for all events giving rise to such liability, to the yearly average of the total Pinnacle User Account Monthly Fees invoiced averaged over each complete Agreement Year to date, or in the case of any claims arising in the first Agreement Year, to the amount reasonably expected to be invoiced on account of Pinnacle User Account Monthly Fees for that Agreement Year.

## 17.   FORCE MAJEURE

17.1   **Excuse from performance**

If either party to this Agreement is or will be prevented or delayed in the performance of any of its obligations under this Agreement by a Force Majeure Event, and if such party gives written Legal Notice thereof to the other party containing the matters constituting the Force Majeure Event, the obligations affected by such Force Majeure Event, such evidence as it reasonably can give as to the existence of the Force Majeure Event, and the period for which it is estimated that its obligations will be affected, then the party in question shall be excused the performance or the punctual performance as the case may be as from the date of such Legal Notice for so long as such Force Majeure Event shall continue and shall continue to prevent or delay performance.  A party serving a Legal Notice under this Clause shall on request provide

reasonable updates as to the situation, shall take reasonable steps to mitigate the effect of the Force Majeure Event, and shall consult with the other party on request concerning the Force Majeure Event and steps being taken to mitigate its effect.

17.2 **Meaning of Force Majeure Event**

For the purpose of this Agreement, a "**Force Majeure Event**" means any act, event, or circumstance beyond the reasonable control of a person, and the following matters shall be deemed to be beyond a person's reasonable control: (1) acts of God, (2) war, threat of war, terrorism, riot, civil commotion, or act of the public enemy, public demonstration, blockade, sabotage, (3) the act of any government agency or authority, governmental restraint, act of legislature, or any directive or requirement of a competent authority governing either party, (4) strikes, lock-outs or other industrial action or trade disputes of whatever nature (including the employees of either party or their sub-contractors), (5) lightning, fire, storm, flood, earthquake, accumulation of snow or ice, lack of water arising from weather or environmental problems, (6) shortage of or prevention from or hindrance in obtaining in any way labour, parts, materials, fuel, energy or other supplies, either at all or at an economic cost, (7) failure of power supply, explosion, fault or failure of plant or machinery, (8) any delay or failure by any sub-contractor to perform their obligations due to any Force Majeure Event affecting such sub-contractor.

17.3 **Termination**

If any event of force majeure prevents a party from substantially performing this Agreement for more than 1 months, then the other party shall be entitled to terminate this Agreement. Where the Reseller service Legal Notice of a Force Majeure Event under Clause 17.1, then Pinewood shall be entitled to terminate Clause 4.1.

18. **ASSIGNMENT**

The Reseller shall not be entitled to assign this Agreement without the prior written consent of Pinewood which shall not be unreasonably withheld. Pinewood shall not be entitled to assign this Agreement to an entity outside the group of companies controlled by Pendragon PLC without the written consent of the Reseller, such consent not to be unreasonably withheld.

19. **LEGAL NOTICES**

The following provisions shall apply to the service of any notice which is referred to as a Legal Notice in this Agreement:-

19.1 **Form and Method of Delivery**

Legal Notices under this Agreement shall be in writing, shall be signed by an authorised representative of the party sending it, shall be in the English Language, and shall be sent by prepaid first-class post, facsimile transmission or e-mail.

19.2 **Address for Legal Notices**

Legal Notices shall be sent to the postal address, fax number or e-mail address of the other party set out in Schedule 1 to this Agreement, or to such new address, fax number or e-mail address as that party may by future Legal Notice to the other specify its address or fax number for Legal Notices.  In addition a party may send a Legal Notice addressed to a director or company secretary at the registered office of that party.

19.3 **Deemed Delivery : Post**

Any Legal Notice given by post pursuant to Clause 19.1, shall be deemed to have been given on the seventh (7th) day after the envelope containing the Legal Notice was so posted.

19.4 **Deemed Delivery : Fax**

Any Legal Notice sent by facsimile transmission shall be deemed to have been given on the date of completion of uninterrupted transmission by the sender.

19.5 **Deemed Delivery : E-mail**

Any Legal Notice sent by e-mail shall be deemed to have been given on the date it is received by the mail server of the intended recipient.

## 20. GENERAL

20.1 **Entire Agreement**

The written terms of this Agreement set out in this document constitute the entire agreement between Pinewood and the Reseller concerning the subject matter of this Agreement. The parties further agree that no statements or representations made by either party, and not recorded in writing in this document, have been relied upon by the other party in entering into this Agreement. Nothing in this Clause 20.1 shall operate so as to limit or exclude any liability for fraud or fraudulent misrepresentation.

20.2 **Costs**

Each party shall be responsible for its own costs (including legal costs) incurred in preparing, negotiating, and performing this Agreement.

20.3 **Recovery Costs**

Pinewood may charge to the Reseller all costs and expenses (including legal costs) reasonably incurred by Pinewood in enforcing this Agreement against the Reseller[PP3].

20.4 **Variation**

No variation or amendment of this Agreement shall bind either party unless agreed to in writing by both parties.

20.5 **Severability and Illegality**

Each of the provisions of this Agreement shall be separate and severable. If any provision of this Agreement is found by any court or tribunal of competent jurisdiction to be illegal, void, or unenforceable, or if any government authority with power to do so makes any determination that any provision of this Agreement is illegal, void, or unenforceable, then this Agreement shall continue in force save that such provision shall be deemed to be severed from this Agreement with effect from the date of such finding or determination or such earlier date as the parties may agree. If any third party makes any complaint or commences any legal proceedings, or any government authority commences any investigation as to whether any provisions of this Agreement, then the parties shall agree in good faith what action to take. If as a result of the above finding, determination, or complaint or legal proceedings the restrictions on the Reseller in Clause 4.2 are severed or required to be severed from this Agreement in whole or in part, or the Reseller otherwise ceases to observe the restrictions on the Reseller in Clause 4.2, then the restrictions in Clause 4.1 shall in addition cease to apply.

20.6 **Waiver**

No failure of either party to exercise any right or remedy under this Agreement or to enforce any term of this Agreement, and no delay of either party in exercising or enforcing any such right, remedy or term, shall constitute a waiver of such right, remedy or term, and no party shall be considered to have waived any right or remedy under this Agreement or breach of this Agreement unless such waiver is given in a printed document signed by a duly authorised representative of the party giving it.

20.7 **No Partnership or Agency**

Nothing in this Agreement shall create any partnership, joint venture, or relationship of principal and agent between the parties.

20.8    **Third Party Rights**

It is not intended by the parties to this Agreement that any other person should benefit from or be entitled to enforce any term of this Agreement, and any such right to do so is hereby excluded.

20.9    **Governing Law**

This Agreement and the construction and validity of this Agreement shall be governed in all respects by English Law.

20.10   **Jurisdiction**

All claims, disputes and legal proceedings which the Reseller wishes to make or bring in connection with or arising in any way out of or affecting this Agreement shall be subject to the exclusive jurisdiction of the English Courts.  All claims, disputes and legal proceedings which Pinewood wishes to make or bring in connection with or arising in any way out of or affecting this Agreement may be made or brought in either the English Courts or the courts of the Territory, at the option of Pinewood.

## 21.    COUNTERPARTS

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one single agreement between the parties.

**EXECUTED** the day and year first above written by the parties acting by their duly authorised representatives.

# SCHEDULE 1 – CONTRACT DETAILS

22.    **RESELLER CONTROLLER(S)**

Ronald vd Vlist

23.    **ADDRESSES FOR LEGAL NOTICES**

23.1    **PINEWOOD**

| Post | Pinewood Technologies PLC |
|------|---------------------------|
|      | 2960 Solihull Parkway |
|      | Birmingham Business Park |
|      | West Midlands |
|      | B37 7YN |
| Fax | + 44 121 696 6699 |
| Email | Paul.hopkinson@pinewood.co.uk |
| For the attention of: | Paul Hopkinson |

23.2    **RESELLER**

| Post | Pinewood Technologies Asia Pacific Limited |
|------|--------------------------------------------|
|      | Suite 603, Admiralty Centre |
|      | Tower 1, 18 Harcourt Road |
|      | Admiralty, Hong Kong |
| Fax | +852 9307 0565 |
| Email | dneilsen@pinewoodap.com |
| For the attention of: | David Neilsen |

## SCHEDULE 2 – FORM OF ESCROW AGREEMENT

Attached overleaf.

Saas Secure
Agreement 23 June

**Schedule 3**

| Pinnacle App | Description |
|---|---|
| Host+ | Sales Reception greeting, recall/create customer, Service customer greeting, receiving job and creating Welcome Video |
| Sales+ | Showroom sales process with Part Exchange Appraisal integration, finance calculation and proposal |
| Pay+ | Card payment processing integration with Verizon |
| Video+ | Sales tool for Personal Video creation |
| Parts+ | Parts stock take recording |

Users will be able to log into both a Desktop Session and a Pinnacle App simultaneously however only one device will be active, the user session on the 2nd device will temporarily paused.

<u>Schedule 4</u>

**Definitions**

"**Applicable Monthly Period**" means, for a calendar month in which a Service Credit is owed, the number of days that you are a subscriber for a Service.

"**Downtime**" is defined below.  Downtime does not include Scheduled Downtime. Downtime does not include unavailability of a Service due to limitations described below and in the Services Specific Terms.

"**Incident**" means (i) any single event, or (ii) any set of events, that result in Downtime.

"**Scheduled Downtime**" means periods of Downtime related to network, hardware, or service maintenance or upgrades.  We will publish notice or notify you at least three (3) days prior to the commencement of such Downtime.

"**Service Credit**" is the percentage of the Pinnacle User Account Monthly Fees credited to you following Pinewoods claim approval.

"**Service Level**" means the performance metric(s) set forth in this SLA that Pinewood agrees to meet in the delivery of the Services.

"**User Minutes**" means the total number of minutes in a month, less all Scheduled Downtime, multiplied by the total number of users.

"**Downtime**":  Any period of time when no end users are able to login to their instance.

"**Monthly Uptime Percentage**":  The Monthly Uptime Percentage is calculated using the following formula:

$$(\text{User Minutes} - \text{Downtime})/(\text{User Minutes}) \times 100$$

where Downtime is measured in user-minutes; that is, for each month, Downtime is the sum of the length (in minutes) of each Incident that occurs during that month multiplied by the number of users impacted by that Incident.

**Terms**

**1.   Claims**

1.1   In order for Pinewood to consider a claim, you must submit the claim to customer support at Pinewood including all information necessary for Pinewood to validate the claim, including but not limited to: (i) a detailed description of the Incident; (ii) information regarding the time and duration of the Downtime; (iii) the number and location(s) of affected users (if applicable); and (iv) descriptions of your attempts to resolve the Incident at the time of occurrence.

1.2   Pinewood must receive the claim within one month of the end of the billing month in which the Incident that is the subject of the claim occurred.

1.3   We will evaluate all information reasonably available to us and make a good faith determination of whether a Service Credit is owed.  We will use commercially reasonable efforts to process claims during the subsequent month and within forty-five (45) days of receipt.  You must be in compliance with the Agreement in order to be eligible for a Service Credit.  If we determine that a Service Credit is owed to you, we will apply the Service Credit to your Pinnacle User Account Monthly Fees.

1.4  Service Credits are not available for periods where the Reseller is in breach of any payment terms of this Agreement.

**2.   Service Credits**

2.1  Service Credits are your sole and exclusive remedy for any performance or availability issues for any Downtime under the Agreement and this SLA.  You may not unilaterally offset your Pinnacle User Account Monthly Fees for any performance or availability issues.

2.2  The Service Credits awarded in any billing month will not, under any circumstance, exceed your monthly service fees, as applicable, in the billing month.

**3.   Limitations**

3.1  These Service Levels do not apply to any performance or availability issues:

(a)  Due to factors outside our reasonable control (for example, natural disaster, war, acts of terrorism, riots, government action, or a network or device failure external to our data centers, including at your site or between your site and our data center);

(b)  That result from the use of services, hardware, or software not provided by us, including, but not limited to, issues resulting from inadequate bandwidth or related to third-party software or services;

(c)  Caused by your use of a Service after we advised you to modify your use of the Service, if you did not modify your use as advised;

(d)  That result from your unauthorized action or lack of action when required, or from your employees, agents, contractors, or vendors, or anyone gaining access to our network by means of your passwords or equipment, or otherwise resulting from your failure to follow appropriate security practices;

(e)  That result from your failure to adhere to any required configurations, use supported platforms, follow any policies for acceptable use, or your use of the Service in a manner inconsistent with the features and functionality of the Service (for example, attempts to perform operations that are not supported) or inconsistent with our published guidance;

**4.   Service Credit:**

| Monthly Uptime Percentage | Service Credit |
|---|---|
| < 99.9% | 25% |
| < 99% | 50% |
| < 95% | 100% |

## SIGNATURE PAGE

Executed by **PINEWOOD TECHNOLOGIES PLC**
acting by a director, signing in the presence of:

)
)
)
)
)
)
)
)

................................................
Director's Signature

*P.D. HOPKINSON*

................................................
Director's Name

Witness-
Signature:

Name: KATIE MARTIN MCKEY

Occupation: USED CAR DIRECTOR

Address: PENDRAGON PLC
2 OAK WOOD COURT
LITTLE OAK DRIVE
ANNESLEY
NG15 0DR

Executed by **Pinewood Technologies Asia
Pacific Limited**, acting by a director, signing in the
presence of:-

)
)
)
)
)
)
)
)

................................................
Director's Signature

*David D. Neilsen*

................................................
Director's Name

Witness:-
Signature: ................................................

Name: James Richard Beeton

Occupation: General Manager

Address: Harley Davidson of Hong Kong
G/F, Eltee Building
3 Ning Foo Street, Chai Wan
Hong Kong.