# EXHIBIT 8



Neutral Citation Number: **[2023] EWHC 2506 (TCC**

Case No: HT-2022-000244

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**TECHNOLOGY AND CONSTRUCTION COURT (KBD)**

Rolls Building
Fetter Lane
London, EC4A 1NL

**13/10/2023**

**Before** :

**MRS JUSTICE JOANNA SMITH DBE**
- - - - - - - - - - - - - - - - - - - - -

**Between :**

**PINEWOOD TECHNOLOGIES ASIA PACIFIC**
**LIMITED**                                     **Claimant**


**- and -**

**PINEWOOD TECHNOLOGIES PLC**

**Defendant**


- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Tom Sprange KC and Kabir Bhalla** (instructed by **King & Spalding International LLP**) for
the **Claimant**
**Tamara Oppenheimer KC and Max Kasriel** (instructed by **Trowers & Hamlins LLP**) for
the **Defendant**

Hearing dates: 12 & 13 July 2023
- - - - - - - - - - - - - - - - - - - - -

# APPROVED JUDGMENT

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

**This judgment has been handed down by the judge by circulation to the parties' representatives by email and released to The National Archives.  The date for hand-down is deemed to be 2 pm, 13 October 2023.**

**Mrs Justice Joanna Smith:**

1. The Defendant ("**Pinewood**") applies pursuant to CPR r.24.2 for reverse summary judgment of the claim brought by the Claimant ("**PTAP**"), together with summary judgment on its counterclaim ("**the SJ Application**"). In response, PTAP applies (i) to amend its Reply and Defence to Counterclaim dated 2 December 2022 pursuant to CPR r.17.1(2)(b) and r.17.3; and (ii) for specific disclosure pursuant to the court's general case management powers in CPR r.3.1(2)(m) ("**the PTAP Application**").

2. The SJ Application invites the court:
   a. to construe the provisions of an exclusion clause contained at clause 16.2 of two similar contracts on which the claim is based dated respectively the 28 July 2017 and the 8 January 2019 ("**the First Reseller Agreement**" and "**the Second Reseller Agreement**"; together "**the Reseller Agreements**"). In particular, to grant reverse summary judgment on the basis that PTAP's claim for breach of various general obligations imposed on Pinewood under the Reseller Agreements is excluded by clause 16.2 by virtue of being a claim for "loss of profit", alternatively for "any costs or expenses…incurred in reliance on" those agreements; alternatively
   b. to declare that Pinewood's liability is limited by reason of the provisions of clause 16.3 of the Reseller Agreements to £134,528 in respect of the First Reseller Agreement and to £0 in respect of the Second Reseller Agreement;
   c. to enter summary judgment on Pinewood's counterclaim for outstanding sums due under the Reseller Agreements in the sums of US$212,105 and THB 15,517,413 plus interest in circumstances where PTAP has no legally recognisable defence. Pinewood relies upon a "no set off" provision in clause 8.10 of the Reseller Agreements in support of the proposition that there is no proper basis to deny it judgment on its counterclaim, inviting the court to construe that provision now.

3. PTAP opposes the SJ Application, contending that it raises questions of construction that can only be dealt with at trial (I shall refer to the legal arguments raised by the SJ Application as "**the Construction Arguments**") and that, further, the need for this case to be determined at trial is borne out by the PTAP Application, which seeks:
   a. an amendment to the Reply and Defence to Counterclaim to plead that clause 16 of the Reseller Agreements formed part of Pinewood's written standard terms of business within the meaning of section 3(1) of the Unfair Contract Terms Act 1977 ("**UCTA 1977**"), such that Pinewood is not entitled to seek to exclude or restrict its liability by reference to clause 16. PTAP contends that clauses 16.2 and 16.3 of the Reseller Agreements do not meet the requirement of "reasonableness" under section 11 UCTA 1977 ("**the UCTA Argument**"). By a letter sent on the second day of the hearing, PTAP's solicitors also indicated that PTAP wished to make a similar amendment so as expressly to aver that clause 8.10 of the Reseller Agreements also formed part of Pinewood's written standard terms of business such that Pinewood is not entitled to exclude the application of equitable set off by reference to clause 8.10 because that clause also does not meet the requirement of reasonableness under section 11 UCTA 1977. It is common ground that I should treat this as part of the PTAP Application.

    b.  specific disclosure in respect of eight categories of document, two of which are designed to obtain additional information to support the UCTA Argument. The remaining six categories are designed to explore the possibility that PTAP has a claim against Pinewood for "fraud or fraudulent misrepresentation", in respect of which clause 16.1 of the Reseller Agreements makes clear that Pinewood's liability is not excluded ("**the Fraud Argument**").

## The Background:

4.  Pinewood is a UK-registered company and a subsidiary of Pendragon Plc ("**Pendragon**"), one of the world's largest automotive retailers, listed on the main market of the London Stock Exchange with group revenue of some £3.6 billion. Pinewood develops and supplies a dealer management system ("**the Pinewood DMS**") for the automotive industry. A DMS is a bundled management information system containing software that meets the needs of the finance, sales, workshop, parts, inventory and administration components of running a motor dealership. Pinewood typically contracts with independent partners known as "resellers" to market and sell the Pinewood DMS to motor vehicle dealerships outside the United Kingdom. PTAP, an unrelated company notwithstanding its similar name, is just such a reseller, registered in Hong Kong.

5.  Pursuant to the First Reseller Agreement, PTAP was appointed exclusive reseller of the Pinewood DMS (pursuant to a non-exclusive licence) in Hong Kong SAR, Guam, Thailand, Macau SAR, the Philippines and Vietnam. Pursuant to the Second Reseller Agreement, which was in materially identical terms save for the territories covered, PTAP was appointed exclusive reseller in Japan. It is common ground that the Reseller Agreements were signed on behalf of PTAP by Mr David Neilsen and on behalf of Pinewood by Mr Paul Hopkinson, both directors of the respective companies.

6.  The Reseller Agreements include the following express terms which are material for the purposes of the SJ Application.

7.  By clause 3.1, PTAP was appointed by Pinewood as the "exclusive reseller of the [Pinewood DMS] in the Territory for the Term", with the right to sell Pinewood DMS Services "to and only for use by Motor Vehicle Dealerships, and only for use with respect to Motor Vehicle Dealership outlets physically located within the Territory".

8.  Clause 4 sets out competition restrictions that apply to the parties during the Term. Clause 4.2(c) places an obligation on PTAP not to "for the Term, promote, market, sell, licence, resell, supply or otherwise provide or deal in any software, licence or services to or in relation to Motor Vehicle Dealerships, which is or are similar to or may compete with the [Pinewood DMS] and/or [Pinewood DMS] Services…". Clause 5 identifies the targets that PTAP was to achieve for new users for each year that the agreement was in force and clause 6 provides for Pinewood to grant a non-exclusive licence to PTAP in relation to the Pinewood DMS.

9.  Clause 8 provides for payment by PTAP to Pinewood of monthly fees in US$ (or THB in respect of Thailand), on a fixed basis proportionate to the number of Pinewood DMS user accounts provided from time to time by PTAP to its customers in the relevant

territories. Such fees are known as the "**Pinnacle User Account Monthly Fees**".
Clause 8.10 provides as follows:

> "*Deductions and Withholding Taxes*
>
> *The Pinnacle User Account Monthly Fees (and all value added taxes and sales taxes thereon) shall be the net amount payable by the Reseller, and shall be made in full without withholding, deduction or set-off, including in respect of any taxes, charges, and other duties that may be imposed by any law or country on the same or on either party (with the exception of any corporation tax charged by the UK government on Pinewood's net income), and the Reseller shall be responsible for paying any such taxes, charges and other duties, except in so far as any such taxes, charges and other duties may be credited in full by Pinewood against its own tax liabilities. The parties agree to co-operate in all respects necessary to take advantage of such double taxation treaties as may be available, and each party agrees to assist the other party to mitigate or obtain a credit or reduction of such taxes, charges and other duties, including providing any information, certificates and documentation reasonably required.*"

10. Each of the parties to the Reseller Agreements had "General Obligations" plainly designed to facilitate the smooth functioning of the relationship.  Thus, PTAP agreed in clause 9 (amongst other things) to promote the Pinewood DMS to all Car Motor Vehicle Dealerships in the Territory, to employ sufficient staff to ensure fulfilment of its obligations, to uphold Pinewood's reputation, to comply with applicable laws and to provide information to Pinewood on a regular basis as to its activities. Pinewood's "General Obligations" were set out in clause 10.   These included the supply of promotional materials, training and support.  Clause 10.5 is in the following terms:

> "*Future Developments*
>
> *Pinewood will keep [PTAP] advised about all releases and further development of the [Pinewood DMS] which may assist [PTAP] in the successful operation and promotion and sale of [Pinewood DMS] Services. Pinewood will make any necessary changes to ensure that the [Pinewood DMS] meets the legal requirements of the Territory, provided that [PTAP] provides Pinewood reasonable notice and detail of the changes required. Pinewood will use its best endeavours to make any necessary changes to ensure that the [Pinewood DMS] meets the vehicle manufacturer franchise standards of the franchises held by Contracting Customers.*"

11. PTAP's claim in these proceedings is that this clause imposes three distinct obligations on Pinewood (referred to compendiously as "**the Development Obligations**"), namely: (i) "**the Update Obligation**" (to "keep [PTAP] advised about all releases and further development of the [Pinewood DMS] which may assist PTAP in the successful operation and promotion and sale of [Pinewood DMS] Services"); (ii) "**the Legal Requirements Obligation**" (to "make any necessary changes to ensure that the [Pinewood DMS] meets the legal requirements of the Territory…"); and (iii) "**the Franchise Standards Obligation**" (to "use its best endeavours to make any necessary changes to ensure that the [Pinewood DMS] meets the vehicle manufacturer franchise standards of the franchises held by the Contracting Customers").  PTAP also asserts an implied term ("**the Localisation Obligation**") that Pinewood was required to complete

what it refers to as localisation items, i.e. Development Items necessary to ensure that the Pinewood DMS could operate and be sold in the particular Territory.

12. Clause 16 contains a general exclusion and limitation of Pinewood's liability, as follows:

> *"**LIABILITY OF PINEWOOD [UK]**
>
> **16.1 Liability not limited**
>
> *Pinewood does not exclude its liability for death or personal injury resulting from its negligence, for fraud or fraudulent misrepresentation, or for breach of Clause 13 (Confidentiality).*
>
> **16.2 Excluded Types of Loss**
>
> *Subject to Clause 16.1, Pinewood excludes, in relation to any liability it may have for breach of this Agreement, negligence under, in the course of or in connection with this Agreement, misrepresentation in connection with this Agreement, or otherwise howsoever arising in connection with this Agreement, any such liability for: (1) special, indirect or consequential loss; (2) loss of profit, bargain, use, expectation, anticipated savings, data, production, business, revenue, contract or goodwill; (3) any costs or expenses, liability, commitment, contract or expenditure incurred in reliance on this Agreement or representations made in connection with this Agreement; or (4) losses suffered by third parties or the Reseller's liability to any third party.*
>
> **16.3 General Liability Limit**
>
> *Subject to Clause 16.1, Pinewood limits its liability for breach of this Agreement, negligence under, in the course of or in connection with this Agreement, or otherwise howsoever arising in connection with this Agreement, in aggregate for all events giving rise to such liability, to the yearly average of the total Pinnacle User Account Monthly Fees invoiced averaged over each complete Agreement Year to date, or in the case of any claim arising in the first Agreement Year, to the amount reasonably expected to be invoiced on account of Pinnacle User Account Monthly Fees for that Agreement Year."*

13. It is common ground that the Reseller Agreements have both been terminated, albeit that the parties are in dispute (amongst other things) about the precise circumstances of termination.

14. By its claim in these proceedings, PTAP alleges that Pinewood acted in breach of the Development Obligations.  In particular, that it acted in breach of the Update Obligation and the Legal Requirements Obligation in each of the Reseller Agreements and that it acted in breach of the Franchise Standards Obligation and the Localisation Obligation in relation to the Second Reseller Agreement.  Essentially PTAP contends that these breaches caused significant disruption of customer contracts under the First Reseller Agreement and that not a single dealership in Japan was able to go live on the Pinewood DMS.  PTAP says that it could not onboard further customers, leading to a loss in user accounts, monthly fees and, therefore, lost profits.

15. PTAP's claim is "calculated at approximately USD 312.7 million", which is said to comprise:

    a. Damages for costs and expenses incurred by PTAP in reliance on Pinewood's anticipated performance of clause 10.5, said to be "currently assessed in the sum of at least USD 7.2 million". It is common ground that this is a claim for wasted expenditure;

    b. Lost profits under the Second Reseller Agreement said to be "currently assessed in the sum of USD 32.5 million";

    c. Lost profits arising out of the failure of the launch of the Pinewood DMS in Japan with contracted customers under the Second Reseller Agreement "currently assessed in the sum of at least USD 85.8 million"; and

    d. Lost profits under the First Reseller Agreement said to be "currently assessed in the sum of at least USD 187.2 million".

16. In Further Information provided by PTAP on 22 September 2022, PTAP made clear that "the costs and expenses specified [referred to in paragraph 15(a) above] constitute reliance expenditure, the recovery of which is sought in the alternative to its claim for loss of expected profits". At the same time, PTAP made clear that it has "also suffered incidental losses caused by Pinewood's breaches and in dealing with the consequences of the breach" ("**the Incurred Costs**"). At paragraph 29.2 of its Reply and Defence to Counterclaim, PTAP described these incidental losses as:

    "additional costs beyond that which could be recouped through additional Customer charges in developing its AutoBI tool to produce reports that complied with Vietnamese Accounting Standards ("VAS Reports"). This was only necessary following Pinewood's failure to deliver the necessary functionality to produce VAS Reports in the Pinewood DMS, in breach of the Legal Requirements Obligation in the First Reseller Agreement. This loss is currently assessed in the sum of at least USD 896,535.39".

17. Notwithstanding evidence to the contrary in the statement of Mr Dunseath in support of the SJ Application, it appears now to be accepted on behalf of Pinewood that this additional category of incidental loss is properly to be characterised as direct loss (which does not fall within any of the words in the sub-clauses to clause 16.2) and, as such, does not fall foul of clause 16.2 on its true and proper construction and, therefore, is not caught by the SJ Application. I shall return to this point when I come to construction in due course.

18. In its Defence to the claim, Pinewood denies that it breached clause 10.5 of the Reseller Agreements, denies the existence of the Localisation Obligation and, in any event, denies breach of that obligation. Pinewood also asserts that PTAP's claim to loss and damage is unparticularised, and it denies, in any event, that PTAP would be entitled to reliance costs, whether in addition to lost profits or by way of alternative to lost profits. At paragraphs 42.4 and 42.5, Pinewood pleads as follows:

    "42.4. It is denied that [PTAP] is entitled to damages in respect of lost profits (as pleaded in sub-paragraphs 37.2 and 37.3) by virtue of the exclusion of Pinewood's liability for such losses in clause 16.2 of the Reseller Agreements.

42.5. Alternatively, any liability of Pinewood is subject to the following general limits pursuant to clause 16.3 of the Reseller Agreements:

(a) Under the First Reseller Agreement: £134,528; and

(b) Under the Second Reseller Agreement: £0*”*.

These paragraphs are the subject of bare denials in PTAP's Reply and Defence to Counterclaim.

19. In a draft Amended Reply and Defence to Counterclaim attached to the PTAP Application dated 4 July 2023, PTAP seeks to include the new UCTA Argument in the following terms:

"Moreover, pending further disclosure, [PTAP] infers that clause 16 of the Reseller Agreements formed part of [Pinewood's] written standard terms of business within the meaning of section 3(1) of [UCTA]. [Pinewood] is not entitled to seek to exclude or restrict its liability in respect of its breaches of the Reseller Agreements under clause 16.2 and 16.3 of the Reseller Agreements pursuant to section 3(2)(a) UCTA. It is averred (if alleged by [Pinewood]) that clauses 16.2 and 16.3 of the Reseller Agreements do not meet the requirement of "reasonableness" under section 11 UCTA".

20. This proposed new paragraph, inserted at 29.4.3 of the draft Amended Reply and Defence to Counterclaim, is the subject of PTAP's application for permission to amend.

21. By its Counterclaim, Pinewood claims in debt (alternatively as damages for breach of the First Reseller Agreement) the sums of US$203,197 and THB15,000,613 (approximately £425,000) which are said to have been owing since 26 April 2022 pursuant to outstanding invoices ("**the Invoices**") issued under clause 8 of that agreement.  In particular, Pinewood pleads that:

"For the avoidance of doubt, [PTAP] is not entitled to set off the sums due under the Invoices and/or the Further Invoices against any sums due or claimed as due by [PTAP] (including by way of the claims brought by [PTAP] in these proceedings), by reason of clause 8.10 of the First Reseller Agreement".

22. In its Reply and Defence to Counterclaim, PTAP admits the issue of the Invoices and admits that they have not been paid.  However, it asserts an entitlement to withhold payment of the Invoices on the basis of equitable set off, pleading that "…on its proper construction, clause 8.10 of the First Reseller Agreement does not operate to exclude the applicability of equitable set off, including in the circumstances of [PTAP's] claims in these proceedings".

23. By a letter dated 13 July 2023, sent to Pinewood on the second day of the hearing, PTAP sought Pinewood's consent to a further proposed amendment to its Reply and Defence to Counterclaim, contained in a revised draft amended pleading.  This arose in circumstances where it had become common ground at the hearing that clause 8.10 of the Reseller Agreements is an exclusion clause for the purposes of UCTA.  The proposed amendment (in a new paragraph 34.2) is in the following terms:

"Further or alternatively, pending further disclosure, [PTAP] infers that clause 8.10 of the Reseller Agreements formed part of Pinewood's written standard terms of business within the meaning of section 3(1) of UCTA. Pinewood is not entitled to rely on clause 8.10 of the Reseller Agreement to prevent the set off of sums claimed under the Reseller Agreements against the sums claimed by way of counterclaim. It is averred (if alleged by Pinewood) that clause 8.10 of the Reseller Agreements does not meet the requirement of 'reasonableness' under section 11 UCTA".

**The Evidence**

24.  In support of the SJ Application, Pinewood relies upon a statement from its solicitor, Mr Stephen Dunseath, who sets out the background to the claim and confirms his belief that summary judgment should be granted in Pinewood's favour.

25.  PTAP relies in turn on a statement from Ms Sarah Walker, its solicitor, together with a statement from Mr Neilsen, its managing director. Ms Walker's statement is largely submission, but she identifies the UCTA Argument and the Fraud Argument in terms to which I shall return. She also sets out PTAP's case on construction explaining that it raises legally and factually complex issues which cannot realistically proceed within the confines of a summary procedure. PTAP also relies upon a second statement from Ms Walker in support of the PTAP Application.

26.  Mr Neilsen provides evidence that in July 2017 PTAP was "a small start-up business" which he had founded with a longstanding friend and business partner. It had no other employees and its operations were being funded by Mr Neilsen personally. Mr Neilsen sets out his recollection of the negotiations in respect of the First Reseller Agreement, saying that Mr Hopkinson had told him that "the draft represented Pinewood's standard terms" and that, except for the sales targets and territories covered by the appointment, Pinewood "would not accept any changes to the terms". Mr Neilsen has no recollection of discussing clause 16 of the First Reseller Agreement and he confirms that he signed that agreement "after some negotiations in relation to the sales targets and territories only". As for the Second Reseller Agreement, Mr Neilsen says that he was sent a copy of the agreement which was already signed by Mr Hopkinson, that there was no time to seek legal advice and that there was no negotiation or discussion at all as to the terms of the agreement. Mr Neilsen also gives evidence about requests by Pinewood for strategic information from PTAP together with Pinewood's activities post termination of the Reseller Agreements.

27.  Mr Dunseath provided a second statement on 4 July 2023 containing evidence obtained from Mr Hopkinson as to the nature of the contract negotiations for the First Reseller Agreement and exhibiting a bundle of correspondence and draft agreements generated at the time of those negotiations. In short, it is Mr Dunseath's evidence that the First Reseller Agreement was negotiated, that various communications passed between the parties and, further, that PTAP had legal assistance at the time of the negotiations in the form of Ms Debby Davidson, a qualified lawyer and a former Senior Associate at Clifford Chance. It is also his evidence that various aspects of Mr Neilsen's evidence are inaccurate. This is acknowledged in part in a second statement from Mr Neilsen dated 6 July 2023 in which he explains that he did not have access to documents at the time of his first statement, albeit he confirms that it remains his recollection that there

was no negotiation or discussion at all of the terms of the draft Second Reseller Agreement.

**Approach to the Applications**

28. At the outset of the hearing I discussed with the parties the order in which these applications should be addressed and it was their preference that the court should hear the SJ Application first, with each party addressing the PTAP Application in the course of its submissions on the SJ Application. It is accepted on both sides that I must consider the merits of the SJ Application on the basis of the claim that would be made at trial, which means that the merits of the proposed amendment application are of significance, as is the question as to whether the evidence which is sought by PTAP on disclosure will give rise to a real prospect of success. Although my attention was drawn by PTAP to the potential for the court to order specific disclosure prior to, and in order to facilitate, the proper resolution of a summary judgment application (see *Dellal v Dellal* [2015] EWHC 907 (Fam) at [66]), it was not suggested by PTAP that the SJ Application should in fact be adjourned for this purpose and, for reasons which will become clear, I do not consider that such an outcome would be in accordance with the interests of justice in this case.

29. Notwithstanding the approach taken by the parties in their submissions, I consider that it makes sense to address the PTAP Application first, given that its outcome has the potential to inform the resolution of the SJ Application. Accordingly, I intend to consider the individual applications in the following order in this judgment: (i) PTAP's amendment application (which raises the UCTA Argument) together with its related application for specific disclosure in relation to two categories of document; (ii) the specific disclosure application in relation to the remaining six categories of document which arises in the context of the Fraud Argument; (iii) the application for summary judgment in respect of the true construction of clauses 16.2 and 16.3 of the Reseller Agreements; and (iv) the application for summary judgment in respect of the true construction of clause 8.10 of the Reseller Agreements.

30. In dealing with the amendment application, I shall address the application in respect of both clause 16 and 8.10 of the Reseller Agreements. I should make clear that although PTAP suggested that if I were to allow the amendments then the inevitable corollary would be refusal of the SJ Application, on the ground that Pinewood's application notice (which seeks dismissal of the claim) is in the wrong form, I made it clear at the hearing that I would not be prepared to determine the SJ Application on a purely procedural point such as this and Mr Sprange KC, on behalf of PTAP, did not press the point.

31. However, he did contend that there are two important reasons why the SJ Application would need to be refused in the event that PTAP is successful on its amendment application. The first concerns case management – in particular that if the UCTA amendment is allowed and the matter must proceed to trial for a determination on the UCTA Argument, it would make no sense from a case management perspective for a summary decision to be made on the Construction Arguments. There would inevitably be further evidence at trial as to the background to the Reseller Agreements and the circumstances of their negotiation and signature and it would be both unusual and potentially unwise to make a decision on the construction of individual provisions at

this stage.  This fed into the second reason: that it would be much better for all of the issues to be dealt with together at trial, when the judge will be in the best possible position to determine them by reference to a complete body of evidence.  I accept that if the amendment application is successful, these arguments are capable of amounting to some "other compelling reason" for the matter to go to trial.

**The Amendment Application and related application for specific disclosure**

32. The UCTA Argument raised in the proposed amendments to the Reply and Defence to Counterclaim is dependent upon the applicability of section 3 UCTA, which (insofar as material) is in the following terms:

"3 **Liability arising in contract.**

(1) This section applies as between contracting parties where one of them deals... on the other's written standard terms of business.

(2) As against that party, the other cannot by reference to any contract term—

(a) when himself in breach of contract, exclude or restrict any liability of his in respect of the breach; or

(b) claim to be entitled—

(i) to render a contractual performance substantially different from that which was reasonably expected of him, or

(ii) in respect of the whole or any part of his contractual obligation, to render no performance at all,

except in so far as (in any of the cases mentioned above in this subsection) the contract term satisfies the requirement of reasonableness".

33. The requirement of reasonableness for the purposes of section 3, is explained in section 11 UCTA, in so far as relevant, as follows:

"(1) In relation to a contract term, the requirement of reasonableness for the purposes of this Part of this Act, section 3 of the Misrepresentation Act 1967 and section 3 of the Misrepresentation Act (Northern Ireland) 1967 is that the term shall have been a fair and reasonable one to be included having regard to the circumstances which were, or ought reasonably to have been, known to or in the contemplation of the parties when the contract was made

…

(5) It is for those claiming that a contract term…satisfies the requirements of reasonableness to show that it does".

34. The amendment application seeks permission to plead the UCTA Argument in respect of both clauses 16 and 8.10 of the Reseller Agreements.  The parties are agreed that the test to be applied to this application is the "real prospect of success" test; in other words, the court's consideration of this point should mirror the approach it needs to take when considering whether the UCTA Argument advanced in the proposed amendment is sufficient to establish a real prospect of a successful claim by PTAP at trial for the

purposes of the SJ Application and/or a successful defence by PTAP in respect of Pinewood's Counterclaim.

35. The connected application for specific disclosure seeks two classes of documents, broadly summarised as reseller arrangements entered into with other resellers (identified at paragraphs 1 and 2 of Schedule 1 attached hereto).

36. There is a dispute between the parties as to whether the court even has jurisdiction to make an order for specific disclosure in this case, to which I shall return in a moment. For present purposes, however, I should record that the justification for PTAP's disclosure application was explained by Mr Sprange as emanating from a desire to plead the UCTA Argument in more detail than is presently possible in the proposed amendment, in particular as to Pinewood's use of the terms provided to PTAP for the purposes of the Reseller Agreements in its dealings with other counter-parties.

37. During the course of the hearing, Ms Oppenheimer KC, on behalf of Pinewood, conceded that Pinewood has a form of reseller agreement on its system, that it doesn't "reinvent the wheel" each time it enters into an agreement with a reseller and that this form of agreement is sent to prospective resellers. Accordingly, she submitted that the disclosure sought by PTAP "falls away" because Pinewood is "resting its argument on the point of negotiation and the substantial variations". By this concession, I understood Pinewood to be accepting that there was a real prospect of PTAP establishing that clauses 16 and 8.10 satisfy three of the four requirements of section 3 of UCTA, namely (i) the term is written; (ii) the term is a term of business and (iii) the term is part of Pinewood's standard terms of business, in the sense that it is habitually used in relationships with others (see *African Export-Import* (CA) at [18]-[20]).

38. What remains in issue between the parties is whether there is a real prospect of PTAP establishing that, in relation specifically to the Reseller Agreements, PTAP was dealing on those standard terms of business. This is the threshold question and the first stage of an enquiry under section 3 of UCTA. If there is a real prospect, then the second stage of the enquiry concerns the question of whether clauses 16 and 8.10 satisfy the requirement of reasonableness in section 11 of UCTA. Although Pinewood submitted in its skeleton that PTAP would have no real prospect of showing that clause 16 satisfied this second requirement, Ms Oppenheimer realistically conceded during the hearing that if the threshold question were to be determined in PTAP's favour, then the question of reasonableness at least in relation to clause 16.2 (and probably also 16.3 owing to its inter-relationship with 16.2) required a factual inquiry which would have to be determined at trial. She nevertheless maintained that the reasonableness of clause 8.10 remains capable of being determined summarily. For reasons which will become clear, it has proved unnecessary for me to consider these issues beyond the threshold question.

*The relevant legal principles*

39. I was referred to a number of authorities as to the meaning of the words 'deals on the other's written terms of business', which are not defined or explained in UCTA, including *Hadley Design Associates Ltd v Westminster City Council* [2003] EWHC 1617 (TCC) at [78]; *Yuanda (UK) Co Ltd v WW Gear Construction Ltd* [2010] EWHC 720 (TCC) at [19]-[29]; and *African Export-Import Bank v Shebah Exploration &*

*Production Co Ltd* [2016] EWHC 311 (Comm) per Phillips J at [17]-[22]. The key principles identified in these (and other) first instance authorities were summarised in *African Export-Import Bank* in the Court of Appeal [2017] EWCA Civ 845, per Longmore LJ at [18]-[25], the relevant passages for present purposes being [21]-[25]:

> "21 The fourth requirement is that the deal must be done on the written standard terms of business. That raises the question whether the Act applies in cases where there has been negotiation between the parties the result of which is that some but not all the standard terms are applicable to the deal. In *St Albans City and District Council v International Computers Ltd* [1996] 4 All ER 481 (the only other case, so far as counsel were aware, which has come before this court on this issue since the Act was passed), the party relying on the Act submitted that, if there were any negotiation of any kind, the Act could not apply. That broad submission was rejected by this court in an obiter passage of the judgment of Nourse LJ with whom Hirst LJ and Sir Iain Glidewell agreed, but Nourse LJ went on to approve (at p 491G) the statement of Scott Baker J at first instance that the deal in that case had been done on the defendant's standard terms of business because those terms remained "effectively untouched" by the negotiations that had taken place. That leaves open the question of the correct approach when some of the standard terms are not part of the deal.

> 22 Here there is also some first instance authority. Shortly after the Act was passed Lord Dunpark in *McCrone v Boots Farm Sales Ltd* 1981 SLT 103 had to construe the phrase "standard form contract" in the part of the Act which applied in Scotland. He said (at p 105):

>> "It is, in my opinion, wide enough to include any contract, whether wholly written or partly oral, which includes a set of fixed terms or conditions which the proponer applies, without material variation, to contracts of the kind in question."

> 23 In *Hadley Design Associates Ltd v Westminster City Council* [2004] TCLR 1, Judge Seymour said, at para 78:

>> "The concept underlying the provisions of Unfair Contract Terms Act 1977 section 3, in my judgment, is that there should exist a stock of written, no doubt usually, at any rate, printed, contract conditions which was simply drawn from as a matter of routine and intended to be adopted or imposed without consideration or negotiation specific to the individual case in which they were to be used. That seems to me to be the force of the words 'written' and 'standard' in the expression 'written standard terms of business'. In other words, it is not enough to bring a case within Unfair Contract Terms Act 1977, section 3, that a party has established terms of business which it prefers to adopt, as, for example, a form of draft contract maintained on a computer, or established requirements as to what contracts into which it entered should contain, as, for example, provision for arbitration in the event of disputes. Something more is

needed, and on principle that something more, in my judgment, is that the relevant terms should exist in written form prior to the possibility of the making of the relevant agreement arising, thus being 'written', and they should be intended to be adopted more or less automatically in all transactions of a particular type without any significant opportunity for negotiation, thus being 'standard'."

24 In *Yuanda (UK) Co Ltd v WW Gear Construction Ltd* [2011] Bus LR 360 Edwards-Stuart J adopted the same approach, at para 21:

"The conditions have to be standard in that they are terms which the company in question uses for all, or nearly all, of its contracts of a particular type without alteration (apart from blanks which have to be completed showing the price, name of the other contracting party and so on). One encounters such terms on a regular basis - whether when buying goods over the internet or by mail order or when buying a ticket for travel by air or rail."

25 I would also approve these first instance decisions and hold that it is relevant to inquire whether there have been more than insubstantial variations to the terms which may otherwise have been habitually used by the other party to the transaction. If there have been substantial variations, it is unlikely to be the case that the party relying on the Act will have discharged the burden on him to show that the contract has been made "on the other's written standard terms of business".

40. *African Export-Import* involved an application by claimant lenders for summary judgment against the defendants for sums outstanding under a syndicated loan facility totalling in excess of US$144 million. The defendants submitted that they had arguable defences to the claim arising by reason of their entitlement to set off a counterclaim for damages. They contended that the loan facility constituted the claimants' written standard terms of business under section 3 UCTA, such that the claimants could not rely on express provisions in that agreement which excluded any right of set off, except insofar as they satisfied the requirement of reasonableness in section 11 UCTA. Phillips J set out the facts concerning the provenance of the loan facility and the extent of the parties' negotiations and then, having regard to those facts he rejected the defendants' case and granted summary judgment, expressing himself to be satisfied (at [26]) that the defendants had no realistic prospect of establishing at trial that the loan facility was on the claimants' written terms of business. The Judge identified three changes to the agreement which had been suggested by the defendants and accepted by the claimants. In addition he observed that, "[t]he suggestion that disclosure might alter the position is a classic example of hoping that something may turn up, in this case a forlorn hope given the evidence that there was in fact a degree of real negotiation of the final terms".

41. On appeal, it was submitted, amongst other things, that "if an allegation is made by one party that a contract was in fact on the other's standard business terms and if that other gives no evidence of other similar contracts made in the past, disclosure will be required and the case is unsuitable for summary judgment" and that the amendments or

variations that had been made to the loan facility during the negotiations were not of real significance (at [30]). Longmore LJ rejected these arguments, pointing out, first that a party who wishes to contend that it is arguable that a deal is on standard business terms must produce some evidence of that contention (at [33]). I pause here to say that, in light of Ms Oppenheimer's concession, this issue does not arise in this case, although Mr Neilsen had, in any event, provided evidence justifying his understanding that the First Reseller Agreement represented Pinewood's standard terms of business for resellers.

42. Second, Longmore LJ said (at [35]) that even if he was wrong on the approach to be taken to deciding whether the terms being relied upon were standard business terms of the relevant party, he would also uphold the judgment "on the basis that there were in fact detailed negotiations in the present case which render it impossible to say that either the [loan facility] model form was, or the terms ultimately agreed were, the claimant's standard terms of business". He pointed to the three amendments identified by the judge which he described as "undoubtedly of considerable substance" and said that these showed that "there was a substantial negotiation which suffices to demonstrate that the terms ultimately agreed were not standard business terms. It certainly cannot be said that the terms were "effectively untouched"…". At [36], Longmore LJ made it clear that "[t]here is…no requirement that negotiations must relate to the exclusion terms of the contract, if the Act is not to apply".

*The Evidence*

43. Against that background, PTAP submits that, it has a real prospect of establishing at trial that there were no negotiations of any substance in advance of the First Reseller Agreement, because the evidence shows that the communications between the parties were largely concerned either with (i) PTAP asking for an amendment to be made which was rejected by Pinewood; or with (ii) PTAP making, and Pinewood addressing, simple requests for clarification of the terms. Insofar as the First Reseller Agreement in the form provided by Pinewood was amended, PTAP submits that those amendments were either designed to "fill in the blanks" or were immaterial, such that section 3 of UCTA is engaged. In considering this issue, it also submits that it is open to the court to have regard to the fact that neither clause 16, nor clause 8.10, was the subject of any amendments.

44. The available evidence as to the origins of the First Reseller Agreement is as follows:
    a. On 8 December 2016, Mr Hopkinson sent an email to Mr Neilsen attaching a first draft proposal to supply the Pinewood DMS to PTAP. Amongst other things the email attached "our reseller agreement for partners". Mr Hopkinson asked Mr Neilsen to give him a call "[o]nce you have had a chance to digest this". It appears to be accepted that the attached reseller agreement was in the form held by Pinewood on its internal system. Every page had a footer "Pinewood – Reseller Agreement".
    b. The following day, Mr Neilsen responded, thanking Mr Hopkinson for the information and asking some preliminary questions "to get an idea of the investment required on my side". On 13 December 2016, Mr Hopkinson responded to the questions posed.
    c. On 10 April 2017, after a delay of several months, Mr Neilsen emailed Mr Hopkinson with his comments on the proposed reseller agreement, saying

"Sorry for the delay in getting back to you – lawyers are slow during these holidays in HK. I've bypassed their final round of comments and captured them as noted in the markup". Mr Neilsen asked Mr Hopkinson to let him know "when you have time to discuss this week". The markup made various changes of the "fill in the blanks" variety (e.g. the identity of the contracting party, the Territory to be included and the Targets), made some other suggested amendments (including at clauses 2.2, 3.1, 3.2, 3.6 and 9.1) and also included comment boxes making observations about ways in which various clauses needed to be revised. No proposals were made in respect of clauses 8.10 and 16, and this remained the position throughout the parties' subsequent exchanges.

d. On 12 April 2017, Mr Hopkinson responded by email, saying that he had added some comments to the draft agreement and suggesting a call once Mr Neilsen had had a chance to consider them. He said he had "not spoken to our legal guys at this stage, let's see if we can get a closer understanding first". Mr Hopkinson also observed that "[t]hese things are always a bit awkward, our SA agreement has been in place since 2009 and have never needed to call each other out over it". Mr Hopkinson's attached markup of the draft agreement responded to Mr Neilsen's comments using separate comment boxes, providing clarification and also rejecting some of the proposals made. Mr Neilsen's suggested amendment to clause 2.2 was rejected as "completely unacceptable", his amendment to 3.1 and 3.2 was "unnecessary" and his amendment to 3.6 was rejected. No comment was made in relation to the amendment at clause 9.1.

e. It seems from an email from Mr Neilsen to Mr Hopkinson of 25 April 2017 that a call then took place "just before Easter". In his email, Mr Neilsen said "I believe we are aligned on most of the terms and the agreement now reflects that. The only remaining issues revolve around your obligations for modifications, our risk in an outage scenario and toher (*sic*) related liabilities. My lawyers tried to make the language way too complicated, so what you will see if (*sic*) the same comments as before in the section related to your obligations. Why don't you have your team take a crack at it and we will respond with any modifications". Mr Neilsen ended by saying: "Have fun with the lawyers today and let me know if you need anything from me in the meantime". The attached markup of the draft agreement shows that Mr Neilsen's original amendments to clauses 3.1, 3.2 and 9.1 are no longer in issue and that there has been movement by Pinewood in relation to clause 3.6. Further comments suggest revised wording for clause 2.2 and raise additional points of clarification.

f. This markup appears to have prompted another call, because an email from Mr Neilsen to Mr Hopkinson of 9 May 2017 includes the following: "Thank you for your patience with the delay in getting back the changes after our call. I have worked with the team and scoped out the markets we intend to enter first. Hopefully these revisions get us over the line and I would like to execute this contract by 19th May if possible. Let me know if you think that will be an issue". Another markup of the draft agreement was attached to this email, showing a revised list of Territories and retaining comments from the earlier markup.

g. On 2 June 2017, Mr Neilsen again emailed Mr Hopkinson referring to modifications he had made to the Territories in the draft agreement and saying that "I know you are struggling for priorities with the legal team at group" but that he hoped to get to execution "this coming week".

h. On 11 July 2017, Mr Hopkinson emailed Mr Neilsen attaching the draft agreement and saying "Assuming all OK we can get this signed up. We have added the SLA provisions, Guam and converted to US$. We have also redefined the Mobile licence situation as a mobile user is only required for Tech+ the other Apps are available as part of the regular licence". The attached draft makes clear that the additional wording proposed by Mr Neilsen in relation to clause 2.2 has been rejected, inserts new wording at the end of clause 3.6 and inserts a new clause at 10.6, together with a new Schedule 4 addressing Service Levels (this was confirmed by Pinewood during the hearing as the SLA provisions referred to in the covering email).

i. On 18 July, Mr Neilsen responded, apologising for the delay and saying "It took a while to debate some items back and forth with our counsel. Attached you will find the agreement with some minor changes that I'd like to talk through with you". These changes included crossing out some of the new words inserted by Mr Hopkinson into clause 3.6, and suggesting new (and substantive) changes to clauses 18 (concerning assignment) and 20.3.

j. On 24 July 2017, Mr Hopkinson emailed Mr Neilsen attaching a further version of the draft agreement and summarising his position on the "outstanding" points, some of which concerned targets and payment. Mr Hopkinson pointed out that a change had been made to clause 18 to make it "mutual" but that Pinewood was unable to accept the proposed change to clause 20.3. The First Reseller Agreement was subsequently signed on 28 July 2017.

45. During the course of the hearing, Ms Oppenheimer identified the specific variations which Pinewood contends are material as occurring in relation to clauses 3.6, 9.1, 10.6 and 18. Although Pinewood originally also relied upon the amendments to clauses 3.1 and 3.2, it was accepted by Ms Oppenheimer in reply that these did not change the obligations of the parties and that an amendment at the end of clause 3.2 was "clarificatory" only.

46. As for the four clauses on which Pinewood relies:

a. Clause 9.1 involved a change from "best" endeavours to "all reasonable endeavours" in connection with PTAP's obligation to secure as many customers for the Pinewood DMS Services and sales of User Accounts as possible in the Territory. In isolation, Ms Oppenheimer accepted that this was probably not material (and I agree), but she maintained that it must be taken together with the substantive changes to clauses 3.6, 10.6 and 18.

b. Clause 3.6 – this clause provides for Pinewood to give notice to PTAP in the event that it wishes to appoint a reseller in a different Territory and gives PTAP a period of time in which to accept or reject the appointment. The amendment by way of additional wording at the end of the clause provided that it would "only apply where [PTAP] has met the last applicable targets as set out in clause 5.1". If PTAP has not met that target then "Pinewood shall not be obliged to make an Offer to [PTAP] and notwithstanding any provisions of exclusivity shall be entitled to appoint any other reseller as it sees fit".

c. Clause 10.6 introduced an entirely new provision whereby Pinewood was to "provide hosting for the [Pinewood DMS] Services in accordance with the Service Levels set out in Schedule 4".

d. Clause 18 altered the original provision as to assignment (which permitted Pinewood freedom to assign the agreement but restricted PTAP's ability to

assign without prior written consent) so that the restriction on assignment without written consent was mutual.

47. In my judgment, these amendments (with the exception of clause 9.1 when viewed on its own) were clearly substantive. They directly affect the obligations of the parties under the First Reseller Agreement. The amendment to clause 3.6 could have important consequences for PTAP's appointment in other territories and I reject the submission by Mr Sprange that it is no more than a "species of the discussions" about term and territory – i.e. no more than "filling in the blanks". The amendment to clause 18 (which was plainly the subject of negotiation) had the effect of ensuring symmetrical provisions in relation to assignment and was more than (in Mr Sprange's words) a "nitpicky clarification". During the course of her submissions, Ms Oppenheimer informed the court on instructions that Schedule 4 was not contained in other reseller agreements entered into with third parties but, as Mr Sprange rightly pointed out, I can have no regard to that information in the absence of evidence. I do note, however, that on the evidence, clause 10.6 was an entirely new addition to the terms of the "precedent" agreement as originally provided in draft to PTAP, Schedule 4 only became a part of the First Reseller Agreement by reason of it being directly referenced in clause 10.6 (it was first provided under cover of the email of 11 July 2017) and by agreeing to Schedule 4, Pinewood accepted a considerable additional burden not proposed in the original draft agreement and, as I shall return to in a moment, not imposed by the Second Reseller Agreement.

48. In all the circumstances set out above, I reject PTAP's submission that it has a real prospect of success at trial on the UCTA Argument. It is clear from the documents exhibited by Mr Dunseath that negotiations took place between the parties in advance of the First Reseller Agreement involving email exchanges and calls; it is also clear that both sides had access to legal advice. The draft agreement went backwards and forwards between the parties on several occasions and changes were proposed by PTAP, some of which were rejected by Pinewood but others accepted. Pinewood made at least one substantive addition at clause 3.6 of its own accord. In my judgment, just as was the case in *African Export-Import*, it is impossible to say that the terms ultimately agreed in the First Reseller Agreement were Pinewood's standard business terms; on any view, it cannot be said that the terms were "effectively untouched" or that none of the changes was material or that the changes left the First Reseller Agreement to all intents and purposes unchanged. The fact that there was no negotiation on clauses 8.10 and 16 does not alter the position, as Longmore LJ made clear at [36] in *African Export-Import*.

49. I can see no basis on which any further evidence that may be available at trial as to the negotiations or their context could possibly alter this conclusion; that evidence is only likely to be more fulsome as to the calls (and perhaps additional correspondence) that took place between the parties. Even assuming the availability of further information about the origins of Schedule 4, I cannot see that it will shift the dial. Mr Sprange suggested that it was impossible for the court to form a view as to the materiality of a variation in a vacuum, i.e. without a full understanding of the contractual background. However, I can see nothing in the authorities that says that materiality will depend on the materiality of the change in light of the nature and effect of the contract, or indeed that it will depend on the subjective evidence of the parties as to the relative importance of the changes in the context of the overall contract. The touchstone is whether the

standard terms remain "effectively untouched" – that is a question which I can determine now.

50. Mr Sprange suggested that further evidence as to the relative bargaining power of the parties would be available at trial, evidence which he contended would be relevant having regard to the decision of Judge Thayne Forbes QC in *Salvage Association v CAP Financial Services Ltd* [1995] FSR 654, referred to in *Yuanda* at [24]. However, I note that although Judge Thayne Forbes QC identified the relative bargaining power of the parties as a matter which it would be appropriate to take into account in considering whether the parties were dealing on written standard terms of business, Edwards Stuart J in *Yuanda* (at [26]) did not agree. Further, there is nothing in *African Export-Import* to suggest that this is a relevant consideration and I reject the suggestion that the potential availability of such evidence provides a real prospect of success. Even assuming it to be relevant, the court already has evidence as to the parties' bargaining power, together with evidence that each party had legal input; I cannot see that further evidence will affect the question of whether they were dealing on Pinewood's standard terms of business.

51. Although Mr Neilsen says in his first statement (without access to the documents) that he recalls being told by Mr Hopkinson that Pinewood "would not accept any changes to the terms" of the First Reseller Agreement and that the only amendments related to sales targets or territories, the documentary evidence tells a different story. The fact that, as Mr Neilsen says in his second statement, he cannot confirm that the documents exhibited by Mr Dunseath "constitute the full factual picture" and that he believes additional emails from Mr Hopkinson to exist, does not alter the fact that on the available evidence it is already clear that there were negotiations between the parties and that those negotiations led to substantive changes to the terms of the First Reseller Agreement. Although I accept the need for considerable caution in arriving at this view and I remind myself that this is not the opportunity for a mini-trial, nevertheless I consider that, in light of the authorities, the suggestion that a trial judge (even assuming the availability of additional evidence) will arrive at a different conclusion is fanciful.

52. The parties made little in the way of submissions about the Second Reseller Agreement and I was not specifically taken to the documentary evidence as to its origins. However, looking at that evidence it is clear that it was sent in draft (and unsigned) to Mr Neilsen by Mr Hopkinson on 8 January 2019 and that the changes made to the First Reseller Agreement in the form of clauses 10.6 and 18 together with the addition of Schedule 4 (although not clause 3.6 which was removed in its entirety) are also in the Second Reseller Agreement. Mr Hopkinson merely invited Mr Neilsen to "correct the highlighted areas" specific to that agreement and to let him know if there was anything else. The Second Reseller Agreement was signed on 4 April 2019.

53. It appears to be common ground on the evidence that there was no negotiation or discussion as to the substantive terms of the Second Reseller Agreement. Where, however, the Second Reseller Agreement included variations made in the First Reseller Agreement, it is also fanciful to suppose that PTAP would be able to establish at trial that it was concluded on Pinewood's standard business terms. Mr Sprange did not suggest that if I were to find no real prospect of success on the UCTA Argument in relation to the First Reseller Agreement, then different considerations would apply to the Second Reseller Agreement.

54. In light of my conclusions as to section 3 of UCTA, there is no need for me to consider the reasonableness of either clause 16 or 8.10 pursuant to section 11 of UCTA.

*Conclusion on the amendment application and related application for specific disclosure*

55. For the reasons set out above, I dismiss the amendment application. The UCTA Argument has no real prospect of success at trial. I also dismiss the application for specific disclosure in relation to the two categories of document identified above. Ms Oppenheimer's concession rendered these unnecessary in the context of considering the merits of the amendment application and, where I have dismissed that application solely by reference to the question of whether the parties dealt on Pinewood's written standard terms, the disclosure of documents evidencing the extent of its dealings with other parties on those terms will take matters no further. Accordingly the question of whether the court has jurisdiction to order specific disclosure does not arise in this context.

**The remaining application for specific disclosure and the Fraud Argument**

56. There is no pleaded case of "fraud" in PTAP's Reply and Defence to Counterclaim and no pleaded assertion that PTAP is entitled to rely upon the provisions of clause 16.1 of the Reseller Agreements pursuant to which Pinewood is not entitled to exclude its liability for fraud or fraudulent misrepresentation. It is accepted that PTAP does not have the evidence it would need in order to support such a plea and there is accordingly no application to amend to raise it. Indeed Mr Sprange accepted at the outset of his submissions on this topic that it was equally possible to infer innocence on the facts that are currently available to PTAP.

57. Nonetheless, PTAP says that it wishes to plead, if possible, that the exception in clause 16.1 is engaged and that it considers disclosure from Pinewood to be "an important step in that process"; disclosure will enable it to establish whether it has a pleadable case against Pinewood. For the moment, PTAP submits that existing available facts are "insightful" and that they invite further enquiry and explanation. This is a reference to evidence in Mr Neilsen's first statement:

   a. of requests from Pinewood between September 2019 and January 2021 for PTAP's growth strategies and client proposals which he says coincided with a change in leadership at Pendragon and a substantial slowdown in the delivery of development updates required to launch the Pinewood DMS with existing and prospective customers;

   b. of his suspicion that the information provided pursuant to these requests had led Pinewood to form the view that it wanted PTAP's customers and markets for itself, albeit in conjunction with an acknowledgment that the factual position can only be established by sight of internal communications from Pinewood and Pendragon at the time;

   c. that almost immediately following termination of the Reseller Agreements, Pinewood approached each of PTAP's former customers seeking to require them to enter into direct contracts for the provision of the Pinewood DMS;

   d. that since contracting directly with these customers, Pinewood has delivered a number of longstanding Development Items;

e. of his concern that the combination of the above factors indicates that Pinewood and Pendragon "may have made a conscious decision either not to carry out, or at least not to deliver, development work while [PTAP] was the contracted reseller, with the ultimate aim of driving PTAP out of business and taking [its] contracts directly". Mr Neilsen goes on to say that "[i]t is also entirely possible in my view that Pinewood was in contact with underlying customers to prepare for that eventuality".

58. It is on the basis of this evidence that PTAP seeks specific disclosure of six broad categories of documents, identified in paragraphs 3-8 of Schedule 1 attached hereto.

59. Further, PTAP suggests that it would not be just to enter summary judgment on the basis of clauses 16 and 8.10 where there is a real possibility (in the words of Ms Walker) that disclosure "could result in the disclosure of evidence that would be sufficient to permit PTAP to amend its pleaded claims to include, for example, a claim alleging unlawful means conspiracy between (*inter alia*) [Pinewood] and Pendragon to drain [PTAP's] funds and acquire [PTAP's] customers, or a claim that other parties procured [Pinewood's] breach of the Reseller Agreements". Ms Walker describes these as "the Possible Economic Tort Claims" and says that if these are available, "it might in turn mean that the 'fraud' or 'fraudulent misrepresentation' exception to the Exclusion Clauses is engaged".

60. In my judgment, the suggestion that the potential to run the Fraud Argument creates a real prospect of success at trial is misconceived. PTAP's case as to the Fraud Argument is currently no more than mere speculation. Mr Neilsen's statement acknowledges that there "may be a legitimate explanation" for the requests made by Pinewood and he accepts that "Pinewood had a legitimate financial interest in our successful growth of the Pinewood DMS in the Asia Pacific market". He also acknowledges that he "does not know why" Pinewood appears to have accelerated the pace of its development work. On close analysis he goes no further than to say that he "suspects" wrongdoing on the part of Pinewood and that he "is concerned" at the possibility that a conscious decision was made by Pinewood to drive PTAP out of business and steal its customer base.

61. Against this background it is fanciful to suppose that PTAP will have a positive case on fraud or fraudulent misrepresentation at trial and I did not understand Mr Sprange seriously to suggest otherwise. Indeed he frankly acknowledged that he could not say whether there was a claim in deceit or whether there might be unlawful means involving a fraudulent misrepresentation – fraud being a necessary averment (see *Interactive E-Solutions JLT v O3B Africa Ltd* [2018] BLR 167 per Lewison LJ at [23]). I note, but need not address in any detail, the fact that the Reseller Agreements make express provision at clauses 4.1(c)(i) and 15 for the entitlement of Pinewood to provide DMS Services direct to any person in the Territory if PTAP is unable to do so, together with making detailed provision for Pinewood to take over PTAP's customers in the event of termination; thus Pinewood's entry into direct contracts with PTAP's customers after termination of the Reseller Agreements was expressly contemplated and permitted by those agreements.

62. The force of PTAP's submissions was directed at the application for specific disclosure on the basis that if disclosure were to be ordered, that would establish very quickly whether, in Mr Sprange's words, the Fraud Argument can "live or die" in that it is the

"only way that we can have these unknowns that exist answered". As I have already said, however, it was not submitted by Mr Sprange that the determination of the SJ Application must await the exercise of disclosure, although it was suggested that the fact that disclosure is an outstanding issue is in itself capable of amounting to a "compelling reason" to refuse the SJ Application.

63. There is no express provision for specific disclosure at this stage of the proceedings and the parties disagree over whether the court has jurisdiction to entertain this application in circumstances where the Practice Direction on Disclosure at CPR PD 57AD applies. Pinewood contends that PD57AD (which, at paragraph 1.1 "provides for disclosure in the Business and Property Courts" and at paragraph 1.8 expressly disapplies CPR 31) impliedly excludes an unfettered discretion to order disclosure under CPR 3.1(2)(m). It points by way of analogy to *Hart v Royal Borough of Kensington and Chelsea* [2022] EWHC 1090 (QB) in which Senior Master Fontaine held (at [6]) that in a case to which CPR 31 applied, "the court does not have jurisdiction to make an order for disclosure under CPR 3.1(2)(m)" as it was unlikely that that rule would have been intended to give the court unfettered jurisdiction to order disclosure which might be inconsistent with the threshold requirements contained in Rule 31.

64. However, PTAP draws my attention to a trilogy of cases in which it has been accepted (albeit apparently without argument) that the court has an inherent jurisdiction to order disclosure pursuant to CPR r.3.1(2)(m) for the purpose of managing the case and furthering the overriding objective: see *Balfour Beatty Regional Construction Limited v Broadway Malyan Limited* [2022] EWHC 2022 (TCC) per Jefford J at [33], *Merrill Lynch International v Citta Metropolitano Di Milano* [2023] EWHC 1015 (Comm) per Mr Stephen Houseman KC sitting as a Deputy High Court Judge at [36] and *Patisserie Holdings plc v Grant Thornton UK LLP* [2021] EWHC 3022 (Comm) per Moulder J at [37]. In the latter case Moulder J observed at [38]-[39] that:

> "38…the proper exercise of that power should be informed by the Practice Direction and the purposes for which it was imposed, namely to provide a structure and a set of rules which limit disclosure to what is reasonable and proportionate.
>
> 39…the court would only [make] the order sought under its residual power if it was satisfied that it was not thereby running contrary to the regime imposed by the Practice Direction having regard both to its literal terms and its overall purpose".

65. In *Merrill Lynch*, in the context of a pending jurisdiction challenge, Mr Stephen Houseman KC found that there were "exceptional circumstances" to justify the disclosure sought, which did not cut across or sidestep the regime in PD57AD. He observed at [46] that:

> "…A residual contextual jurisdiction oils the cogs of the formal machinery. Specific disclosure which is reasonable and proportionate can, in exceptional situations, be ordered even when the document is not "mentioned" in a formal sense and even if it proves to be "adverse" to the disclosing party as a matter of jurisdictional analysis. This does not undermine the integrity of PD57AD…"

66. As a matter of judicial comity, it appears to me that I should follow these cases and accept the existence of a residual jurisdiction but that, in common with the approach adopted in the cases, I should take a restrictive view of its reach: specific disclosure pursuant to the residual jurisdiction in CPR 3.1(2)(m) will only be granted where it is reasonable and necessary and where it does not undermine the integrity of PD57AD. Furthermore, in my judgment, adopting this approach addresses the concern expressed by Senior Master Fontaine in *Hart* around the dangers of inconsistency.

67. Turning to the application in this case, I do not consider that the requirements I have identified have been satisfied. Mr Bhalla, who very ably dealt with the jurisdiction point on behalf of PTAP, was unable to provide any compelling reason why PTAP's application does not cut across or sidestep the regime in PD57AD. As I understood his submissions, the rationale for the structure of PD57AD "is to render disclosure more efficient [and] to try to eliminate issues, so far as that may be possible". However, insofar as he deploys this in support of the proposition that there is a wide-ranging obligation to cooperate over the disclosure of documents which one side considers may shed light on the nature of the case it wishes to pursue, he goes far beyond what is envisaged by PD57AD.

68. Paragraph 2.1 of PD57AD states that disclosure "involves identifying and making available documents that are relevant to the issues in the proceedings". Cooperation is encouraged at paragraph 2.3, but paragraph 2.4 provides that

> "[t]he court will be concerned to ensure that disclosure is directed to the issues in the proceedings and that the scope of disclosure is not wider than is reasonable and proportionate…in order fairly to resolve those issues and specifically the Issues for Disclosure (as defined in paragraph 7.6)".

69. The Practice Direction makes provision for Initial Disclosure (at the time of the statements of case) followed by Extended Disclosure, which requires the identification of Issues for Disclosure. Paragraph 7.6 makes clear that "Issues for Disclosure" means "for the purposes of disclosure only those key issues in dispute, which the parties consider will need to be determined by the court with some reference to contemporaneous documents in order for there to be a fair resolution of the proceedings" and paragraph 7.8 confirms that the key issues in dispute are "identified by the parties' statements of case". These paragraphs are concerned with Extended Disclosure, but in my judgment it is telling that there is no provision in the Practice Direction for a party to seek disclosure of wide-ranging categories of document from the other party for the purposes of enabling it to decide whether it might have a cause of action. Paragraph 18 permits the court to vary an order for Extended Disclosure, including by making an additional order for disclosure of specific documents or narrow classes of documents, but it specifies that these must relate "to a particular Issue for Disclosure".

70. In my judgment, the scheme of the Practice Direction is to encourage and permit disclosure in relation to the issues to be determined by the court at trial. I agree with Pinewood's submissions that it would be contrary to the purpose and objectives of the Practice Direction to order disclosure in relation to unpleaded issues purely on the grounds that something might turn up which will change the shape of the proceedings. I certainly do not consider that such grounds constitute "exceptional circumstances" justifying the exercise of the residual jurisdiction.

71. Mr Sprange accepts that the categories of document that he seeks would not be disclosable in the proceedings in the absence of an amended case to plead the Fraud Argument and I reject his case that they are disclosable absent such a case. The application for disclosure to determine whether there is a case to be run amounts, to my mind, to no more than a fishing expedition. Mr Sprange submitted that an order requiring Pinewood to hand over "a small body of documents at an early stage in the proceedings…makes a lot of practical sense", but this does not come close to engaging the residual jurisdiction. That the disclosure exercise may not be onerous (a suggestion that was rejected by Ms Oppenheimer) is nothing to the point.

72. The entirely speculative nature of the application was borne out by the suggestion by Mr Sprange during his submissions that there would be no need for an order for disclosure, if only Pinewood could serve a statement explaining that its conduct was innocent – a suggestion which appeared to imply a positive obligation on the part of Pinewood to address a case which has not been pleaded and which is currently unsustainable on the available evidence. There is no such obligation and the court can draw no inference from the fact that Pinewood has not served such a statement.

73. In my judgment, to permit this application for specific disclosure would be to undermine the regime of the Practice Direction, both as to its literal terms and its overall purpose. Accordingly I decline to make the order sought.

**Summary Judgment – law and practice**

74. The principles to be applied on an application for summary judgment are largely uncontroversial - the court may grant summary judgment "on the whole of the claim or on a particular issue", if it considers that "the claimant has no real prospect of succeeding on the claim or issue" (CPR r.24.2(a)(i)) and "there is no other compelling reason why the claim or issue should be disposed of at trial" (r.24.2(b)). In determining a summary judgment application, evidence is admissible to establish that the pleaded case is fanciful – albeit that the court will be very cautious about rejecting the claimant's factual case at the summary stage.

75. The parties relied upon the well-known judgment of Lewison J in *Easyair Ltd v Opal Telecom Ltd* [2009] EWHC 339 (Ch) at [15]:

   "i) The court must consider whether the claimant has a "realistic" as opposed to a "fanciful" prospect of success: *Swain v Hillman* [2001] 2 All ER 91;

   ii) A "realistic" claim is one that carries some degree of conviction. This means a claim that is more than merely arguable: *ED & F Man Liquid Products v Patel* [2003] EWCA Civ 472 at [8];

   iii) In reaching its conclusion the court must not conduct a "mini-trial": *Swain v Hillman*;

   iv) This does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents: *ED & F Man Liquid Products v Patel* at [10]

v) However, in reaching its conclusion the court must take into account not only the evidence actually placed before it on the application for summary judgment, but also the evidence that can reasonably be expected to be available at trial: *Royal Brompton Hospital NHS Trust v Hammond* (No 5) [2001] EWCA Civ 550;

vi) Although a case may turn out at trial not to be really complicated, it does not follow that it should be decided without the fuller investigation into the facts at trial than is possible or permissible on summary judgment. Thus the court should hesitate about making a final decision without a trial, even where there is no obvious conflict of fact at the time of the application, where reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case: *Doncaster Pharmaceuticals Group Ltd v Bolton Pharmaceutical Co 100 Ltd* [2007] FSR 63;

vii) On the other hand it is not uncommon for an application under Part 24 to give rise to a short point of law or construction and, if the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, it should grasp the nettle and decide it. The reason is quite simple: if the respondent's case is bad in law, he will in truth have no real prospect of succeeding on his claim or successfully defending the claim against him, as the case may be. Similarly, if the applicant's case is bad in law, the sooner that is determined, the better. If it is possible to show by evidence that although material in the form of documents or oral evidence that would put the documents in another light is not currently before the court, such material is likely to exist and can be expected to be available at trial, it would be wrong to give summary judgment because there would be a real, as opposed to a fanciful, prospect of success. However, it is not enough simply to argue that the case should be allowed to go to trial because something may turn up which would have a bearing on the question of construction: *ICI Chemicals & Polymers Ltd v TTE Training Ltd* [2007] EWCA Civ 725".

76. In the recent case of *Square Leg International Inc v Hassan* [2022] EWHC 554 (Comm) at [37], Ms Clare Ambrose, sitting as a Deputy High Court Judge, drew attention to the encapsulation of these principles by Warby LJ in *HRH The Duchess of Sussex v Associated Newspapers Ltd* [2021] EWHC 273 (Ch) at [14]-[16]:

"14. Easyair principles (vi) and (vii) contain echoes of the law's traditional disapproval of 'a desire to investigate alleged obscurities and a hope that something will turn up...' as a basis for defending a summary judgment application; a case that is 'all surmise and Micawberism' will not do: see The Lady Anne Tennant v Associated Newspapers Ltd [1979] FSR 298, 303 (Sir Robert Megarry V-C). The focus is not just on whether something more might emerge, but also - and crucially - on whether, if so, it might 'affect the outcome of the case'; and the court's task is to assess whether there are 'reasonable grounds' for believing that both these things would occur: see *Doncaster Pharmaceuticals Group Ltd v The Bolton Pharmaceutical*

*Company 100 Ltd* [2006] EWCA Civ 661 [2007] FSR 63, [18] (Mummery LJ).

15. As Mummery LJ warned in the *Doncaster* case at [10], on applications for summary judgment the court must be alert to 'the defendant, who seeks to avoid summary judgment by making a case look more complicated and difficult than it really is'. But as he also said at [11], the court should beware 'the cocky claimant who ... confidently presents the factual and legal issues as simpler and easier than they really are and urges the court to be efficient...'. Efficiency is not a ground for entering summary judgment. Judgment without a trial may sometimes result in huge savings of time and costs; that would have been so in the hugely expensive litigation in *Three Rivers District Council v Bank of England*. But neither Part 24, nor the overriding objective, permits the court to enter judgment on the basis that the claimant has a strong case, the defence is not likely to succeed, and the time and costs involved in a trial are disproportionate to the potential gains.

16. The overriding objective of 'deciding cases justly and at proportionate cost' does have a role to play if the court concludes there is no realistic prospect of a successful defence, and the question arises whether there is 'some other compelling reason' for a trial. At that point, the court would be bound to have regard to considerations such as saving expense, proportionality, and the competing demands on the scarce resources (CPR 1.1(2)(b), (c) and (e)). It is rare for the court to find a compelling reason for a trial, when it has concluded there is only one realistic outcome. The defendant has not suggested that this is such a case. My focus must be on whether it is realistic or fanciful to suppose the claims might fail at trial."

77. In resisting the SJ Application, Mr Sprange emphasises the need for the court to proceed with caution and points to the fact that the court is not limited to considering the issues arising on the pleaded case or the evidence as at the date of the application, but must assess the application by reference to evidence that can reasonably be expected to be available at trial (see *Easyair* at [15(v)] and more recently *Mishcon de Reya LLP v RJI (Middle East) Ltd* [2020] EWHC 1670 (QB), per Johnson J at [54]-[57]). This much was uncontroversial. However, in his skeleton, Mr Sprange also submitted that the court must assess the application "by reference to all the arguments raised in relation to the claim or issue, whether pleaded or not yet pleaded because disclosure would be required to advance them". Although I accept that on an application of this sort I may have regard to matters that have not yet been put in issue in the pleadings, I cannot accept this formulation without adding an important caveat: the touchstone will always be whether the new evidence or argument (even if it is unpleaded) is likely to affect the outcome of the case so as to give it "a real prospect of success". See *Square Leg* at [34]:

"…in forming an assessment of the prospects of success for the purpose of applying the test in Part 24, the court may take a view on what is an issue between the parties on the pleadings and the merits of the points that have been raised but are not yet pleaded. The key question is whether the arguments raised, whether pleaded or unpleaded, give rise to a real prospect of success".

78. Finally, as I have already said, Mr Sprange also submitted that the prospect of disclosure in respect of an argument that a party wishes to advance in the proceedings (which would have a real prospect of success) may in itself present a "compelling reason" for the claim to proceed to trial within the meaning of CPR r.24.2(b). I reject this argument which does not appear to me to be supported by authority – I was not shown a single authority in which the potential for disclosure to be given has been held to be a compelling reason for the case to go to trial.

79. Amongst other things, in considering the question of "real prospect of success" for the purposes of r.24.2(a), the court is required "to consider the evidence which can reasonably be expected to be available at trial and the lack of it" (see *Commerzreal Investmentgesellschaft mbh v TFS Stores Limited* [2021] EWHC 863 (Ch) per Chief Master Marsh at [17]). It would be surprising if this were also a consideration relevant to the determination as to the existence of some "other compelling reason" pursuant to the second limb of the test, at r.24.2(b). Consistent with this approach, the extract from Warby LJ's judgment in the *Duchess of Sussex* case to which I have already referred places the focus of the enquiry under r.24.2(b) firmly on matters extraneous to the considerations that apply in determining whether a respondent to an application for summary judgment has no real prospect of success. Accordingly, whilst I accept that the potential for further disclosure in respect of an argument that has a real prospect of success must be taken into account by the court in considering the first limb of the test for summary judgment under r.24.2(a), in my judgment it does not come into play in the context of the second limb.

80. In any event, in circumstances where I have rejected PTAP's application for disclosure in its entirety, the point does not arise in this case.

81. For the purposes of this application, I must proceed on the basis that the breaches alleged in the Particulars of Claim are capable of being established at trial.

**Approach to the construction of Exclusion Clauses**

82. The parties cited various cases as to the approach to be taken by the court to the construction of exclusion clauses. Ultimately there was little difference between them. The key principles may be summarised as follows:
    a. The exercise of construing an exclusion clause must be undertaken in accordance with the ordinary methods of contractual interpretation. Commercial parties are free to make their own bargains and to allocate risks as they think fit; exclusion and limitation clauses are an integral part of pricing and risk allocation. The principle of freedom of contract requires the court to respect and give effect to the parties' agreement (see *Frans Maas (UK) Ltd v Samsung Electronics (UK) Ltd* [2004] 2 Lloyds Rep 251 per Gross J at [130]; *Tradigrain SA v Intertek Testing Services (ITS) Canada Ltd* [2007] 1 CLC 188 at [46] per Moore-Bick LJ; *Interactive E-Solutions JLT v O3b Africa Ltd* [2018] BLR 167 at [14] per Lewison LJ and *Triple Point Technology Inc v PTT Public Co Ltd* [2021] AC 1148 at [108] per Lord Leggatt with whom Lord Burrows agreed).
    b. However, a vital part of the setting in which parties contract is a framework of rights and obligations established by the common law. In construing an exclusion clause, the court will start from the presumption that in the absence of clear words the parties did not intend to derogate from those normal rights

and obligations. (*Modern Engineering (Bristol) Ltd v Gilbert Ash (Northern) Ltd* [1974] AC 689 per Lord Diplock at page 717H; *Triple Point* at [108]-[110]).

c.  The more valuable the right, the clearer the language of the exclusion clause will need to be if it is to be given effect (*Triple Point* at [110]).

d.  However, "[i]n commercial contracts negotiated between business-men capable of looking after their own interests and of deciding how risks inherent in the performance of various kinds of contract can be most economically borne…it is…wrong to place a strained construction upon words in an exclusion clause which are clear and fairly susceptible of one meaning only…" (*Photo Production Ltd v Securicor Transport Ltd* [1980] AC 827 per Lord Diplock at page 851 and *Fujitsu Services Ltd v IBM United Kingdom Ltd* [2014] 1 CLC 353 per Carr J at [49]).

e.  Notwithstanding (a)-(d) above, an exclusion clause will not normally be interpreted as extending to a situation which would defeat the main object of the contract or create a commercial absurdity, notwithstanding the literal meaning of the words used. This is a context in which it is open to the court to strain to avoid a particular construction, rather than one which requires ambiguity on a fair reading before the principle comes into play, because it is inherently unlikely that the parties intended that the clause should have so wide an ambit as in effect to deprive one party's stipulations of all contractual force such that the contract becomes 'a mere declaration of intent' (*Kudos Catering (UK) Ltd v Manchester Central Convention Complex Ltd* [2013] EWCA Civ 38, per Tomlinson LJ at [19] citing from the speech of Lord Wilberforce in *Suisse Atlantique Societe d'Armement Maritime SA v NV Rotterdamsche Kolen Centrale* [1967] 1 AC 361 at pages 431-432; *AstraZeneca UK v Albemarle International* [2011] 2 CLC 252, per Flaux J at [313]; and *CNM Estates (Tolworth Tower) Ltd v VeCREF I Sarl* [2020] 2 CLC 243, per Foxton J at [33]).

f.  However, even in this context, where language is fairly susceptible of one meaning only, that meaning must be attributed to it unless "the meaning is repugnant to the contract" (see *Kudos* at [20]). This is a principle which "should be seen as one of last resort and there is authority that it applies only in cases where the effect of the clause is to relieve one party from all liability for breach of any of the obligations which he has purported to undertake: see *Great North Eastern Rly Ltd v Avon Insurance plc* [2001] EWCA Civ 780, [2001] Ll Rep IR 793. Only in such a case could it be said that the contract amounted to nothing more than a mere declaration of intent" (*Transocean Drilling UK Ltd v Providence Resources plc (The GSF Arctic III)* [2016] EWCA Civ 372, per Moore-Bick LJ at [27]).

83. Although I was not referred to any authorities dealing with the general approach to be taken by the court to the interpretation of contracts, that approach is well known, and not in doubt. The principles are to be found in *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; *Arnold v Britton* [2015] UKSC 36 and *Wood v Capita Insurance Services Ltd* [2017] UKSC 24. There is no need to set them out here.

84. PTAP pointed out in its skeleton argument (by reference to *2Entertain Video Ltd v Sony DADC Europe Ltd* [2021] 1 ALL ER 527 (TCC)) that exclusion clauses in the nature of clause 16 "may also on their true construction only be intended to apply to special or unforeseen losses falling within the second rule of *Hadley v Baxendale*, rather than direct and natural losses arising out of the breach including lost profits". This was not

in dispute, although it will always depend upon the true construction of the relevant clause in its proper context.

85. One point of difference between the parties in relation to the applicable principles of construction arose in connection with a submission from PTAP that exclusion clauses "do not apply to the non-performance of contractual obligations or to repudiatory breaches of contract", a submission that was said to be supported by the decision in *Kudos*. In my judgment, this proposition is neither consistent with the ratio in *Kudos*, nor with wider authority. Indeed, although Mr Sprange disavowed any attempt to resurrect the doctrine of fundamental breach (which the House of Lords in both *Suisse Atlantique* and *Photo Production* concluded was no longer good law), it is difficult to see this submission as anything other than that and I can deal with it briefly.

86. As Flaux J (as he then was) observed in *AstraZeneca* at [294], it is clear from the speeches of Lord Wilberforce in both *Suisse Atlantique* and *Photo Production* that he was:

"…rejecting any artificial distinctions between different kinds or degrees of breach of contract or presumptions against the application of exclusion or limitation clauses and saying that, whilst such clauses are construed strictly against the party who seeks to rely on the clause, it is a question of construction of the clause in every case, as to whether it covers the particular breach in question."

87. The decision in *Kudos* is in no way inconsistent with this proposition. It concerned a claim for lost profits arising by reason of the repudiatory breach of a contract for the provision of catering services. The Court of Appeal construed an exclusion clause (appearing as a sub-clause within a section of the agreement entitled "Indemnity and Insurance"), which provided that there should be "no liability whatsoever in contract, tort…or otherwise for any loss of…profits…suffered by the Contractor or any third party in relation to this Agreement…", so as to have a narrow meaning, namely lost profits arising by reason of the defective performance of the agreement and not lost profits arising by reason of a refusal or disabling inability to perform it. In so doing, Tomlinson LJ expressed the view that the wide construction adopted by the judge at first instance rendered the agreement "effectively devoid of contractual content".

88. At [23]-[27] Tomlinson LJ considered the clause in its context within the agreement, including its position within the "Indemnity and Insurance" clause, its relationship with other sub-clauses and its language. He concluded that its position and content showed that it was designed to qualify the extent of an indemnity provided in an earlier sub-clause and that the words "or any third party" in the clause were key to its interpretation. It was suggested by counsel (as is apparent from [28] of the judgment) that this approach represented an objectionable resort to the discredited doctrine of fundamental breach. But, Tomlinson LJ rejected that suggestion observing that he had conducted "a legitimate exercise in construing a contract consistently with business common sense and not in a manner which defeats its commercial object".

89. At [29] Tomlinson LJ made clear that, had they so wished, the parties could have provided that there should be an exclusion of all liability for financial loss in the event of a refusal to perform, but he went on to say that had that been intended "I would have expected them to spell that out clearly, probably in a free standing clause, rather than

in a sub-clause designed in part to qualify an express and limited indemnity, and in one which moreover forms part of a series of sub-clauses dealing with the provision of indemnities and the insurance to support them". In his judgment "by their language and the context in which they used it [the parties] demonstrated that the exclusion related to defective performance of the Agreement, not to a refusal or to a disabling inability to perform it".

90. Mr Sprange submitted that at [27], Tomlinson LJ held that the expression "in relation to this Agreement" meant "in relation to the performance of this Agreement", and thus did not extend to losses suffered in consequence of a refusal to perform or to be bound by the Agreement. However, to my mind this is a misunderstanding of this passage of the judgment. Tomlinson LJ prefaced his observations as to the construction of the expression "in relation to this Agreement" with the words "[i]n order to construe the provision consistently with business common sense" and went on to say how he "would regard the expression…in this context". In my judgment this was not a general statement as to the meaning in every case of the words "in relation to this Agreement", but rather an interpretation of those words in their specific context and against the background of his earlier observations that the alternative construction adopted by the judge was devoid of contractual context. For similar reasons, McCombe LJ observed in his very short judgment that he "would have been prepared to hold that in clause 18.6 the words '…in relation to this Agreement…' as they appear in that clause should be taken to mean '…in performance of this Agreement'".

91. Accordingly, I reject the suggestion that there is any principle that exclusion clauses cannot apply to the non-performance of contractual obligations or to repudiatory breaches of contract. Subject to the application of the particular principles to which I have referred above, it will be a question of construction in every case whether the exclusion clause covers the breach or, in the case of clause 16.2, the loss in question.

92. During his submissions, Mr Sprange submitted that whilst the fundamental breach principle is no longer good law, there is a rule of construction which "leads to the same result", namely that if an exclusion clause is to cover a repudiatory breach (particularly where the clause is asymmetrical) it must use clear language – a reference to "breach" is not good enough, the clause must expressly refer to "repudiatory breach" or use other words which make it clear beyond peradventure that that is what is meant.

93. In support of this proposition, Mr Sprange directed my attention to a passage at 12.95 in *Lewison on the Interpretation of Contracts (7th Edition)* in which the learned author cites at length from a passage in a judgment of Mr Gabriel Moss QC (sitting as a Deputy High Court Judge) in *Internet Broadcasting Corp v MAR LLC (t/a MARHedge)* [2009] 2 Lloyds Rep 295 setting out various principles relevant to cases of deliberate repudiatory breach, which I can summarise by reference to the numbers that he used as including (2) the existence of a strong presumption against an exemption clause being construed so as to cover deliberate repudiatory breach; (3) the need for clear words in the context of "deliberate repudiatory breach" and "strong language such as 'under no circumstances'"; (4) the need for words which expressly cover deliberate wrongdoing such as "including deliberate repudiatory acts by [the parties to the contract] themselves"; (5) the need to avoid construing words which in their literal sense cover a deliberate repudiatory breach consistent with that literal sense if that would defeat the main object of the contract and (6) that an exemption clause should not normally be

construed in a commercial contract so as to cover uninsurable risk, in particular deliberate wrongdoing by a party to the contract itself.

94. Mr Sprange submitted that although Flaux J held in *AstraZeneca* at [289] that propositions (2) and (3) from this summary were wrong on the modern authorities because they effectively sought to revive the discredited doctrine of fundamental breach, nonetheless propositions (4)-(6) remain good law. I disagree. As Lewison goes on to observe at 12.96, in *AstraZeneca* (at [301]) Flaux J made the following concluding observation about the judgment in *MARHedge*:

> "Thus, in my judgment, the judgment in *MARhedge* is heterodox and regressive and does not properly represent the current state of English law. If necessary, I would decline to follow it. Even if the breach by Albemarle of its obligation to deliver DIP had been a deliberate repudiatory breach as AZ contends, the question whether any liability of Albemarle for damages for that breach was limited by clause M would simply be one of construing the clause, albeit strictly, but without any presumption".

95. In my judgment, the propositions identified in *MARHedge* are unsafe and I decline to apply them in circumstances where they were plainly premised upon the existence of a strong presumption against exclusion clauses being construed so as to cover deliberate repudiatory breach – a presumption which is inappropriate.  Instead, I intend to apply the principles to which I have already referred in so far as it is necessary to construe the clauses.

## Should the court "grasp the nettle" and construe clauses 8.10 and 16?

96. Pinewood invites me to grasp the nettle and determine the issue of construction in relation to clauses 8.10 and 16 in its favour.  This requires the court to be satisfied that it is able to determine the true construction of those clauses at this stage, such that there is no reason for that determination to await trial.

97. I have rejected the PTAP Application and so there is no prospect of PTAP establishing either its UCTA Argument or its Fraud Argument at trial.  Nevertheless, PTAP contends that there are other reasons why the court should not determine the issue of construction at this stage; essentially (i) that the issue is legally complex and "the subject of conflicting decisions"; and (ii) factually complex in that "complete evidence on both sides can be reasonably expected to be available at trial".

98. I can see nothing in the suggestion that the legal complexity of the construction issue should cause the court to delay its determination until trial.  If PTAP intends to suggest that there are conflicting decisions as to the correct approach to be taken to the true interpretation of an exclusion clause, I disagree.  As I have already said, there was little between the parties on the law and, in my judgment, the available authorities provide examples of the application of those principles and are explicable by reference to the individual wording of the clause in question when viewed strictly in its proper contractual context.  If PTAP intends to rely upon its submissions as to the true effect of *Kudos*, I have been able to address those in short order.  There is nothing in the authorities themselves or their proper application in the circumstances of this case to suggest that this matter must go to trial.

99. It was suggested by PTAP that none of the reported decisions arises in the context of a summary judgment application and that this shows that the construction of an exclusion clause is not a suitable task to be undertaken on such an application.  However, as Pinewood was able to show by reference to two recent authorities (*Interactive E-Solutions JLT v O3b Africa Ltd* [2018] BLR 167 and *Mott Macdonald Ltd v Trant Engineering Ltd* [2021] BLR 440) in which applications for summary judgment were made (and succeeded) in circumstances where an issue arose as to the true interpretation of an exclusion clause, this is mistaken.  The question of whether summary judgment is a suitable remedy will depend, of course, on the individual circumstances of every case.  But, there is certainly no hard and fast rule that the question of the true construction of an exclusion clause must go to trial.

100. Is the question of construction in this case factually complex such that it is unsuitable for summary determination?  No factual complexities were identified in PTAP's skeleton argument and there was no hint in its skeleton that it intended to rely upon any factual matrix evidence at trial.  Ms Walker's evidence suggests that the construction of clause 16 "will necessarily depend upon more complete evidence as to each party's bargaining power and whether clauses were specifically negotiated and that relevant contractual context", but does not identify specifically what it is that she considers to be significant or admissible in this context.  She merely asserts that the necessary assessment "cannot realistically proceed within the confines of a summary procedure".

101. During the course of his submissions, Mr Sprange asserted that PTAP would want to rely upon factual matrix evidence at trial, together with material addressing the contractual context, and that this in itself meant that the SJ Application should be dismissed.  I put to Mr Sprange that PTAP had not provided, or identified, any such material for the purposes of this application, to which he responded "No and nor should we.  And I take issue with the suggestion that we ought to" going on to say that in his experience "we are damned if we do and damned if we don't".

102. I found this to be a surprising submission.  It is incumbent upon a party seeking to oppose an application for summary judgment on the grounds that there will be a need for the court to consider relevant factual evidence at trial to substantiate that assertion by describing, at least in general terms, the nature of the evidence, its source and its relevance to the issues before the court.  The court may then be able to determine whether there is some substance in the point or whether that party is simply hoping that something may turn up.  If a party wishes to rely upon material which indicates the existence of a substantive factual dispute, or even the likelihood of such material being available at trial, placing that material before the court (or providing credible evidence as to its existence) could only operate in that party's favour; it is difficult to see how that party could be in any way prejudiced by doing so.  I am inclined to agree with Ms Oppenheimer that this exchange with Mr Sprange reinforces the impression that PTAP is doing no more than merely hoping that something will turn up.

103. Perhaps appreciating that the submission that there was no need to identify any factual matrix or contractual context evidence on which PTAP wishes to rely at trial left PTAP somewhat exposed, Mr Sprange returned to the question of the factual matrix and the general contractual context at various points in his submissions.  In doing so, he contended that (with reference to the pleadings and statements provided for this

hearing) the court already had evidence before it "as to some of the contractual matrix that is relevant to construction" but also that further evidence would be required at trial:

    a.  In the context of clause 8.10, Mr Sprange pointed to the Scott Schedule setting out the parties' respective positions as to Development Items not provided by Pinewood in support of the submission (as I understood it) that the nature of claims made after the event will inform the court as to the mindset of the parties at the time of entry into the Reseller Agreements. I reject this submission. Any relevant factual matrix material together with evidence of contractual context must date back to before entry into the contract – evidence as to failures on the part of Pinewood after the event cannot conceivably assist (see *Mott MacDonald Ltd v Trant Engineering* [2021] BLR 440 at [68]).

    b.  Mr Sprange then focused on clause 10 of the Reseller Agreements making submissions as to its purpose and relevance to the interpretation of clause 8.10, albeit not explaining how this gave rise to a factual issue that requires evidence at trial. Indeed he accepted that "there is sufficient matrix evidence for you to understand what the parties were trying to achieve". He went on to describe that as follows: "you have a sophisticated, large scale platform that, if sold to car dealers, allows them to run their entire business from the moment somebody walks in to buy a car, all the way to the end when they sell it, after having had it serviced for five years. So you can imagine the scale and complexity of that. [Pinewood] wanted that software sold in Asia Pacific. [PTAP], owning a dealership in Hong Kong, is there to get penetration in the territories that were chosen…[it] cannot do that successfully unless it gets this software and gets it so it works appropriately and properly in all the territories…[PTAP] was at the mercy of [Pinewood] in terms of 'Can you please fix or provide us with all of these things that we need in all of the jurisdictions?'" This explanation provided contractual context, all evident from the material before the court, but did not suggest the need for the court to consider any disputed issues of fact, or factual matrix evidence.

    c.  Although Mr Sprange later contended that there would be further relevant evidence at trial as to the nature of the business, the bargaining positions of the parties, the detail of the software, the real purpose of the provisions in clause 10 of the Reseller Agreements and the drafting history, including all of the negotiations, he never identified more specifically what that evidence would be, where it would come from, and (more importantly) how it was said by PTAP that such evidence would be relevant to the issue of construction such that it would provide PTAP with a real prospect of success on that issue at trial. Insofar as Mr Sprange's description of that likely evidence appeared to stray into subjective evidence from the parties as to the negotiations and their understanding of the terms of the Reseller Agreements, it could not possibly be admissible in any event. Insofar as he was intending to suggest the availability of relevant factual matrix evidence, PTAP has not begun to satisfy the requirement to show a real prospect of such evidence affecting the approach of the court to construction. It was open to PTAP to serve further evidence for this hearing to support Mr Sprange's submissions but it did not do so.

104. I have little reason to suppose that the context at the time of concluding the First Reseller Agreement is genuinely contentious (given the evidence I have seen to date) and it is difficult to see that the court's understanding or assessment of that context will be affected to any material degree by the evidence at trial. No doubt there would be

more details as to the approach each party took to the Reseller Agreements, their subjective intentions and the negotiations, but little, if any of this is likely to be admissible and accordingly it is very unlikely that the court's understanding of the overall picture will really change. PTAP could have done more to seek to convince the court that the picture at trial will be different, but where it has apparently chosen not to engage with that exercise, it cannot expect the court to shy away from the invitation to grasp the nettle.

105. It is true that the parties to this contract were not equal in terms of bargaining power and that clause 16.2 is asymmetrical in effect – excluding only liability on the part of Pinewood. Is this enough to render it unjust to determine the Construction Arguments summarily? Having considered the matter with care, in my judgment it is not. The imbalance between the parties means that the court must look very closely indeed at the terms of the exclusion clause, bearing in mind all the principles to which I have referred - including importantly that it is to be presumed that PTAP did not intend to abandon any claim it might have for loss of profits or wasted expenditure by reason of Pinewood's breach of contract. However, as I have already determined, there were clearly negotiations prior to the signing of the First Reseller Agreement and PTAP plainly had access to legal advice. It was suggested in submissions that the nature and scope of this advice might be relevant to the court's determinations at trial, but it is very difficult to see how and I was not provided with any information from which to conclude that the facts surrounding PTAP's legal advice would be material in the context of the Construction Arguments and would provide a real prospect of success at trial.

106. In all the circumstances, and while I am very conscious that the court should proceed with the utmost caution when invited to make a final decision without a trial, in my judgment there is no impediment to my making such a decision and I intend to do so in accordance with the approach set out in proposition (vii) of *Easyair*.

107. PTAP has not identified anything to suggest a real prospect that (i) a proper understanding of the context of the Reseller Agreements genuinely requires further evidence at trial or the resolution of any disputed issues of fact; (ii) there is any admissible factual matrix evidence which requires further analysis at trial; or (iii) that there will be evidence available to the court at trial which will be materially different from the evidence that is now before the court and that will provide PTAP with a real prospect of success on the Construction Arguments.

108. In summary and in light of the analysis set out above:
   a. The question of the true interpretation of clauses 16 and 8.10 is a short point of construction, largely dependent upon an analysis of the terms of the Reseller Agreements themselves;
   b. I am satisfied that the court has before it all the evidence necessary for the proper determination of that point of construction. There is no obvious conflict of fact on any issue which is likely to bear upon that question. The matters raised by Mr Sprange as providing legitimate contractual context are not in dispute. There is no factual matrix evidence which takes matters any further and no suggestion (beyond mere vague and unsubstantiated assertion) that additional relevant factual matrix evidence will be available at trial. Accordingly, there is no reason to believe that a fuller investigation into the facts of the case would materially

add to, or alter, the evidence available to the trial judge and so affect the outcome of the case; and

c. I do not consider there to be any other reason why I should decline to decide the Construction Arguments, and none was suggested.

**Is Pinewood's liability to PTAP in respect of its claims for breach of clause 10 of the Reseller Agreements excluded by clause 16.2?  If not, is it nevertheless limited by clause 16.3?**

109. Pinewood says that the wording of clause 16.2 is clear – it was intended to exclude liability for specified heads of loss.  Amongst other things, it was intended to exclude "any liability… for breach" of contract for "loss of profit" and for "costs or expenses…incurred in reliance on the Reseller Agreement".  It was not intended to exclude all and any liability for breach of contract, only liability that gave rise to the specified heads of loss in sub-clauses (1)-(4).  This, says Pinewood, explains (and sits comfortably with) the provisions of clause 16.3 which is intended to limit liability for any head of loss not caught by 16.2.  Pinewood points out that the Incurred Costs now pleaded by PTAP (by way of its Further Information and Reply and Defence to Counterclaim), which arose as a direct consequence of the alleged breach, but which neither amount to loss of profit, nor costs or expenses incurred in reliance on the Reseller Agreement (and do not fall under any of the other heads of loss identified in 16.2) would be caught by 16.3.

110. By contrast, PTAP advances a primary and a secondary case as to construction:

a. Its primary case is that the word "breach" in clause 16.2 (and also 16.3) cannot properly be construed as a repudiatory breach because there is nothing in the clause that makes it clear beyond peradventure that the parties intended it to cover a repudiatory breach.  This submission is made by reference to the points with which I have already dealt in respect of *Kudos*.

b. Its secondary case is that the types of loss identified at clause 16.2(2), (3) and (4) are, on their true and proper construction, species of indirect or consequential loss falling within the second limb of *Hadley v Baxendale*.  That is so because clause 16.2(1) expressly introduces the excluded categories of loss as "special, indirect or consequential loss" and this reference governs the scope of the heads of loss identified in sub-paragraphs (2)-(4), all of which are capable of falling within the words "special, indirect or consequential loss".

111. Having considered the text of clauses 16.2 and 16.3 with care, together with their context within the Reseller Agreements, and applying the principles to which I have referred above, I am satisfied that on a true interpretation of clause 16.2, any liability on the part of Pinewood for breach of the Reseller Agreements (in this case in respect of clause 10.5) giving rise to damage in the form of loss of profit and wasted expenditure falls within the terms of the exclusion.  My reasons are as follows:

112. The language of clause 16.2 is on its face clear and unambiguous – it excludes "in relation to any liability it may have for breach of this Agreement", loss of profit and costs or expenses incurred in reliance on the agreement.  There is no suggestion that the word "breach" is qualified or limited in scope.  Indeed the tenor of clause 16.2 (which also excludes the identified heads of loss for any liability in respect of "negligence under, in the course of or in connection with this Agreement,

misrepresentation in connection with this Agreement or otherwise howsoever arising in connection with this Agreement") is that it is intended to exclude the specified heads of loss arising by reason of any liability on the part of Pinewood (save where that liability is exempt by reason of the provisions of clause 16.1). The obvious implication is that, with the exception of the liability identified in 16.1, the parties were intending to cast the net as widely as possible.

113. I have already rejected the submission that if an exclusion clause is to exclude loss caused by repudiatory breach it must say so in express terms. I bear in mind, however, that the starting presumption is that neither party intends to abandon any remedies arising by operation of law and that clear express words must be used in order to rebut this presumption (see *Gilbert Ash*). The ascertainment of the meaning of apparently clear words is itself a process of contractual construction which requires consideration of those words in their wider context (see *Kudos* at [22]).

114. Mr Sprange drew my attention to the words "made in connection with this agreement" in clause 16.2, suggesting that an analogy could be drawn with the words "in relation to this agreement" used in *Kudos* and that this supports the proposition that, as with *Kudos*, these words mean "in relation to the performance of this agreement" and so do not extend to losses "*suffered in consequence of a refusal to perform or to be bound by the Agreement*" i.e. they do not extend to repudiatory breaches. However, looking very carefully at the wording of clause 16.2, this cannot be correct. The clause excludes the heads of loss identified in (1)-(4) "in relation to any liability it may have for breach of this Agreement" (the word "breach" not being restricted to breach of a particular type); the words "or in connection with this Agreement" then arise in the context of dealing with liability for negligence and for misrepresentation, and then there is a general catch all provision: "or otherwise howsoever arising in connection with this Agreement". Unlike *Kudos*, where the context (including the surrounding provisions and the exclusion of loss suffered by "any third party", which the court determined must be viewed in the context of the obligation to indemnify) persuaded the court of the need to construe the words "in relation to this Agreement" restrictively (effectively by reading in additional words) there is nothing whatever in the wording of clause 16.2 (or any other provision) to suggest a similar approach should be taken here.

115. It is not suggested by PTAP that the loss of profits and wasted costs or expenses claimed in the Particulars of Claim are incapable of falling within the scope of the words used in the clause, save by reference to its secondary case on construction. However, that secondary case is in my view unsustainable on the clear words of clause 16.2. Sub-clauses (1)-(4) make up a series of separate and distinct categories of loss that are to be excluded as is clear from the conjunction "or" before sub-clause (4). There is nothing whatever to indicate that sub-clauses (2)-(4) are intended to be governed by sub-clause (1). The words of clause 16.2 are very different from the clause to which my attention was drawn by PTAP in *2Entertain Video Ltd* (at [218]) which precluded liability for any indirect or consequential loss or damage **including (to the extent only that such are indirect or consequential loss or damage only)** but not limited to loss of profits…" (**emphasis added**). The wording of clause 16.2 does not support the proposition that it was only intended to cover defective performance.

116. Clause 16 viewed as a whole, does not in any way undermine the broad scope of Clause 16.2. The clause is entitled "Liability of Pinewood" and 16.2 is entitled "Excluded

Types of Loss".  These headings are not determinative, but they describe the nature of the clauses to which they relate in clear terms.  If PTAP's narrow construction of the word "breach" (in both clause 16.2 and 16.3) were correct, then it is difficult to see how that would be consistent with the heading to 16.3: "General Liability Limit".

117. There is nothing unusual or odd about the positioning of clause 16.2 in the Reseller Agreements (unlike the clause in *Kudos*) and there is nothing to indicate that the ambit of clause 16.2 was intended to be restricted.  I reject PTAP's submission that clause 16 appears at the end of the Reseller Agreements and so cannot have been intended to have the effect for which Pinewood contends.

118. Of course, if the wording of clause 16.2 appeared to exclude all liability for loss of any type, then that would render otiose the general liability limit in 16.3.  But the fact that it is possible to identify loss which is not excluded by clause 16.2 means that is not the case.  PTAP did not suggest that Pinewood's submissions as to PTAP's pleaded Incurred Loss falling outside the excluded categories of loss in clause 16.2 were wrong.  In the circumstances, the construction for which Pinewood contends is not in any way inconsistent with the provisions of clause 16.3.

119. PTAP made an additional point in respect of clause 16.3, however, submitting that it cannot objectively have been the parties' intention that loss arising out of breaches by Pinewood of clause 10.5 (which would have prevented or significantly reduced the value of the Pinewood User Account Monthly Fees) be restricted to a cap of the yearly average of those fees.  PTAP contends this would be "commercial nonsense" as it would allow Pinewood to benefit from its own breaches.  However, this argument does not seem to me to be open to PTAP in circumstances where the yearly average is taken over "each complete Agreement year to date".  Seen in context, the words "to date" can only be a reference to the date on which the event giving rise to liability occurred – on this construction there can be no question of Pinewood benefiting from any breach.

120. The fact that the language is clear and unambiguous is not, without more, the end of the question.  The words of the exclusion must be read in the context of the whole exclusion clause, the contract as a whole, the material background and circumstances as at the time the Reseller Agreements were entered into having regard to all of the principles to which I have referred.

121. Looking first at the Reseller Agreements in their entirety, PTAP drew my attention only to a couple of provisions which it was said were relevant to the construction of clause 16.2.  The first was clause 10, to which I shall return in a moment because it is better dealt with in a consideration of the overall context of the agreement.  The second was clause 14, which is concerned with termination for cause and includes at clause 14.1 a provision entitled "Repudiatory Breach":

"14.1 Repudiatory Breach

A party may, by Legal Notice to the other party, terminate this Agreement immediately, or on such date as the party terminating may specify in its Legal Notice of termination, if the other party is in repudiatory breach of this Agreement".

122. Clauses 14.2 and 14.3 are concerned with "Remedial Breach" and "Repeated Breach" respectively. Clause 14.5 makes provision for the non-payment of a sum due under the agreement by PTAP to be deemed a "repudiatory breach" of the agreement and thereby to entitle Pinewood to terminate. Mr Sprange submitted that the clear implication was that the parties to the Reseller Agreements were aware of the distinction and that it is to be inferred that Pinewood had used the words "repudiatory breach" deliberately elsewhere whilst at the same time seeking to eviscerate the value of the contract to PTAP by using only the word "breach" in clause 16.2.

123. Whilst there is no doubt that the imbalance in the parties' sizes and bargaining power is a relevant part of the context of this agreement, a possible (wholly unpleaded) deliberate intention somehow to pull the wool over PTAP's eyes is not something to which the court can pay any attention in connection with the exercise of interpretation. This appears to have been suggested for the first time only in submissions. Further, and in any event, the use of the words "repudiatory breach", "remedial breach" and "repeated breach", elsewhere in the Reseller Agreements suggests, to my mind, that the parties were well aware that there could be different species of breach and that these could (if required) be specifically identified; it is unsurprising that this was done in the context of a clause dealing with termination. However, there was no attempt to identify any form of specific breach in clause 16.2. In my judgment this tends to support the proposition that the parties meant to use the umbrella term "breach" to capture all forms of breach.

124. I remind myself that, even where there is an imbalance between the parties, there is no requirement for the court to strain the language if it is clear. PTAP's construction would require the court to read words into clause 16.2 which are not there (whether to facilitate a narrowing of the natural meaning of the word "breach" or to limit the loss falling within 16(2)-(4) to loss falling within the second limb of *Hadley v Baxendale*) and I can see nothing in the surrounding provisions or contractual context to justify that. I repeat that PTAP has not specifically sought to rely upon any factual matrix evidence. As Moore-Bick LJ said at [28] in *Transocean:* "[t]he principle of freedom of contract, which is still fundamental to our commercial law, requires the court to respect and give effect to the parties' agreement".

125. PTAP has one further string to its bow. It contends that Pinewood's construction would leave it with no effective remedy in circumstances where (it is to be assumed for present purposes) Pinewood has breached clause 10.5 of both Reseller Agreements. It says that a broad construction of "breach" deprives the provisions of clause 10.5 of all contractual force, turning them into a mere statement of intent, and that this would apply to any other breach of the Reseller Agreements; the parties cannot have intended such a result. In support of this proposition, PTAP again relies upon *Kudos*, in which the Court of Appeal held that a wide construction of the relevant clause would render the agreement in that case "effectively devoid of contractual content".

126. To address this submission properly, it is important to bear in mind the nature of the Reseller Agreements and in particular the nature of the bargain that the parties were entering into (which I have dealt with in some detail already, and in respect of which Mr Sprange made the submissions I have recorded above). The key rights conferred on PTAP under the Reseller Agreements were those deriving from its appointment as the exclusive reseller of the Pinewood DMS in the specified Territories, including (i)

the right to use the Pinewood DMS to provide services in the Territories and (ii) the right to restrain Pinewood from soliciting for itself customers for the Pinewood DMS in the Territories.  I accept Ms Oppenheimer's submission that those rights were specifically enforceable by PTAP and were not excluded or limited by clause 16.

127. Clause 10.5 was an ancillary obligation on Pinewood, one of a number of "General Obligations" designed to facilitate the functioning of the Reseller Agreements and to assist PTAP to sell user accounts and thereby generate revenue. I accept that there is no reason in principle why the obligations in clause 10.5 could not have been the subject of a claim for specific performance; this is not precluded by clause 16 (which is concerned only with excluding types of loss).  Equally, clause 16.2 does not extend to a claim for direct losses incurred by PTAP in remedying issues caused by any breach by Pinewood of clause 10.5 – i.e. in procuring substitute performance - PTAP's claim for Incurred Costs falls within this category.  Although clause 16.3 may have the effect of limiting such a claim, it does not exclude it altogether and so does not have the effect of denuding Pinewood's obligation under the Reseller Agreements of all meaningful content.  Accordingly I reject PTAP's case that Pinewood's interpretation has the effect of removing all substantive rights and remedies.

128. Further and in any event, the facts of this case are very far from those in *Kudos*. In that case, the fact that the nature of the contract required "daily and detailed cooperation" between the parties (at [17]) was of the utmost significance in the context of the finding of the court that a broad construction of the clause in issue would render the agreement "effectively devoid of contractual content since there is no sanction for non-performance by the respondent" (at [19]). The Reseller Agreements are not premised on the need for cooperation in the same way[1], even if some degree of cooperation is required in relation to the General Obligations provisions at clauses 9 and 10.  This is not a case in which the court would refuse to compel performance of clause 10.5 and I do not consider that it is a case "of last resort" (see *Transocean Drilling* at [27]).  This is certainly not a case where the effect of clause 16.2 is to relieve Pinewood of all liability for breach of its obligations under the Reseller Agreements and nor is it a case where the language of clause 16.2 leaves room for doubt such that a restricted meaning must be given to that clause (*Transocean* at [28]).

129. In all the circumstances, I am going to grant reverse summary judgment in relation to PTAP's claim, save in so far as it has a claim for Incurred Costs – although not formally pleaded in PTAP's Particulars of Claim, this claim has been raised in its Further Information and Reply and Defence to Counterclaim and it appears to be accepted that it has a real prospect of success at trial, subject to the argument that it should be limited in amount pursuant to the true interpretation of clause 16.3.  I was not, however, invited to make any determination in that regard.  I note, however, that the continued potential for a claim for Incurred Costs means that I need to go on to determine the true construction of clause 8.10, notwithstanding that I am going to grant summary judgment in Pinewood's favour.

**Is Pinewood entitled to summary judgment on its Counterclaim?**

---

[1] Mr Sprange said during his submissions that his clients were "surplus to requirements" once they had sold the software to clients.

130. It is common ground that the court must approach a clause said to restrict rights of set off with caution (see *FG Wilson (Engineering) v John Holt & Co* [2012] 2 Lloyds Rep 479 per Popplewell J at [83]). If a set off is to be excluded by contract, clear and unambiguous wording is required. That a set off clause is asymmetrical, as is the case here, can only make the requirement for clear words all the more important.

131. Pinewood says that the wording of clause 8.10 is clear – the requirement to pay Monthly Fees is a requirement that they be paid "in full" without set off. There is nothing in the clause to suggest that this wording should apply to legal as opposed to equitable set off as a matter of language and no commercial reason why the parties should have intended the reference to "set off" to be limited to legal as opposed to equitable set off. Even if equitable set off was not included within the concept of "set off", it would plainly be included within the broader concepts of "withholding" or "deductions".

132. That the reference to "set off" must ordinarily include equitable set off is put beyond doubt by the decision of the Court of Appeal in *FG Wilson (Engineering) v John Holt & Co* [2014] 1 WLR 2365, where Longmore LJ said pithily at [36] "the average businessman who was told that a clause of this kind applied to legal set offs but not equitable set offs would hardly be able to contain his disbelief".

133. However, PTAP makes a different point by reference to the language of the clause. It submits that clause 8.10 is primarily concerned with prohibiting the deduction of taxes, charges and other duties from amounts payable by PTAP to Pinewood, hence the words "including in respect of taxes, charges and other duties" in the clause.

134. I can see no basis for the construction advanced by PTAP. Clause 8.10 provides that payment "shall be made in full without withholding deduction or set off, **including** in respect of taxes, charges and other duties" (**emphasis added**). I agree with Pinewood that it is plain from the use of the word "including" that "taxes, charges and other duties" are not exhaustive of the items which may not be withheld, deducted or set off against User Account Monthly Fees. Not only does this appear to me to be obvious as a matter of ordinary language, but it is made even clearer by clause 1.2(e) of the Reseller Agreements which provides that "the word 'including' shall be deemed to be followed by '(without limitation)'". At no time has it been suggested that there is any factual matrix evidence relevant to this issue.

135. In my judgment, Pinewood is entitled to judgment on its Counterclaim.

**Conclusion**

136. The SJ Application succeeds for the reasons set out above. The PTAP Application is dismissed.

137. I shall hear from the parties as to the form of order that must follow this judgment. In particular I invite them to consider how the claim for Incurred Costs (not yet included in the Particulars of Claim) is to be advanced.